UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
CIVIL ACTION NO.: **1:09-CV-00071**

| | | |
|---|---|---|
| JAMES L. PHILLIPS, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | |
| Plaintiff, | ) ) | **REPLY BRIEF IN FURTHER SUPPORT OF DEFENDANTS' MOTION TO DISMISS** |
| v. | ) ) | |
| TRIAD GUARANTY INC., MARK K. TONNESEN, and KENNETH W. JONES, | ) ) ) | |
| Defendants. | ) ) | |

_____

# Table of Contents

**Page**

Table of Authorities ............................................................................................. iii

I.    Alleged Misrepresentations About the Risk to Capital Ratio And
      Statutory Contingency Reserves Cannot Support a Fraud Claim. ............... 1

II.   Any Alleged Misrepresentations  About GAAP Loan Loss Reserves
      Cannot Support a Fraud Claim. .................................................................. 3

      A.    Plaintiffs Fail Adequately To Allege  Any False Statements
            About Triad's GAAP Loan Loss Reserves. ...................................... 3

      B.    Alleged Misrepresentations About the Adequacy of GAAP
            Loan Loss Reserves and Capitalization Fall Within the Safe
            Harbor. ............................................................................................ 4

III.  Alleged Misrepresentations and Omissions About the Sufficiency
      Of Premiums in Light of the Risks Cannot Support a Fraud Claim............. 6

IV.   Alleged Misrepresentations and Omissions About Purported
      Manipulation of Internal Risk Models,  And Loan Quality Cannot
      Support a Fraud Claim. ............................................................................... 9

V.    Alleged Misrepresentations About the Adequacy Of Internal
      Controls Cannot Support a Fraud Claim..................................................... 10

VI.   Many of the Alleged Misrepresentations Are Inactionable Puffery........... 11

VII.  Plaintiffs Fail Adequately To Allege Scienter. ......................................... 12

      A.    Plaintiffs' Theory Ascribes Irrational Behavior to Defendants....... 12

      B.    Plaintiffs Improperly Attempt To Plead Scienter By
            Hindsight........................................................................................ 13

      C.    Plaintiffs Fail Adequately To Plead Scienter Based on
            Alleged Contrary Information Available to Defendants  Or
            Supposed Red Flags Raised by Confidential Witnesses. ................ 13

      D.    The Core Operations Doctrine Is Inapplicable to Plaintiffs'
            Allegations. .................................................................................... 15

E.    This Court May Take Judicial Notice of Defendants' Stock
      Purchases. ...................................................................................... 16

VIII.  Plaintiffs Fail Adequately To Allege Loss Causation. .............................. 16

Conclusion......................................................................................................... 19

# Table of Authorities

**Page(s)**

## CASES

*Atlas* v. *Accredited Home Lenders Holding Co.*,
    556 F. Supp. 2d 1142 (S.D. Cal. 2008) ............................................................... 14

*Cozzarelli* v. *Inspire Pharm. Inc.*,
    549 F.3d 618 (4th Cir. 2008)............................................................................... 16

*Ellington Mgmt. Group, LLC* v. *Ameriquest Mortgage Co.*,
    2009 WL 3170102 (S.D.N.Y. 2009) ................................................................... 15

*Harris* v. *Ivax Corp.*,
    182 F.3d 799 (11th Cir. 1999)............................................................................... 6

*In re Inspire Pharm., Inc., Sec. Litig.*,
    515 F. Supp. 2d 631 (M.D.N.C. 2007) ............................................................... 16

*Johnson* v. *Pozen Inc.*,
    2009 WL 426235 (M.D.N.C. 2009) ..................................................................... 5

*In re K-tel Int'l, Inc. Sec. Litig.*,
    300 F.3d 881 (8th Cir. 2002).................................................................................. 1

*In re Lab. Corp. of Am. Holdings Sec. Litig.*,
    2006 WL 1367428 (M.D.N.C. 2006) ................................................................... 5

*Laborers Pension & Welfare Fund* v. *Omnicare, Inc.*,
    2009 WL 3365189 (6th Cir. 2009)..................................................................... 18

*Lentell* v. *Merrill Lynch & Co.*,
    396 F.3d 161 (2d Cir. 2005)............................................................................... 18

*Luminent Mortgage Capital, Inc.* v. *Merrill Lynch & Co.*,
    2009 WL 2590087 (E.D. Pa. 2009)............................................................. 13, 18

*McAdams* v. *McCord*,
    2009 WL 3350036 (8th Cir. 2009)..................................................................... 18

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*,
    568 F. Supp. 2d 349 (S.D.N.Y. 2008) ............................................................... 17

*Miller* v. *Champion Enters. Inc.*,
    346 F.3d 660 (6th Cir. 2003)................................................................................. 6

*In re Mut. Funds Inv. Litig.*,
    566 F.3d 111 (4th Cir. 2009).............................................................. 16

*Nathenson* v. *Zonagen Inc.*,
    267 F.3d 400 (5th Cir. 2001).............................................................. 15

*Ottmann* v. *Hanger Orthopedic Group, Inc.*,
    353 F.3d 338 (4th Cir. 2003).............................................................. 12

*In re PEC Solutions, Inc. Sec. Litig.*,
    418 F.3d 379 (4th Cir. 2005).............................................................. 10

*Plumbers' Union Local No. 12 Pension Fund* v. *Nomura Asset Acceptance Corp.*,
    2009 WL 3149775 (D. Mass. 2009)................................................... 13

*In re PXRE Group, LTD, Sec. Litig.*,
    600 F. Supp. 2d 510 (S.D.N.Y. 2009) ................................................ 6

*In re Rhodia S.A. Sec. Litig.*,
    531 F. Supp. 2d 527 (S.D.N.Y. 2007) .............................................. 19

*Shapiro* v. *UJB Fin. Corp.*,
    964 F.2d 272 (3d Cir. 1992)................................................................ 4

*Southland Sec. Corp.* v. *INSpire Ins. Solutions, Inc.*,
    365 F.3d 353 (5th Cir. 2004)................................................................ 6

*Stevens* v. *InPhonic, Inc.*,
    2009 U.S. LEXIS 94571 (D.D.C. 2009) ........................................... 16

*Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ......................................................................... 10

*In re The First Marblehead Corp. Sec. Litig.*,
    639 F. Supp. 2d 145 (D. Mass. 2009)................................................ 10

*In re The PMI Group*,
    2009 WL 3681669 (N.D. Cal. 2009) ................................................. 14

*In re VeriFone Sec. Litig.*,
    11 F.3d 865 (9th Cir. 1993) .............................................................. 10

*Zucco Partners, LLC* v. *Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009)............................................................ 15

## STATUTES

15 U.S.C. § 78u-5(e) ................................................................................ 4

iv

# I.   Alleged Misrepresentations About the Risk to Capital Ratio And Statutory Contingency Reserves Cannot Support a Fraud Claim.

Plaintiffs argue that, as a result of purported underpricing of its insurance policies, Triad's publicly reported risk-to-capital ratio was misleadingly low and that the company's statutory contingency reserves were misstated. (Op. 6, 11-12.)[1] But plaintiffs fail to allege how these figures were inaccurate. Nor do they adequately allege that underpricing premiums – intentional or otherwise – could have had the results that they claim. Plaintiffs thus fail to allege with particularity why Triad's statutory contingency reserves or risk-to-capital ratio were false or misleading. *E.g., In re K-tel Int'l, Inc. Sec. Litig.*, 300 F.3d 881, 892 (8th Cir. 2002).

Triad's risk-to-capital ratio is calculated pursuant to a formula established by state insurance regulatory agencies – total risk divided by total capital. (Mot. 19.)[2] The inputs to the calculation are objectively determined: the "total risk" is Triad's total exposure on all insured loans – that is, the total amount Triad would have to pay if every single insured loan defaulted. The "total capital" is all of the funds Triad has available to pay claims. In their answering brief on this motion, plaintiffs do not dispute the formula. And like the complaint, the answering brief does not – and cannot – allege facts showing that Triad misstated its total exposure on all insured loans or the amount of capital available to pay claims. (*Id.*)

---

[1]   References to Plaintiffs' Opposition to Defendants' Motion To Dismiss are cited herein as (Op. __).

[2]   References to the Brief in Support of Defendants' Motion to Dismiss are cited herein as (Mot. __).

1

Additionally, in light of the undisputed nature of a risk-to-capital calculation, plaintiffs' contention that underpricing of premiums somehow led to an understated risk-to-capital ratio (Op. 12) is incorrect and misunderstands what the risk-to-capital ratio represents. For purposes of the risk-to-capital ratio, the "risk" attributable to a highly risky $100,000 loan and a very safe $100,000 loan (assuming that the insurer has agreed to cover 100 percent of the defaulting loan in each case) is the same – $100,000. That amount is the numerator of the risk-to-capital ratio. If, as plaintiffs allege, Triad charged too little for a particular loan given the risk profile of that loan, the effect would have been to *reduce* the amount of Triad's capital (the denominator of the ratio) without affecting Triad's "risk" (the numerator). As a matter of simple arithmetic, this would *increase* the risk to capital ratio as a whole, *not* decrease it. Thus, setting premium prices "too low" could not possibly reduce the risk-to-capital ratio as plaintiffs contend – doing so would have the opposite effect.[3] And the risk-to-capital ratio by definition is *not* a predictor of how many insured loans will ultimately become claims, or of the likely amount of those claims. Accordingly, it says nothing about the relative riskiness of the loans insured by Triad.

Triad's statutory contingency reserve is calculated pursuant to a formula imposed, as its name implies, by state insurance law. Triad was required to reserve 50% of actual premiums paid to the company. Plaintiffs do not contend that Triad

---

[3] For example, if a $100,000 mortgage was 100% insured at the "proper price" of $20,000, the risk to capital ratio would be $100,000/$20,000 = 5. If the same loan was 100% insured at the "improperly low" price of $10,000, the risk to capital ratio would be $100,000/$10,000 = 10. This example demonstrates that alleged underpricing would *increase* the risk to capital ratio.

2

failed to follow the statutory mandate or to calculate its statutory reserves correctly. Thus, no misstatement has been identified in the complaint. (Mot. 18.) And to the extent that plaintiffs seek to state a claim based on the premise that Triad's statutory contingency reserves falsely suggested that the company was well capitalized and its reserves "sufficient" (Op. 9), such a claim fails because plaintiffs have not pleaded that those reserves reflect anything more than a portion of the company's total capital.

## II. Any Alleged Misrepresentations About GAAP Loan Loss Reserves Cannot Support a Fraud Claim.

### A. Plaintiffs Fail Adequately To Allege Any False Statements About Triad's GAAP Loan Loss Reserves.

Plaintiffs appear to concede that their complaint is not about any alleged misstatement of Triad's GAAP loan loss reserves. (Op. 12 n.9.) As Triad's moving brief explained – and as plaintiffs do not dispute – under the relevant accounting rules those reserves may be taken only for loans actually in default and reflect Triad's estimate of the cost of paying claims solely on those defaulted loans. The complaint does not allege (even generally) that Triad's estimates of the costs of paying such claims were incorrect and thus does not allege that Triad's GAAP loan loss reserves were false or misleading. (Mot. 22-24.) Significantly, Triad's GAAP loan loss reserves have nothing to do with the premiums it charged for policies. Indeed GAAP loan loss reserves are (by their nature) calculated only after the loans go into default, long *after* the premiums are negotiated. Thus, reducing premiums could have had absolutely no effect on the size of Triad's GAAP loan loss reserves.

3

Moreover, determining the adequacy of a company's GAAP loan loss reserves is a matter of judgment. If a company's reserves turn out to be insufficient, an investor might have a claim for mismanagement but not for securities fraud. (*Id.* at 26-27.) The cases relied upon by plaintiffs (Op. 19) do not support their position that misrepresentations related to alleged mismanagement can support a securities fraud claim. In each case in which the court found that the plaintiffs had stated a claim, they had alleged facts showing that the defendants did not believe their public statements at the time they spoke. Notably, in one of the cases relied on by plaintiffs, the court held that the defendants' failure to disclose that loan loss reserves would be inadequate was not actionable because the plaintiffs had not alleged that defendants had specifically forecasted that possibility. *Shapiro* v. *UJB Fin. Corp.*, 964 F.2d 272, 283 (3d Cir. 1992). Plaintiffs here fail adequately to plead that defendants knew their statements to be false or spoke with reckless indifference to the truth. Instead, plaintiffs point only to disagreements about business judgments, which cannot support a securities fraud claim. (Mot. 26-27.)

B.     Alleged Misrepresentations About the Adequacy of GAAP
       Loan Loss Reserves and Capitalization Fall Within the Safe Harbor.

Alleged misrepresentations concerning GAAP loan loss reserves and capitalization are not actionable for the independent reason that such statements are forward-looking and thus fall within the PSLRA safe harbor. (Mot. 23-24.) The question of whether defendants' statements fall within the PSLRA safe harbor is susceptible of determination on a motion to dismiss. 15 U.S.C. § 78u-5(e)

4

(instructing courts to consider "any cautionary statement accompanying the forward-looking statement" on a motion to dismiss). Many district courts in this Circuit have granted motions to dismiss when the alleged misstatements fell within the PSLRA safe harbor. *E.g.*, *Johnson* v. *Pozen Inc.*, 2009 WL 426235, *21 (M.D.N.C. 2009).

Triad's GAAP reserves were forward-looking. As the company explained: "The estimation of loss reserves requires assumptions as to future events, and there are inherent risks and uncertainties involved in making these assumptions." (Ex. 5, 2006 10-K at 20.)[4] Triad's statements about its loan loss reserves were accompanied by meaningful cautionary language that conveyed "substantive information about factors that realistically could cause results to differ materially from those projected in the forward-looking statements." *In re Lab. Corp. of Am. Holdings Sec. Litig.*, 2006 WL 1367428, at *5 (M.D.N.C. 2006); Mot. 24. Triad clearly identified specific factors that could cause its loan loss reserves to prove inadequate:

> To the extent that possible future adverse economic conditions such as increasing unemployment rates or declining housing prices alter . . . historical frequency and severity patterns, actual paid claims on the existing delinquent loans may be greater than the reserves that we have provided and require a charge to earnings. (Ex. 5, 2006 10-K at 20.)

Although plaintiffs assert that defendants knew their statements about reserves were false and therefore fall outside the safe harbor (Op. 17), they do not plead falsity with particularity. The mere fact that reserves turned out to be

---

[4] Citations to "Ex. __" are to exhibits to the Declaration of Robyn F. Tarnofsky in Support of Defendants' Motion To Dismiss Dated August 21, 2009.

inadequate cannot support a claim that they were originally calculated without a good faith basis. *E.g.*, *In re PXRE Group, LTD, Sec. Litig.*, 600 F. Supp. 2d 510, 534 (S.D.N.Y. 2009). And where as here, forward-looking statements are accompanied by meaningful cautionary language, they fall within the safe harbor even if they are false. *E.g.*, *Southland Sec. Corp.* v. *INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 371 (5th Cir. 2004); *Miller* v. *Champion Enters. Inc.*, 346 F.3d 660, 672 (6th Cir. 2003); *Harris* v. *Ivax Corp.*, 182 F.3d 799, 803 (11th Cir. 1999).

## III.  Alleged Misrepresentations and Omissions About the Sufficiency Of Premiums in Light of the Risks Cannot Support a Fraud Claim.

Plaintiffs contend that defendants misrepresented that Triad's premiums were adequate in light of the risks assumed by the company, pointing to two types of statements – that Triad believed it was being appropriately compensated for the risks it took on (Op. 15, 21, citing ¶¶ 71, 89, 116) and that Triad's objective was prudent and profitable growth (*id.* citing ¶¶ 52, 102, 109, 137). But these statements do not provide a basis for plaintiffs' securities fraud claims, because plaintiffs do not plead falsity with the requisite particularity.

Plaintiffs attempt to plead falsity based on allegations that confidential witnesses had raised "significant concerns" with defendants about adjustments made to internal risk models. But the confidential witnesses' alleged concerns do not demonstrate that management intentionally or recklessly priced Triad's premiums too low to cover the predicted cost of paying out claims, or that Triad's goal was anything other than prudent and profitable growth. Nor do the confidential witnesses'

6

recommended changes to Triad's internal risk model provide support for plaintiffs' theory: all of the suggestions alleged are, at most, in the nature of potential improvements to the model, such as the preferred software to use and the types of documentation that should be created and maintained for particular deals. (Cmplt. ¶¶ 57-58.) Plaintiffs confuse disagreements over how best to improve the internal risk models and calculate premiums – an issue of business judgment which cannot support a claim of securities fraud (Mot. 27-28) – with allegations that the premium levels were objectively unreasonable when they were set. (*Id.*)

In their brief, plaintiffs argue that outside consultants hired by the company confirmed that Triad's internal risk models were being manipulated. (Op. 13.) But the complaint pleads nothing of the sort: it alleges only that the consultants "validated" the work previously done by confidential witnesses – which itself did not suggest fraud – and instructed the company on how to allocate capital. (Cmplt. ¶ 59.)

Plaintiffs also contend that an alleged after-the-fact statement by Triad Chairman Will Ratliff in December 2007 that CW5 "was absolutely right about the Company's inadequate reserves" (*id.* ¶ 49) supports their claim that Triad's pricing was known to be too low to cover expected costs at the time the premiums were negotiated and that Triad was knowingly engaging in imprudent growth. (Op. 20.) But the alleged statement reflects nothing more than an acknowledgement that, in hindsight, Triad's reserves had proved to be insufficient due to the onset of the worst downturn in the housing market since the Great Depression following Defendants' optimistic statements about the company.

7

Plaintiffs make the further argument that, once defendants chose to speak about the pools of relatively new types of loans, they were obligated to provide the "full truth" and make clear that the premiums would be inadequate to cover the costs of paying out claims. (*Id.* 13.) This argument too cannot stand in light of plaintiffs' failure adequately to plead that, at the time the premiums were set, defendants knew or recklessly disregarded that they would be too low to cover the predicted costs of paying claims. *See supra* p. 7.

The statement that Triad's management believed that the company was being appropriately compensated for the risk it took on is not actionable for the additional reason that it falls within the PSLRA safe harbor for forward-looking statements. Because the cost of paying the claims on loans in a particular pool is not knowable at the time premiums are set, statements about the adequacy of the compensation Triad received for the risk it took on were necessarily forward-looking. And such statements were accompanied by meaningful cautionary language. Triad made clear that products such as non-prime loans, ARMs and Alt-A loans were relatively new to the market and therefore did not have long-term historical performance data associated with them. (Ex. 5, 2006 10-K at 21.) In the absence of a track record, as Triad warned, the company simply could not "be sure that the premiums including the additional risk charge that we apply to non-prime, ARMs, and Alt-A loans will adequately offset the associated risk, which could adversely impact operating results." (*Id.*)

8

## IV. Alleged Misrepresentations and Omissions About Purported Manipulation of Internal Risk Models, And Loan Quality Cannot Support a Fraud Claim.

Plaintiffs allege that Triad justified undercharging for premiums by manipulating its internal risk models and that as a result, it "presented lower quality loans as high-quality loans." (Op. 9, 11, 26-28.) These allegations cannot support a claim of securities fraud. With respect to the purported manipulation of internal risk models, plaintiffs never identify any public disclosures of the results of the company's internal modeling and therefore fail to identify any public misstatements of those results. Accordingly, the supposed manipulation of internal risk models cannot serve as the predicate for plaintiffs' fraud claims.

On the issue of loan quality, plaintiffs' contention that alleged underpricing made the loan portfolio seem less risky (*id.* at 11-12) is a conclusion without a factual basis, because Triad never disclosed the premiums charged for particular pools of loans and made no representations about how the premiums charged related to the perceived riskiness of the loan pools. Nor can plaintiffs' related argument – that defendants' comments that they believed that the company had a high quality portfolio were false when made (*id.*) – support plaintiffs' fraud claims, because plaintiffs fail to plead concrete facts demonstrating that such statements were false when made. (*See supra* p. 7.) Further, the argument that either defendants' alleged statements about the quality of the loan portfolio or purported underpricing made the loan portfolio seem less risky than it was cannot support a claim of securities fraud in light of the detailed objective information on the actual

risks in the loan portfolio – including information on FICO credit scores, geographical concentration, loan-to-value ratios, numbers of Alt-A loans and numbers of adjustable rate loans – provided in the company's public filings. (Reply Ex. A, 2006 10-K at 13, 34, 37.)[5] Notably, plaintiffs do not assert that any of this information was incorrect or misstated. The objective data provided investors with the material information necessary to evaluate the riskiness of the loans insured by the company. *E.g., In re VeriFone Sec. Litig.,* 11 F.3d 865, 869 (9th Cir. 1993) (once the market has accurate data, investors can make their own predictions); *In re The First Marblehead Corp. Sec. Litig.*, 639 F. Supp. 2d 145, 155-63 (D. Mass. 2009) (disclosures regarding FICO scores, credit criteria, default rates and associated risks went to the heart of plaintiff's fraud theory and negated claims of falsity).

## V. Alleged Misrepresentations About the Adequacy Of Internal Controls Cannot Support a Fraud Claim.

Plaintiffs contend that statements that Triad had comprehensive audit procedures to evaluate underwriting decisions, along with defendants' Sarbanes-Oxley certifications of the adequacy of the company's internal controls, were false. (Op. 11, citing Cmplt. ¶ 89.) Plaintiffs plead no facts suggesting that Triad did not make use of thorough audit procedures that justified the Sarbanes-Oxley certifications. Rather, plaintiffs' theory appears to be that, because Triad's internal

---

[5]    This exhibit is attached to the Reply Decl. of Robyn Tarnofsky in Further Support of the Motion to Dismiss Dated Nov. 19, 2009. The Court may consider these materials on a motion to dismiss because the complaint incorporated them by reference (*see* Cmplt. ¶¶ 89, 91). *Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *In re PEC Solutions, Inc. Sec. Litig.*, 418 F.3d 379, 390 n.10 (4th Cir. 2005).

controls supposedly were insufficient to detect the manipulation of risk models alleged in the complaint, it follows that defendants' statements about the strength of the company's internal controls were false and misleading. (*Id.*) But as set forth above, *see supra* p. 7, plaintiffs fail adequately to plead facts supporting the premise that defendants knowingly or recklessly used improper inputs to the models, and thus plaintiffs' conclusion that defendants misrepresented the strength of Triad's internal controls fails as well.

## VI.    Many of the Alleged Misrepresentations Are Inactionable Puffery.

Plaintiffs contend that courts no longer grant motions to dismiss on the ground that the alleged misrepresentations were mere puffery. (Op. 18.) This argument is incorrect in this jurisdiction. (Mot. 25-26.) Plaintiffs also assert that any puffing statements made by the defendants fell within "larger statements" containing "both historical and forward-looking" information. (Op. 18 & n.14.) Plaintiffs, however, fail to back up this assertion by pointing to any statements set forth in the complaint where the puffery was part of a "larger" and more concrete statement.

Plaintiffs' fall-back position is that opinions and beliefs (and therefore puffing statements) may be actionable. (*Id.*) This is correct, but only if the plaintiff has alleged facts showing that the defendants possessed information at the time they made the puffing statements demonstrating that they had no good faith basis for making those statements. Because the complaint alleges no such facts (*see supra* p. 7), this argument is inapposite here.

# VII. Plaintiffs Fail Adequately To Allege Scienter.

As set forth in defendants' opening brief, the Court should dismiss the complaint for the independent reason that plaintiffs fail to allege any facts supporting a cogent and compelling inference that defendants acted with scienter. (Mot. 10-17.) Plaintiffs' opposition brief fails to show why their proffered inference – that defendants deliberately or recklessly manipulated risk models in order to justify underpricing policies – is plausible, let alone that it is as cogent or compelling as an inference that Triad set prices reasonably but was forced to go into runoff mode as a result of the worst downturn in the housing market since the Great Depression.

## A. Plaintiffs' Theory Ascribes Irrational Behavior to Defendants.

Plaintiffs argue that their theory of the case is compelling because it makes sense for a company to want to grow market share. (Op. 24 & n.21.) But a plaintiff may not plead scienter by alleging that the defendants had a motive, such as increasing sales, that would apply equally to any officer of any corporation. *E.g., Ottmann* v. *Hanger Orthopedic Group, Inc.*, 353 F.3d 338, 352 (4th Cir. 2003).

Moreover, it would have been irrational for Triad to try to grow market share by underpricing its contracts and to ignore that, as a consequence of this pricing policy, it would be in serious financial trouble in the event of an economic downturn. (Mot. 12-14.) Ascribing irrational behavior to defendants does not support a strong inference of scienter. (*Id.*) But even if Triad did want to act against its economic interest by underpricing policies, defendants would have had no reason to manipulate Triad's internal models to justify so doing. Plaintiffs never allege that Triad's

12

premiums were a mechanical function of the results of its internal modeling. Defendants therefore would have had no reason deliberately or recklessly to choose unreasonable inputs to the models in order to understate the anticipated risk for a particular pool of loans. (*Id.*) Notably, plaintiffs make no response to this argument.

B.    Plaintiffs Improperly Attempt To Plead Scienter By Hindsight.

Plaintiffs argue that scienter can be inferred from the fact that Triad's premiums turned out to have been too low. (Op. 24.) But plaintiffs cannot plead fraud by hindsight. *E.g., Plumbers' Union Local No. 12 Pension Fund* v. *Nomura Asset Acceptance Corp.*, 2009 WL 3149775 (D. Mass. 2009) (dismissal required where complaint pleads only subsequent developments in an effort to show that the eventualities were known or knowable to defendants in advance). Plaintiffs' position fails to take into account the virtually unprecedented severity of the recent downturn in the housing market. No one could have predicted such a downturn, and no one in the mortgage insurance industry or the broader financial services industry planned for it. As a result, the entire mortgage insurance industry – not just Triad – was hard hit. *E.g.*, *Luminent Mortgage Capital, Inc.* v. *Merrill Lynch & Co.*, 2009 WL 2590087, *1 (E.D. Pa. 2009) (noting "historically unprecedented declines").

C.    Plaintiffs Fail Adequately To Plead Scienter Based on
       Alleged Contrary Information Available to Defendants
       Or Supposed Red Flags Raised by Confidential Witnesses.

Plaintiffs allege that defendants must have had the requisite scienter in connection with their statements about pricing, reserves and capitalization because they supposedly had access to contrary information and because the confidential

13

witnesses raised red flags. (Op. 26-28.) But as set forth above, the alleged statements by confidential witnesses merely concern disagreements over business judgments. *See supra* p. 7. Such disagreements cannot support claims of scienter. (Mot. 26-29.)

Nor do plaintiffs make any allegations of concrete facts to support their contention that defendants had access to contrary information showing the falsity of defendants' public statements. (Op. 26.) Claiming that defendants had access to reports reflecting Triad's reserve levels does not demonstrate either that the reserves were in fact too low or that defendants had reason to believe they were too low.

Plaintiffs' citation to *Atlas* v. *Accredited Home Lenders Holding Co.*, 556 F. Supp. 2d 1142 (S.D. Cal. 2008), provides them no support. Nor does the recent order denying the defendants' motion to dismiss the amended complaint in *In re The PMI Group Sec. Litig*, a case involving another mortgage insurer. The *Atlas* plaintiffs alleged that the defendants had access to reports reflecting frequent "management overrides of underwriters' rejections of loans for failing to comply with the company's underwriting criteria" and detailing the "adverse effects" such practices had on the company. *Atlas,* 556 F. Supp. 2d at 1156. Similarly, the *PMI* plaintiffs alleged that the company had regularly generated reports demonstrating that the company's delegated underwriters routinely performed below the company's standards and that as a result the company was suffering mounting losses. *In re The PMI Group,* 2009 WL 3681669, *3 (N.D. Cal. 2009). Plaintiffs here plead no comparable facts concerning the "Monthly Claim Payments and Pipeline Detail Report" allegedly received by the individual defendants: plaintiffs do not, for

14

example, allege that the report reflected a failure to comply with any internal policies or that delegated underwriters failed to meet the company's standards.

*In re The PMI Group* is also distinguishable from this case in that the plaintiffs there alleged that the defendants, by virtue of their positions, knew or should have known about actual undisclosed losses at a company controlled by PMI. Plaintiffs here merely allege that defendants failed to act on business policy concerns expressed by confidential witnesses, which does not demonstrate that the defendants had actual knowledge that any of their statements were false; indeed, such behavior does not qualify even as the "extreme departure from the standards of ordinary care" required to plead recklessness. *Ellington Mgmt. Group, LLC* v. *Ameriquest Mortgage Co.*, 2009 WL 3170102, *2 (S.D.N.Y. 2009); *Zucco Partners, LLC* v. *Digimarc Corp.*, 552 F.3d 981, 991, 999 (9th Cir. 2009).

D.    The Core Operations Doctrine
       Is Inapplicable to Plaintiffs' Allegations.

Plaintiffs contend that defendants must have known that they were making false statements about the adequacy of capitalization, reserves and the underwriting processes; about the strength of revenue growth and internal controls; and about the quality of the company's loans because these areas are "core" to defendants' business.  (Op. 24-25.)  Plaintiffs misunderstand the "core operations doctrine," which simply permits an inference that individual defendants were aware of statements made by others at the company about the company's core operations. *E.g., Nathenson* v. *Zonagen Inc.*, 267 F.3d 400, 425 (5th Cir. 2001).  The doctrine has

nothing to do with pleading *falsity*. Plaintiffs' interpretation of the "core operations" doctrine would eviscerate the requirement of pleading scienter with specificity.

And contrary to plaintiffs' argument (Op. 25 n.22), the individual defendants' Sarbanes-Oxley certifications do not support a conclusion that defendants acted with scienter. *Cozzarelli* v. *Inspire Pharm. Inc.*, 549 F.3d 618, 628 n.2 (4th Cir. 2008); *Stevens* v. *InPhonic, Inc.*, 2009 U.S. LEXIS 94571 (D.D.C. 2009).

E.     This Court May Take Judicial
       Notice of Defendants' Stock Purchases.

This Court may take judicial notice of stock purchases: district courts throughout the Fourth Circuit routinely consider stock purchases and sales in connection with motions to dismiss. *E.g.*, *In re Inspire Pharm., Inc.*, *Sec. Litig.*, 515 F. Supp. 2d 631, 640 (M.D.N.C. 2007). The only case cited by plaintiffs in support of their position is an unpublished decision from another jurisdiction. (Op. 30.) Defendants' stock purchases contradict plaintiffs' theory of scienter. (Mot. 16.)

## VIII.  Plaintiffs Fail Adequately To Allege Loss Causation.

Plaintiffs fail adequately to allege loss causation because they never identify concrete allegations showing that either the materialization of an undisclosed risk or a corrective disclosure was a "substantial" factor in the drop in the company's stock price. *E.g., In re Mut. Funds Inv. Litig.*, 566 F.3d 111, 128 (4th Cir. 2009).

In the first instance, plaintiffs fail to identify any corrective disclosures, or the materialization of undisclosed risks, prior to August 27, 2007 (Mot. 33) – by which time the company's stock had fallen from a class period high of $58.62 to

16

$25.88. (Ex. 13, Bloomberg Stock Chart for Triad.) Thus, plaintiffs must be deemed to have conceded that defendants cannot be responsible for any losses investors may have sustained due to a decline in Triad's stock price prior to August 27.

Plaintiffs do point to four alleged corrective disclosures or the materialization of undisclosed risks on or after August 27, but none of the statements reflects either a corrective disclosure or the materialization of a previously undisclosed risk. To the contrary, each of the statements reflects the materialization of a previously *disclosed* risk (Mot. 35-38), which cannot support an allegation of loss causation. *E.g., In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 568 F. Supp. 2d 349, 361-363, 365 (S.D.N.Y. 2008).

Plaintiffs argue that the alleged revelations they have identified need not precisely mirror the alleged misrepresentations and omissions. (Op. 40.) True enough, in the abstract. But the new information must relate back to the alleged misrepresentations. (Mot. 34-35.) Plaintiffs fail to plead facts indicating how *any* of the identified disclosures – of the drawdown of the credit facility; of losses in the third quarter of 2007; of losses in the fourth quarter of 2007; and of the likely runoff of the business – relates to information that plaintiffs say was misrepresented or omitted. (*Id.* 35-38.) Plaintiffs' contention that analysts confirmed that the drawdown of the credit facility was related to the fraud alleged by plaintiff (Op. 39, citing Cmplt. ¶¶ 123, 125) mischaracterizes both the complaint and the analysts' reports cited therein. The Bear Stearns report merely warns of the possibility of a downgrade by the ratings agencies, and the Fitch Report announces a downgrade.

17

(Cmplt. ¶¶ 123, 125.) Neither report refers to any corrective disclosures or to the materialization of any previously undisclosed risks. (Ex. 15, Bear Stearns Report at 15; Ex. 16, Fitch Report.) In fact, Fitch attributed the downgrade to a combination of changes to its model "in light of the rapidly changing U.S. mortgage environment" and increased leverage at Triad due to its drawdown of the credit facility. (*Id.*)

Plaintiffs go on to argue that they may not be "required to rule out all other factors that contributed to a security's lower price in order to plead loss causation." (Op. 38 n.33.) Again, this is a correct statement of the law as an abstract matter. But a plaintiff is required to plead "facts, which, if proven, would show that its loss was caused by the alleged misstatements as opposed to intervening events." *Lentell* v. *Merrill Lynch & Co.*, 396 F.3d 161, 174 (2d Cir. 2005).[6] Numerous courts have considered "marketwide phenomenon" such as the current global financial crisis in holding that plaintiffs have not adequately pleaded loss causation. *E.g., id.*[7] Plaintiffs neglect to identify any concrete facts showing that their losses were caused by the claimed misstatements or omissions as opposed to the downturn in the market.

Plaintiffs also argue that the disclosures they have identified are sufficient because each of them should properly be viewed as a partial disclosure. (Op. 35-37.) Defendants do not dispute that a plaintiff need not allege that the truth about a company was disclosed all at once; the law clearly allows plaintiffs to plead

---

[6] *See also Laborers Pension & Welfare Fund* v. *Omnicare, Inc.*, 2009 WL 3365189, *7 (6th Cir. 2009); *McAdam*s v. *McCord*, 2009 WL 3350036, *3 (8th Cir. 2009).

[7] *See also Luminent Mortgage Capital, Inc.* v. *Merrill Lynch & Co.*, 2009 WL 2590087, *14 (E.D. Pa. 2009); Mot. 38-39 (citing cases).

loss causation based on partial disclosures. But each partial disclosure must relate to the alleged fraud in some way. The cases cited by plaintiffs (*see id.*) do not support their argument. In those cases, while the individual statements alleged to have caused the plaintiffs' losses may not have fully revealed the alleged fraud, the statements clearly were related to it. By contrast, in this case, plaintiffs have failed to plead that the supposed manipulation of Triad's risk models in order to underprice insurance premiums was *ever* revealed to the market; nor have plaintiffs pleaded that alleged misrepresentations concerning risk-to-capital ratios, loan loss reserves, or loan quality were ever revealed to have been false when made. "Disclosure of financial losses generally – even if those financial losses are a result of the specific concealed fact – is not sufficient" to plead loss causation. *In re Rhodia S.A. Sec. Litig.*, 531 F. Supp. 2d 527, 545 (S.D.N.Y. 2007). The statements identified by plaintiffs in their opposition papers simply do not qualify as partial disclosures.

Plaintiffs' final argument, that the court should look not at specific alleged corrective disclosures and their relationship to stock price, but rather should examine the stock's general trajectory (Op. 39), finds no support in this jurisdiction.

## Conclusion

For these reasons and the reasons set forth in defendants' opening brief, the Court should grant defendants' motion to dismiss the case.

Dated: November 19, 2009

19

| /s/ William K. Davis | /s/ Richard A. Rosen |
|---|---|
| WILLIAM K. DAVIS, BAR NO. 1117 | RICHARD A. ROSEN, NEW YORK |
| Email: wdavis@belldavispitt.com | ATTORNEY REGISTRATION NO. 16633830 |
| **Bell, Davis & Pitt, P.A**. | Email: rrosen@paulweiss.com |
| Post Office Box 21029 | ROBYN F. TARNOFSKY, NEW YORK |
| Winston-Salem, NC 27120-1029 | ATTORNEY REGISTRATION NO. 2757102 |
| Telephone: 336/722-3700 | Email: rtarnofsky@paulweiss.com |
| Facsimile: 336/722-8153 | **PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP** |
| | 1285 Avenue of the Americas |
| | New York, NY 10019-6064 |
| | Telephone: 212/373-3000 |
| | Facsimile: 212/757-3990 |
| **ATTORNEYS FOR DEFENDANTS** | |

## CERTIFICATE OF SERVICE

I hereby certify that on the 19th day of November, 2009, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system which will send notification of such filing to **LESLIE BRUCE MCDANIEL,** mcdas@mcdas.com, **JACK REISE,** jreise@csgrr.com, **PAUL J. GELLER,** pgeller@csgrr.com.

/s/ Robyn F. Tarnofsky
ROBYN F. TARNOFSKY, NEW
YORK ATTORNEY REGISTRATION
NO. 2757102
Email: rtarnofsky@paulweiss.com
**PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP**
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone: 212/373-3000
Facsimile: 212/757-3990
**ATTORNEY FOR DEFENDANTS**

21