UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
CIVIL ACTION NO.: **1:09-CV-00071**

JAMES L. PHILLIPS, Individually )
and on Behalf of All Others Similarly )
Situated, )
      Plaintiff, )
  )
v. )
  )
  )
TRIAD GUARANTY INC., MARK )
K. TONNESEN, and KENNETH W. )
JONES, )
      Defendants. )

**NOTICE OF SUBSEQUENTLY**
**DECIDED AUTHORITY**

## NOTICE OF SUBSEQUENTLY DECIDED AUTHORITY

Defendants Triad Guaranty Inc., Mark K. Tonnesen, and Kenneth W. Jones

respectfully submit this Notice of Subsequently Decided Authority pursuant to Local

Rule 7.3(i) to bring to the Court's attention two recent decisions in further support of

Defendants' Motion to Dismiss. The case of *In re Omnicom Group, Inc. Sec. Litig.*, 541

F. Supp. 2d. 546 (S.D.N.Y. 2008) was cited at page 36 of Defendants' Brief in Support of

the Motion to Dismiss. This case was affirmed by the Second Circuit in *In re Omnicom*

*Group, Inc. Sec. Litig.*, 08-CV-0612, 2010 WL 774311 (2d Cir. Mar. 9, 2010). In

addition, the Eastern District of Wisconsin recently granted MGIC Investment

Corporation's Motion to Dismiss in *Fulton County Employees' Retirement System* v.

*MGIC Investment Corporation*, No. 08-C-0458, 2010 WL 601364 (E.D.Wis. Feb. 18,

2010), which litigation was mentioned at page 9 of Defendants' Brief in Support of the

Motion to Dismiss. A copy of each of these opinions is attached.

Dated: March 12, 2010

| /s/ William K. Davis | /s/ Richard A. Rosen |
|---|---|
| WILLIAM K. DAVIS, BAR NO. 1117 | RICHARD A. ROSEN, NEW YORK |
| Email: wdavis@belldavispitt.com | ATTORNEY REGISTRATION NO. 16633830 |
| **Bell, Davis & Pitt, P.A.** | Email: rrosen@paulweiss.com |
| Post Office Box 21029 | |
| Winston-Salem, NC 27120-1029 | ROBYN F. TARNOFSKY, NEW YORK |
| Telephone: 336/722-3700 | ATTORNEY REGISTRATION NO. 2757102 |
| Facsimile: 336/722-8153 | Email: rtarnofsky@paulweiss.com |
| | **PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP** |
| | 1285 Avenue of the Americas |
| | New York, NY 10019-6064 |
| | Telephone: 212/373-3000 |
| | Facsimile: 212/757-3990 |
| **ATTORNEYS FOR DEFENDANTS** | |

Slip Copy, 2010 WL 601364 (E D Wis )
**(Cite as: 2010 WL 601364 (E.D.Wis.))**

**H**Only the Westlaw citation is currently available

United States District Court,
E D Wisconsin
FULTON COUNTY EMPLOYEES' RETIREMENT
SYSTEM, individually and on behalf of all others
similarly situated, Plaintiff,
v
MGIC INVESTMENT CORPORATION, et al , De-
fendants
**No. 08-C-0458.**

Feb 18, 2010

Arthur L Shingler, III, Scott & Scott LLP, Catherine
J Kowalewski, Darren J Robbins, David C Walton,
Coughlin Stoia Geller Rudman & Robbins LLP, San
Diego, CA, David R Scott, Scott & Scott LLC, Col-
chester, CT, Larry B Brueggeman, Previant Gold-
berg Uelmen Gratz Miller & Brueggeman SC, Max
B Chester, Foley & Lardner LLP, Jacques C Con-
don, K Scott Wagner, Hale & Wagner SC, Nola J
Hitchcock Cross, Andrei H Ciobanu, Cross Law
Firm SC, Milwaukee, WI, Joseph E White, III, Maya
Saxena, Saxena White PA, Boca Raton, FL, Charles
N Nauen, Karen Hanson Riebel, Nathan D Prosser,
Richard A Lockridge, Lockridge Grindal Nauen
PLLP, Minneapolis, MN, David M Foster, David M
Foster PC, Farmington Hills, MI, Harold S Fried,
Fried Saperstein Abbatt PC, Southfield, MI, for
Plaintiffs

Bryan B House, Max B Chester, William J Katt, Jr ,
Foley & Lardner LLP, Elizabeth C Perkins, Jeffrey
K Spoerk, Valerie P Vidal, Quarles & Brady LLP,
Milwaukee, WI, Jay N Varon, Foley & Lardner LLP,
Edward J Fuhr, Hunton & Williams, Washington,
DC, Matthew Bosher, Terence J Rasmussen, Hunton
& Williams LLP, Richmond, VA, for Defendants

### DECISION AND ORDER

LYNN ADELMAN, District Judge

*1 In this consolidated class action, lead plaintiff
Fulton County Employees' Retirement System ("Ful-
ton County") alleges that defendants MGIC Invest-

ment Corporation ("MGIC"), Curt S Culver, Larry
Preizchalski, J Michael Lauer, Bruce Williams and
John Draghi committed securities fraud in violation
of Sections 10(b) and 20(a) of the Securities Ex-
change Act of 1934 and Securities and Exchange
Commission ("SEC") Rule 10b-5, 17 C F R §
240 10b-5 Plaintiff is an institutional investor that
brings this action on behalf of itself and other inves-
tors who purchased MGIC common stock between
October 12, 2006 and February 12, 2008 Before me
now are defendants' motions to dismiss the com-
plaint [FN1]

FN1 On March 27, 2009, I issued an order
consolidating this action with four other ac-
tions involving similar allegations and the
same defendants *See Plumbers & Pipefit-
ters Local 562 Pension Fund v MGIC In-
vestment Corp ,* 256 F R D 620
(E D Wis 2009) In that same order, I named
Fulton County lead plaintiff pursuant to 15
U S C § 78u-4(a)(3) On June 22, 2009,
Fulton County filed a consolidated class ac-
tion complaint This complaint contains a
few technical errors First, although Fulton
County identifies itself as the named plain-
tiff in the caption of the complaint, in the
body of the complaint, it identifies Plumb-
ers' & Pipefitters' Local # 562 Pension Fund
(the named plaintiff in one of the member
actions that have been consolidated under
the above case number) as the sole named
plaintiff (Compl [Docket # 49] ¶ 12 ) Sec-
ond, although Fulton County is the lead
plaintiff for purposes of this litigation, all of
the plaintiffs in the member cases should
have been identified as named plaintiffs in
the consolidated class action complaint Ful-
ton County's failure to include all of the
plaintiffs in the member cases as named
plaintiffs in the consolidated class action
complaint has caused defendants to argue
that, since Fulton County did not purchase
MGIC stock after February 28, 2007, it
lacks standing to assert claims based on
statements made after that date However,
Wayne County-a named plaintiff in one of
the member cases-did purchase MGIC stock

© 2010 Thomson Reuters No Claim to Orig US Gov Works

after February 28, 2007, and thus it has standing to assert claims based on defendants' later statements Because Wayne County should have been identified as a named plaintiff in the consolidated class action complaint, and because the complaint could be amended to add Wayne County as a named plaintiff, I will not dismiss the claims based on statements made after February 28, 2007 for lack of standing

## I. BACKGROUND

This case involves a somewhat complicated series of events involving two different, but affiliated, companies-MGIC and Credit-Based Asset Servicing and Securitization ("C-BASS")-both of which suffered severe losses as a result of the subprime mortgage crisis that materialized in 2007 MGIC, through its principal subsidiary, is an insurer of residential home mortgages During the class period, it insured a fair number of subprime mortgages and other types of risky mortgages MGIC also owned a 46% interest in C-BASS, a joint venture of MGIC and another mortgage insurer, Radian Group Inc ("Radian") Like MGIC, Radian owned a 46% interest in C-BASS C-BASS specialized in purchasing subprime single-family residential mortgages and packaging them into mortgage-backed securities

Plaintiff alleges that as the subprime crisis began to unfold, MGIC, three executives at MGIC (Curt Culver, J Michael Lauer and Larry Pierzchalski) and two executives at C-BASS (Bruce Williams and John Draghi) all made false and misleading statements designed to mask the true impact of the crisis on the companies' businesses These statements can be divided into three categories In the first category are statements about MGIC's underwriting practices during the time period leading up to the subprime crisis Plaintiff argues that such statements were false because they implied that MGIC had been following "superior" underwriting practices when, in fact, its underwriting was lax In the second category are statements about the mortgages that MGIC insured during 2005 and 2006 As the subprime crisis developed, an unusually large percentage of those mortgages went into default and eventually resulted in claims that MGIC had to pay Plaintiff alleges that MGIC's executives knew early in the class period that these claims were coming but made statements designed to mislead investors into thinking that the 2005 and 2006 business was problem-free

The final category of statements concerned C-BASS Plaintiff alleges that both the MGIC defendants and the C-BASS defendants misled investors by failing to disclose during an investor conference call held on July 19, 2007 that C-BASS had received $145 million in margin calls between July 1st and the date of the call [FN2] In the days following this conference call, C-BASS received another $470 million in margin calls, and C-BASS did not have the liquidity needed to pay them This eventually led MGIC to decide that its entire investment in C-BASS (about $516 million) had been materially impaired

> FN2 C-BASS financed its business primarily by borrowing money from various financial institutions, using its portfolio of mortgages as collateral As the subprime crisis developed and financial institutions began to doubt the value of these mortgages, they made "margin calls" demanding that C-BASS either put up additional collateral or pay cash to make up the difference

*2 Plaintiff alleges that defendants' fraudulent statements and failures to disclose caused MGIC's stock to trade at artificially high prices during the class period Plaintiff did not purchase C-BASS securities, and thus any statements about C-BASS are actionable only insofar as they affected MGIC's stock price

Before turning to an analysis of plaintiff's claims, I must provide some additional background concerning MGIC's business This background relates to all of plaintiff's claims I note that in addition to this background, I will provide further details, as needed, in the course of my analysis of plaintiff's specific claims in the discussion section that follows

## A. The Nature of Private Mortgage Insurance

Private mortgage insurance, or "PMI," insures the owner of a residential first mortgage loan against the borrower's default It covers unpaid loan principal, delinquent interest, and certain expenses associated with the default and subsequent foreclosure One of its major roles is to allow mortgage lenders to sell riskier mortgages to third parties such as Fannie Mae and Freddie Mac Due to governmental restrictions

© 2010 Thomson Reuters No Claim to Orig US Gov Works

Slip Copy, 2010 WL 601364 (E D Wis )
(Cite as: 2010 WL 601364 (E.D.Wis.))

on how much risk Fannie and Freddie can assume, these entities cannot purchase a mortgage with a loan-to-value ratio higher than 80%-i e , mortgages in which the borrower did not make a down payment equivalent to 20% of the loan's value Mortgage insurance generally limits the risk of loss in connection with a default to 80% of the loan's value even if the loan-to-value ratio is greater than 80% It thus allows lenders to sell loans to Fannie and Freddie even if the borrower did not put 20% down In exchange for assuming the excess default risk, mortgage insurers charge premiums The premium charged varies depending on the amount of risk assumed, with higher premiums charged on riskier loans

**B. MGIC's Book of Business**

During the class period, MGIC insured mortgages through two principal channels In the first channel, known as the "flow" channel, MGIC insured individual mortgages on a one-by-one basis In the second channel, known as the "bulk" channel, MGIC insured a substantial number of mortgages that had been pooled and packaged into securities MGIC referred to this insurance as its "Wall Street bulk" insurance MGIC also used its bulk channel to insure individual loans that were submitted to it on a portfolio basis MGIC eventually began referring to this bulk business as its "remaining bulk," to distinguish it from the more volatile Wall Street bulk business A substantial portion of MGIC's Wall Street bulk business consisted of insuring subprime and Alt-A loans As the parties use the terms, subprime loans are those made to borrowers with low credit scores and Alt-A loans (also known as 'stated income' or "reduced doc" loans) are loans in which the lender does not obtain documentation verifying the representations made by the borrower concerning his or her income

**C. MGIC's Intent to Merge with Radian and Sell Its Interest in C-BASS**

*3 On February 6, 2007, MGIC and Radian announced that they planned to merge with each other through a stock-for-stock exchange scheduled to close during the fourth quarter of 2007 The merger plan assumed that MGIC and Radian would reduce their joint interest in C-BASS to less than 50% The reason for this was that if the post-merger entity continued to own almost all of C-BASS, the combined entity would have been required to carry C-BASS's

assets and liabilities on its balance sheet, which would have threatened the combined entity's credit rating In order to reduce its interest in C-BASS and facilitate the merger, MGIC planned to sell much of that interest Besides facilitating the merger, MGIC's sale of its interest in C-BASS was designed to raise $1 75 billion in cash, which MGIC planned to use to repurchase some of its shares This share repurchase was designed to raise MGIC's stock price Ultimately, because of the problems that developed at C-BASS at the end of July 2007, MGIC and Radian abandoned their merger plans

## II. DISCUSSION

Plaintiff alleges two theories of liability (1) securities fraud under Section 10(b) of the Securities Exchange Act and Rule 10b-5 against MGIC and the individual defendants, and (2) control person liability under Section 20(a) of the Securities Exchange Act against the individual defendants Both the MGIC defendants (MGIC Culver, Lauer and Pierzchalski) and the C-BASS defendants (Williams and Draghi) have moved to dismiss the consolidated class action complaint for failure to state a claim upon which relief may be granted, Fed R Civ P 12(b)(6), failure to plead fraud with particularity, Fed R Civ P 9(b) and failure to comply with the heightened pleading requirements of the Private Securities Litigation Reform Act ("PSLRA"), 15 U S C § 78u-4(b)(1) & (2)

### A. Pleading Standards for Section 10(b) Claims

Section 10(b) of the Securities Exchange Act forbids the use or employment of any deceptive device in connection with the purchase or sale of any security 15 U S C § 78i(b) Rule 10b-5 forbids the making of any "untrue statement of a material fact" or the omission of any material fact needed to make the statements not misleading 17 C F R § 240 10b-5 To satisfactorily plead a violation of Section 10(b) and Rule 10b-5, a plaintiff must allege facts indicating that (1) defendants made a false statement or omission (2) of material fact (3) with scienter (4) in connection with the purchase or sale of securities (5) upon which plaintiff justifiably relied and (6) the false statement or omission proximately caused the plaintiff's damages *Makor Issues & Rights, Ltd v Tellabs, Inc , 437 F 3d 588, 595 (7th Cir 2006)* (*Makor I* ), *vacated and remanded on other grounds* 551 U S 308 (2007)

© 2010 Thomson Reuters No Claim to Orig US Gov Works

Slip Copy, 2010 WL 601364 (E.D.Wis.)
(Cite as: 2010 WL 601364 (E.D.Wis.))

To plead a false statement of material fact, a plaintiff must "specify each statement that is allegedly misleading, the reasons why it is so, and, if based on information and belief, what specific facts support that information and belief" *Id* (citing 15 U.S.C. § 78u-4(b)(1)) The facts alleged must be "sufficient to support a reasonable belief as to the misleading nature of the statement or omission " *Id* (internal quotation marks omitted)

*4 A statement is material if it is likely that a reasonable purchaser or seller of a security (1) would consider it important in deciding whether to buy or sell the security or (2) would have viewed the total mix of information made available to be significantly altered by the statement at 596. However, mere puffery is not actionable under Rule 10b-5 "If the statement amounts to vague aspiration or unspecific puffery, it is not material " *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 746 (7th Cir.1997)

Scienter involves a "mental state embracing an intent to deceive, manipulate, or defraud " *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 n. 12 (1976) Misstatements or omissions made recklessly are also made with scienter. To plead scienter, a complaint must "state with particularity the facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). In determining whether plaintiff's allegations are adequate to give rise to a strong inference of scienter, I accept the allegations as true and consider the complaint in its entirety as well as other sources that I would ordinarily review, such as documents attached to the complaint or those subject to judicial notice *Tellabs v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) I then ask whether the allegations taken collectively establish a "strong inference of scienter." *Id.* at 323. In doing so, I weigh plausible nonculpable inferences against inferences favoring plaintiff's claim. *Id.* at 323-24. The inference favoring plaintiff's claim "need not be irrefutable, of the most plausible of competing inferences." *Id.* at 324 Rather, plaintiff's complaint survives if a "reasonable person would deem the inference of scienter cogent and at least as compelling as any plausible opposing inference one could draw from the facts alleged " *Id*

### B. Plaintiff's Allegations

### 1. Allegations Concerning MGIC's Underwriting

As noted, the first category of allegedly fraudulent statements concerns MGIC's underwriting As used in the complaint, "underwriting" refers to the process by which MGIC would decide whether to insure a mortgage and what the premiums should be Plaintiff contends that, as the subprime crisis began to unfold,[FN3] MGIC made statements that were designed to assure the market that MGIC's "superior" underwriting practices had "insulated" it from the developing crisis. (Pl.'s Br. in Opp. [Docket # 65] at 24.) Plaintiff contends that these statements were false and misleading because, in fact, MGIC had employed loose underwriting standards and insured risky subprime and Alt-A mortgages

> FN3. The subprime crisis began to seriously affect financial markets in February 2007, when HSBC, the world's largest bank, reported major subprime losses (Compl [Docket # 49] ¶ 54 )

Plaintiff identifies the following statements in support of this claim.

(1) During a February 6, 2007 conference call, in discussing the merger with Radian, Culver (MGIC's CEO) stated that with respect to "the loss side" of the business, "both [MGIC's and Radian's] portfolios are well-managed" and "well controlled "

*5 (2) In early March 2007, Culver met with analysts at Keefe, Bruyette & Woods, Inc ("KBW") and, as indicated by the subsequent KBW analyst report, "stressed" that MGIC had protected itself with "focused underwriting and risk layering in its bulk transactions " The KBW report stated that it was "[t]his underwriting and other qualitative considerations" that "reinforce[d] [KBW's] belief and management's that the [mortgage insurance] exposure is not a proxy of the broader mortgage credit market" and noted that "Mr Culver's tone regarding MGIC .. was the most bullish [KBW had] heard in several years "

(3) On March 9, 2007, Culver, Lauer (MGIC's CFO) and Pierzchalski (MGIC's Vice President of Risk

© 2010 Thomson Reuters No Claim to Orig US Gov. Works

Slip Copy, 2010 WL 601364 (E D Wis )
**(Cite as: 2010 WL 601364 (E.D.Wis.))**

Management) met with Citigroup analysts The analysts' subsequent report stated "in our meetings, management exuded confidence in [MGIC's] positioning vis-a-vis the recent credit issues that have arisen in subprime mortgages In particular, [MGIC] has not written insurance on most of the loans that were apparently subject to lax underwriting standards during the second half of 2005 and the first half of 2006 In fact, the CEO stated that a lot of the 'goofy' stuff was done in order to avoid mortgage insurance products in general "

(4) In the same meeting, Culver, Lauer and Pierzchalski "indicated that [MGIC's] credit outlook was unchanged," and the analysts reported that MGIC had "anticipated much of the recent credit deterioration" and had "avoided the toxic' exposures "

(5) Also during the March 9, 2007 meeting, Culver, Lauer and Pierzchalski indicated that MGIC only worked with Alt-A issuers "where it was able to get the right risk profile and pricing "

(6) During an April 11, 2007 earnings conference call, Culver stated "The subprime business continues to be a hot topic, particularly the 2006 book and rightly so given the many credit practices that were abused last year Our industry and our company did not participate a great deal in these practices "

(Br in Supp [Docket # 65] at 24-25 )

An initial problem with plaintiff's claim is that the quoted statements do not state or imply that MGIC employed "superior" underwriting practices or that those practices had "insulated" MGIC from the subprime crisis None of the statements uses the word "superior" or any other adjective that would cause a reasonable investor to believe that MGIC's underwriting was better than the underwriting employed by others in the industry [FN4] Nor does any statement suggest that MGIC was "insulated" from the losses affecting other participants in the subprime market Thus, taken as a whole, the alleged statements do not support a reasonable belief that MGIC misled investors into thinking that MGIC employed superior underwriting practices that would insulate it from losses in the subprime market

    FN4  Regarding plaintiff's use of the word

"industry," it is not clear whether plaintiff means the mortgage-insurance industry or the entire mortgage industry In any event, MGIC did not state that its underwriting was superior to either the underwriting employed by other mortgage insurers or others in the mortgage industry

To be sure, some of the above statements cast MGIC's underwriting practices in a positive light and suggested that MGIC's underwriting would help it deal with the issues emerging in the subprime markets However, viewing each of the six statements closely and in light of the circumstances in which it was made, I find that the statements are not actionable because most of them were immaterial To the extent that some of them could be considered material, I find that they were not misleading I address each statement in turn

*6 (1) The first statement quoted above occurred during a February 6, 2007 conference call about the MGIC-Radian merger During that conference, an analyst asked Culver about the strategic rationale for the merger, noting that the mortgage market had not been in very good shape during the past few quarters As part of his answer, Culver acknowledged that paid claims were increasing at each company, but added that he thought that both companies' portfolios were "well managed" and "well controlled " (Chester Decl [Docket # 62] Ex 9 at 18-19 ) Culver went on to describe what he thought were the benefits of combining the two companies

In his statement, Culver did not say anything about MGIC's underwriting standards, but plaintiff argues that when Culver stated that the companies' portfolios were "well managed" and "well controlled" he was implying that both companies employed superior underwriting practices However, Culver's use of the terms "well managed" and "well controlled" was so vague that it is hard to know what he was talking about Because this statement was so vague, no reasonable investor would have considered it important in deciding whether to buy or sell MGIC stock Thus, even if it could be considered false or misleading, this statement was not material

(2) The second statement was not made by MGIC or its executives Instead, analysts made this statement in a report they prepared after meeting with Culver

© 2010 Thomson Reuters No Claim to Orig US Gov Works

and another executive of MGIC who is not a defendant in this case Most of this statement consists of conclusions that the analysts drew after meeting with Culver, rather than direct quotes from Culver, and thus this statement may not be attributable to Culver or MGIC [FN5] But even if it could be attributed to Culver or MGIC, it is not actionable, for the reasons explained below

> FN5 See e g, *Southland Sec Corp v Inspire Ins Solutions Inc*, 365 F 3d 353, 373 (5th Cir 2004) ("Generally, securities issuers are not liable for statements or forecasts disseminated by securities analysts or third parties unless they have sufficiently entangled themselves with the analysts' forecasts so as to render those predictions attributable to the issuers " (Internal citations and alterations omitted))

The heart of the statement is the following sentence "The company noted that focused underwriting and risk layering in its bulk transactions continues to differentiate the credit performance in its insured portion of a transaction versus the performance of the overall transaction " (Compl [Docket # 49] ¶ 210 ) Plaintiff argues that the phrase "focused underwriting and risk layering" conveyed the false impression that MGIC's underwriting was so superior to others' that it would insulate MGIC from subprime losses However, the full sentence reveals that plaintiff's interpretation is not a plausible interpretation of the statement To understand why, some further background on MGIC's underwriting practices is necessary

The statement was made in reference to MGIC's Wall Street bulk insurance-i e, insurance on mortgages that had been packaged into securities When MGIC wrote this kind of insurance, it did not automatically insure every loan that had been included in the security Rather, during the underwriting process, MGIC selected specific loans within the pool and insured only those loans Thus, as the complaint alleges, when a securitization started to lose value, "MGIC's loss experience did not necessarily mirror that of the overall securitization transaction " (Compl [Docket # 49] ¶ 31 )

*7 With this background in mind, it is clear that the statement that the analysts attributed to MGIC was, based on the allegations in the complaint, true MGIC

had simply stated that, due to its ability to insure only the loans selected during its underwriting process, MGIC's loss experience would not necessarily mirror the loss experience of the overall securitization To be sure, the phrase "focused underwriting" conveys the impression that MGIC's underwriting would result in a better loss experience However, this phrase is so vague that it cannot be deemed material And even if it were material, the allegations in the complaint do not create a reasonable belief that it was false or misleading Although the complaint contains numerous allegations from confidential witnesses stating that MGIC had loosened its underwriting standards and insured risky loans as part of its bulk business, no witness claims to know anything about the selection criteria that MGIC employed when picking mortgages out of a securitization pool Thus, as far as the complaint reveals, MGIC may have engaged in "focused underwriting" (whatever that means) when it identified the segment of a mortgage-backed security that it would insure

(3) The third statement was also made by analysts rather than MGIC or its executives and therefore may not be attributable to MGIC *See supra* note 5 But again, even if it is attributable to MGIC, it is not actionable The full statement reads as follows

In our meetings, management exuded confidence in [MGIC's] positioning vis-a-vis the recent credit issues that have arisen in subprime mortgage In particular, [MGIC] has not written insurance on most of the loans that were apparently subject to lax underwriting standards during the second half of 2005 and the first half of 2006 In fact, the CEO [i e, Culver] stated that a lot of "goofy" stuff was done by lenders over the past few years in order to avoid mortgage insurance products in general He indicated that the mortgage insurance industry didn't have a chance to insure a lot of the business that was getting done, because it was done with unacceptable underwriting or with "piggybacks" (home equity second lien loans)

(Compl [Docket # 49] ¶ 212 (sixth quoted par ) ) Plaintiff considers MGIC's statement that it "ha[d] not written insurance on most of the loans that were apparently subject to lax underwriting standards during the second half of 2005 and the first half of 2006" to be false because plaintiff's confidential witnesses describe instances in which MGIC insured subprime

© 2010 Thomson Reuters No Claim to Orig US Gov Works

Slip Copy, 2010 WL 601364 (E D Wis )
**(Cite as: 2010 WL 601364 (E.D.Wis.))**

and Alt-A loans

However, MGIC did not state that it had not written *any* insurance on subprime or Alt-A loans or loans that were subject to lax underwriting standards Rather, the statement was that MGIC had not written insurance on *most* of those kinds of loans What "most" means in this context is vague and therefore cannot be deemed material Further, this vague use of the word "most" must be considered along with the fact that, in the same report, analysts identified the precise extent to which MGIC had insured subprime and Alt-A mortgages Specifically, the report stated that MGIC's exposure to subprime and Alt-A mortgages was "$14 billion of risk in force," and that "Alt-A comprised 42% of [MGIC's] bulk business last year, but 94% of flow and 65% of bulk loan risk in force in 2006 had FICO scores of at least 620 (up from 60% in 2005) " (Compl [Docket # 49] ¶ 212 (quoted pars under heading "Framing MTG's Exposure") ) Thus, to the extent that investors considered MGIC's statement that it had avoided "most" of the loans that were subject to lax underwriting important, they could have evaluated that statement in light of the more detailed information made available in the same report Considering the report as a whole, then, MGIC's statement cannot be considered false or misleading

**\*8 (4)** The key language in the fourth statement—which again was written by analysts rather than MGIC-is the following "Regarding recent subprime credit concerns , we [i e , the analysts] believe [MGIC] had anticipated much of the downturn in subprime mortgage (albeit not the rapid pace of the decline) and had avoided the more 'toxic' and aggressively underwritten loansatsubprime monolines,[ FN6] including New Century, Fremont, and Ownit " (Compl [Docket # 49] ¶ 212 (third quoted par ) )

> FN6 "Monoline," as used in this context, means an entity that specializes in one type of loan, such as subprime loans having 100% loan-to-value ratios

Initially, I note that this statement is merely a statement of the analysts' belief, not a direct quote of a statement made by MGIC Further, the report does not quote any statements made by MGIC that could have reasonably led the analysts to form this belief The only words attributed to MGIC in the paragraph

containing this statement are the following "[MGIC] reiterated its 2007 credit guidance, indicating that nothing has changed in the company's portfolio over the past two months since 2007 guidance was provided (on [MGIC's] 4Q06 earnings conference call) " (*Id* ) How the analysts extracted from this statement a belief that MGIC had "anticipated much of the downturn in subprime mortgage" and "avoided the more 'toxic' and aggressively underwritten loans" is unclear, and thus the complaint provides no basis for concluding that false statements by MGIC were the source of this belief Further, even if it could be inferred that MGIC executives stated that they had anticipated "much" of the subprime downturn and avoided the more "toxic" loans from entities such as New Century, Fremont and Ownit, no allegations in the complaint create a reasonable belief that these statements were false and material Saying that one has anticipated "much" of the subprime downturn is vague puffery, and the complaint does not allege that MGIC had, in fact, insured the more toxic loans from entities such as New Century, Fremont and Ownit

**(5)** The fifth statement was again made by analysts rather than MGIC or its executives "[MGIC] continued to write bulk business to Alt-A issuers, where it was able to get the right risk profile and pricing-Alt-A comprised 42% of [MGIC's] bulk business last year, but 94% of flow and 65% of bulk loan risk in force in 2006 had FICOs of at least 620 (up from 60% in 2005) " (Compl [Docket # 49] ¶ 212 (eighth quoted par ) ) Plaintiff contends that this statement was false because MGIC insured Alt-A loans even when it was unable to get the right risk profile and pricing However, the phrase "right risk profile and pricing" is extremely vague and therefore no reasonable investor would consider it important in deciding whether to buy or sell MGIC stock Further, to the extent this phrase has meaning, the analysts seem to have defined the "right risk profile" as loans in which the borrowers had "FICOs of at least 620 " Thus, the statement appears to be emphasizing the fact that most of the Alt-A loans that MGIC had insured involved borrowers with relatively higher credit scores, a fact which plaintiff does not dispute As for the "right pricing," this appears to refer to the premiums that MGIC charged for insuring Alt-A loans However, the complaint contains no allegations concerning the principles MGIC employed when setting its premiums, and thus the complaint contains no allegations giving rise to a reasonable belief that MGIC had not, in fact, "gotten the right pricing" on Alt-A loans,

© 2010 Thomson Reuters No Claim to Orig US Gov Works

Slip Copy, 2010 WL 601364 (E D Wis )
**(Cite as: 2010 WL 601364 (E.D.Wis.))**

given the market conditions that existed when MGIC wrote the insurance

**\*9** (6) During a conference call on April 11, 2007 Culver made the following statement

The subprime business continues to be a hot topic particularly the 2006 book and rightly so given the many credit practices that were abused last year Our industry and our company did not participate a great deal in these practices, as most subprime loans were originated with 80/20 piggybacks that avoided our product MGIC did insure approximately \$4 billion of subprime business last year and by subprime, I'm talking about all loans which have FICO scores below 620[,] and about 7% of our 2006 insurance writings. we have subprime exposure [,] and relative to our entire book, we have 4% of our risk [in] force

(Compl [Docket # 49] ¶ 221 ) Plaintiff does not allege that any of the information in this statement was false, rather, plaintiff claims that this statement was misleading because Culver failed to mention that MGIC had insured a substantial number of Alt-A mortgages in addition to the subprime mortgages described in this statement [FN7] However, Culver unequivocally identified the loans he was talking about "by subprime, I'm talking about all loans which have FICO scores below 620 " Further, the complaint contains no allegations creating a reasonable belief that this statement was misleading due to Culver's failure to mention MGIC's Alt-A business The complaint does not, for example, allege that a reasonable investor would have thought that Culver was including "prime" Alt-A loans in his definition of subprime, despite his explicit definition of the word In any event, in the press release that was the subject of the conference call, MGIC consistently distinguished between subprime and Alt-A loans (the press release uses the synonym "reduced doc" when referring to Alt-A), making clear that MGIC did not consider every Alt-A loan to also be a subprime loan (Chester Decl [Docket # 63] Ex 11 at 13-14 ) Therefore, given the context in which this statement was made, it was not false or misleading

> FN7 As noted in the background section, "subprime" generally means that the borrower has a low credit score An Alt-A borrower may have a "prime" credit score, but

because the lender did not verify the borrower's income, the loan is considered riskier than a regular prime loan

\* \* \*

Accordingly, I conclude that the complaint does not adequately plead that defendants committed securities fraud in violation of Section 10(b) and Rule 10b-5 when they made statements concerning MGIC's underwriting practices

**2. Allegations Relating to Impending Losses on 2005 and 2006 Insurance**

The second category of allegedly fraudulent statements concerns the performance of the insurance that MGIC wrote in 2005 and 2006 Plaintiff alleges that, between October 2006 and April 2007, MGIC's executives made statements indicating that the performance of MGIC's 2005 and 2006 "books" was similar to its earlier books (i e , insurance written in 2004 and prior years) [FN8] Plaintiff argues that these statements were false and misleading because, in fact, those books were experiencing higher delinquency rates and higher instances of fraud To understand plaintiff's argument, some further background regarding the manner in which MGIC tracked the performance of its book of business is necessary

> FN8 MGIC refers to the insurance it writes in a particular period as the insurance in its "book" for that period MGIC also refers to the year in which the insurance was written as the "vintage" of that insurance Thus, MGIC might refer to its "2005 book" or its "2005 vintage insurance "

**\*10** The first time MGIC receives notice that a loan it has insured might result in a paid claim is when the borrower defaults, which occurs when a borrower's mortgage payment is forty-five days or more overdue An insured lender must notify MGIC of any default within 130 days of the default, but usually the lender will notify MGIC of the default more quickly The number of defaults is then used to calculate the "delinquency rate" of the loans in MGIC's book, which is the number of reported defaults divided by the total number of insured loans in the book

Slip Copy, 2010 WL 601364 (E D Wis )
**(Cite as: 2010 WL 601364 (E.D.Wis.))**

A default does not immediately result in a paid claim
MGIC does not pay a claim until a default has caused
a lender to foreclose on the mortgage and the lender
reports that there is a deficiency between what the
lender received at foreclosure and the value of the
loan insured by MGIC Thus, MGIC might not pay a
claim until more than a year after the initial default
Further, a default may never result in a paid claim
because the default might "cure," which can occur
when an increase in a home's value causes the collat-
eral to be worth more than the outstanding balance on
the loan Alternatively, MGIC might prove that the
insurance was procured by fraud and thus be able to
rescind or void the policy Although a default does
not immediately or necessarily result in a paid claim,
MGIC uses the delinquency rate to forecast the num-
ber of paid claims on the horizon MGIC uses the
resulting forecast to identify the amount of money it
needs to keep on hand to pay future claims (i e , its
reserves)

Until the third quarter of 2007, MGIC published its
delinquency rates on an aggregate basis, meaning that
it divided the total number of defaults in its entire
book (regardless of vintage year) by the total number
of insured loans in its entire book Starting in the
third quarter of 2007, when the subprime crisis was
in full swing, MGIC began to publish its delinquency
data by vintage year and whether the insurance was
bulk or flow This data revealed that the delinquency
rates for the 2005 and 2006 bulk books were higher
than in the 2004 and earlier books On February 13,
2008, MGIC took the further step of segregating de-
faults within in its bulk business into its Wall Street
bulk transactions and its remaining bulk These de-
linquency rates showed that, as of December 31,
2007, for Wall Street bulk insurance written in 2004
and prior years, the delinquency rate was 25 02%,
whereas the delinquency rate for Wall Street bulk
insurance was 32 97% in 2005 and 30 17% in 2006
As of the first quarter of 2009, for Wall Street bulk
insurance written in 2004 and prior years, the delin-
quency rate was 25 31 %, while that delinquency rate
had jumped to 46 33% for the 2005 book and 58 14%
for the 2006 book

The statements about MGIC's 2005 and 2006 books
that plaintiff alleges were fraudulent were made be-
tween October 12, 2006 and April 11, 2007 Plaintiff
cites a number of defendants' statements in support of
this claim (Pl Br in Opp [Docket # 65] at 27), and I

will focus on the statements in which defendants un-
equivocally denied that the 2005 and/or 2006 books
were experiencing unusual problems as compared to
earlier books. namely

*11 (1) During an October 12, 2006 conference call
discussing MGIC's third quarter 2006 earnings, an
analyst asked Pierzchalski to "talk a little bit about
the early trends in your '06 bulk writings versus the
'05 and '04 vintages" and asked whether MGIC was
seeing a "deterioration" in its recent books in terms
of delinquency rate Pierzchalski responded as fol-
lows "I'd make this statement on both the bulk and
the flow If you look at the books of business since
2000, probably the best book was '03 because of
the environment Aside from the '03 book, all the
other books including the most recent books are in
a pretty tight ban[d] The newer writings are kind
of in line with the prior writings with the exception
of '03. which is probably at the low end of delin-
quencies and claim spectrum " (Compl [Docket #
49] ¶ 187 )

(2) During an April 12, 2007 conference call discuss-
ing MGIC's first quarter 2007 earnings, Culver
made specific comments about the performance of
the insurance that MGIC wrote in 2006
"[R]egarding the 2006 writings, which have gener-
ated so much publicity, it will not be one of our
better books and its loss development should
closely match our 2000 book However, even with
the poor loss performance, through the combina-
tion of higher premium rates and loss deductibles,
we still expect the 2006 subprime book to perform
at a combined loss and expense ratio of 80% and
provide a 20% margin to MGIC " (Compl [Docket
# 49] ¶ 221 )

(3) During the April 12, 2007 conference call, in re-
sponse to a question from an analyst about the rate
of fraud among MGIC's insured loans, Pierzchalski
stated that the "percentage" of loans found to be
fraudulent had not changed (Compl [Docket # 49]
¶ 223 )

MGIC made these statements during conference calls
addressing MGIC's third quarter 2006 earnings and
its first quarter 2007 earnings These calls took place
before the subprime crisis had had the crushing im-
pact on MGIC's business that it would eventually
have, and this is reflected in the statements that de-

© 2010 Thomson Reuters No Claim to Orig US Gov Works

Slip Copy, 2010 WL 601364 (E D Wis )
**(Cite as: 2010 WL 601364 (E.D.Wis.))**

fendants made on MGIC's quarterly conference calls, as discussed below

During the conference call addressing the third quarter of 2006, MGIC did not have much bad news to report, other than that the average severity of its paid claims was rising (due to the higher loan balances MGIC had been insuring) and that the housing market had slowed down in a few areas, such as California By the fourth quarter of 2006, MGIC had noticed that the housing market had continued to soften in Florida and California and stated that this could lead to more high-dollar paid claims

During the conference call reporting on the first quarter of 2007-which took place on April 12, 2007, when investors were starting to express concern over problems in the subprime market-Culver noted that MGIC's results were "disappointing " (Chester Decl [Docket # 62] Ex 12 at 2 ) Culver attributed MGIC's disappointing results to two factors-losses at C-BASS caused by "turmoil in the subprime markets" and the fact that MGIC's paid claims were continuing to come from areas of the country where loan balances were higher and home prices had been deteriorating, such as Florida and California (Id at 2-3 ) Culver also noted that the delinquency rate was up in areas like California and that this could lead to greater losses, but added that it was too soon to tell whether this would be a substantial problem Culver also made one of the statements quoted above-i e , that the 2006 book would not be one of MGIC's "better books" and that he expected its performance to be closer to MGIC's 2000 book, a book that performed poorly but was not as disastrous as the 2006 book turned out to be Finally, Pierzchalski stated that the percentage of fraud among MGIC's recent business had not increased

**\*12** By the time MGIC reported its second quarter 2007 results, the subprime crisis had started to take its toll On the second-quarter conference call, Culver stated that MGIC had experienced a "runup in delinquencies and paid losses in the high dollar state[s] of Florida and California," and that the remainder of the year would "be a difficult one financially " (Chester Decl [Docket # 62] Ex 14 at 3 ) Another MGIC executive, Mike Zimmerman, also noted an "increase in the pure delinquency itself for the quarter," and that MGIC was anticipating further increases (Id at 5 ) Pierzchalski noted that, especially in California and

Florida, the delinquency rate had jumped faster than MGIC had anticipated (Id at 8 )

The third quarter of 2007 is when MGIC realized that it had an unprecedented problem on its hands Aside from the problems at C-BASS (which I discuss in the next section), MGIC experienced a substantial increase in delinquencies Culver stated that "the loss side has hit us much harder and more quickly than we could ever have anticipated," and that "[t]he ramp-up of loss performance relative to delinquencies, the severity [i e , amount of the claim] and the cure rate deterioration [i e , deterioration of the ability to mitigate losses through home appreciation] in California and Florida has been at speeds not seen in previous books of business " (Chester Decl [Docket # 62] Ex 20 at 3 ) Later in the call, Culver stated that the severe changes in MGIC's recent books "kicked off" in July, August and September-i e , in the third quarter of 2007 (Id at 9 )

Summarizing the statements defendants made during MGIC's quarterly conference calls and taking them at face value, I arrive at the following synopsis of MGIC's affairs between late 2006 and mid-2007 Beginning in the fourth quarter of 2006, MGIC began to experience a rise in delinquencies among loans in its 2005 and 2006 books These delinquencies began to grow to problematic levels in the first and second quarters of 2007, but at this point the delinquency rate had not yet risen to unprecedented levels During the third quarter, MGIC realized that its 2005 and 2006 books were going to be far worse than any other books in recent history Based on this synopsis, one can reasonably infer that the severe delinquencies and other problems in the 2005 and 2006 books took MGIC and its executives by surprise in the third quarter of 2007, and that therefore defendants did not intend to deceive the market when, between late 2006 and mid-2007, they informed investors that the 2005 and 2006 books were not experiencing unusual problems

Under plaintiff's view of the facts, however, MGIC and its executives knew as early as October 2006 that its 2005 and 2006 books were going to be far worse than earlier books but falsely informed investors that the delinquency rate and other indicators of the health of those books were similar to prior years' books To proceed past the pleading stage on this claim, plaintiff must plead facts showing that this inference is

© 2010 Thomson Reuters No Claim to Orig US Gov Works

cogent and at least as compelling as the inference that the alarming delinquency rate that eventually materialized took MGIC by surprise in the third quarter of 2007 To meet this burden, plaintiff might have pleaded that Culver, Pierzchalski and Lauer had read internal reports showing, for example, that in second quarter 2006-when Pierzchalski stated that the 2006 book was "kind of in line" with earlier books-delinquencies in that book were, in actuality, though the roof However, plaintiff does not plead any facts of this type Rather, plaintiff rests almost entirely on its assumption that the disastrous delinquency rate that materialized in the third quarter of 2007 "obviously did not happen overnight" and that MGIC "undeniably would have had data showing alarming trends calling into question the 2005 and 2006 books long before October 2007 " (Pl Br in Opp [Docket # 65] at 28-29 )

*13 However, as just discussed, aside from the smaller increase in delinquencies that MGIC disclosed during the first and second quarter conference calls in 2007, by all appearances the alarming delinquency rate *did* materialize overnight-specifically, during the third quarter of 2007 Thus, to proceed past the pleading stage, plaintiff cannot simply rest on its suspicion that alarm bells must have been ringing as early as October 2006 Rather, it must plead facts that transform this suspicion into a cogent inference that alarm bells were, in fact, ringing at this time *Tellabs,* 551 U S at 324 ("inference of scienter must be more than merely 'reasonable' or 'permissible' "), *Makor Issues & Rights, Ltd v Tellabs Inc,* 513 F 3d 702, 706 (7th Cir 2008) (*Makor II* ) (facts pleaded must create more than "a weak or bare inference of scienter")

In an effort to show that defendants' statements were false and made with scienter, plaintiff argues that the manner in which MGIC reported its delinquency rate suggests that defendants knew that delinquencies among its 2005 and 2006 vintages were mounting as early as October 2006 but were determined to hide this fact from investors As noted, until the third quarter of 2007, MGIC reported delinquencies on an aggregate basis rather than by vintage year Plaintiff alleges that by mixing older, more conservatively written vintages with newer, riskier vintages, MGIC was able to mask any alarming trends in the delinquency rate for the recent vintages Then, in the third quarter of 2007, when the cat was out of the bag,

MGIC decided to report its delinquency rate by vintage year and whether the underlying insurance was written through the bulk channel or the flow channel, which revealed higher delinquency rates for the recent-vintage bulk business

The most serious problem with this argument is that the change in the manner in which MGIC published its delinquency rates was not suspicious Plaintiff does not allege that MGIC's historical practice was to disclose delinquencies by vintage year and that it abruptly switched to reporting on an aggregate basis in 2006 Rather, as far as the complaint reveals, MGIC reported delinquency rates on an aggregate basis all along and switched to reporting rates by type and vintage year in the third quarter of 2007 This suggests that MGIC made the switch because it realized that a certain segment of its business was responsible for its large losses (i e , the 2005 and 2006 bulk insurance) and that investors would thus be interested in statistics related to that specific segment It does not give rise to a strong inference that defendants possessed alarming data prior to the third quarter of 2007 but sought to hide it from investors [FN9]

> FN9 Plaintiff in its brief states that "the Individual Defendants admitted that they were tracking MGIC's delinquencies, trends and losses by vintage year but rebuffed analysts' specific requests for this information " (Pl Br in Opp [Docket # 65] at 28 ) However, the material cited in support of this statement-an exchange between Culver and a Bear Stearns analyst during MGIC's third quarter 2007 conference call-does not actually support it The Bear Stearns analyst never made a "specific request" for any information but simply asked Culver why MGIC had experienced quarter-to-quarter average claim size fluctuations (Chester Decl [Docket # 62] Ex 5 at 13 ) In his response, Culver stated that MGIC "certainly had more claims come in" during the third quarter of 2006, and he finished his sentence by stating that he would not "give that number out " However, his sentence seems to have been mistranscribed because the full sentence is incoherent "Well, in this quarter. David, we certainly had more claims come in and we've quantified it, but I don't to give that number out from the '04 and '05

© 2010 Thomson Reuters No Claim to Orig US Gov Works

Slip Copy, 2010 WL 601364 (E D Wis )
(Cite as: 2010 WL 601364 (E.D.Wis.))

vintages than we did on the '03 and prior "
Whatever Culver actually said during this
exchange, it does not appear as though the
analyst asked for delinquency data by vin-
tage year and that Culver rebuffed the re-
quest

Plaintiff also argues that it is reasonable to infer that,
as early as October 2006, defendants were in posses-
sion of data suggesting that a high number of loans in
MGIC's 2005 and 2006 books were infected with
fraud, and that this would have been an indicator that
those books were about to experience high delin-
quency rates In support of this argument, plaintiff
pleads that in the first quarter of 2009 MGIC reported
that the rate of fraud in its entire book (not just its
2005 and 2006 books) was 20 4% Plaintiff argues
that it is reasonable to infer from the fraud rate re-
ported in 2009 that MGIC must have suspected that
fraud was prevalent in its recent-vintage insurance as
early as October 2006 This is so, argues plaintiff,
because fraud can be indicated by what are known as
"early payment defaults," which are defaults that
occur in the first year of the loan If a borrower de-
faults on a loan almost immediately, this suggests
that he may have misrepresented his income on his
loan application However, because MGIC does not
investigate specific instances of fraud until after the
lender has foreclosed on the mortgage and submitted
a claim, MGIC does not formally report the loan as
fraudulent until years after the early payment default
has occurred Plaintiff argues that it is reasonable to
infer from the high rate of fraud reported in 2009 that
MGIC must have been noticing a large number of
early payment defaults by late 2006 and early 2007,
and that therefore defendants must have known by
that time that the 2005 and 2006 books were loaded
with fraudulent loans

*14 There are a number of problems with this argu-
ment, but in my view the most serious is that even
assuming that MGIC tracked early payment defaults
as they were received, MGIC continued to make
statements indicating that the rate of fraud in its re-
cent-vintage insurance was not unusually high
through the latter half of 2007 By that time, MGIC
had already disclosed its alarming losses, and thus it
had no reason to continue to lie about its fraud rate
What's more, a high fraud rate at that point in time
would have been a somewhat positive development,
since MGIC could have rescinded the policies pro-

cured by fraud and thereby reduced the number of
paid claims Indeed, during the October 17, 2007
conference call regarding MGIC's third quarter re-
sults, an analyst asked Culver whether MGIC saw
any opportunity to "mitigate" its substantial losses
through fraud detection Culver responded as follows

Well, fraud has been present in the past and still is
and more so on the bulk side than the flow side
Our-we're paying more, so the absolute number of
fraud cases is probably up a tad, but as a percent-
age of the flow and the bulk paids, we're not seeing
any material change

(Chester Decl [Docket # 62] Ex 20 at 5 ) Had
Culver (or any of the other defendants on the call)
been in possession of data showing a large increase in
the percentage of early payment defaults and inter-
preted that data as a signal that many of the current
delinquencies would not turn into paid claims, he (or
they) likely would have disclosed this fact instead of
pointing out that the percentage of fraud had not
changed Thus, the only cogent inference is that de-
fendants did not become aware of the high rate of
fraud in MGIC's 2005 and 2006 books until after
October 2007-that is, well after defendants made
their allegedly fraudulent statements about the per-
formance of those books

In sum, plaintiff has not pleaded facts giving rise to a
strong inference that, during late 2006 and early
2007, MGIC and its executives made statements de-
signed to mislead investors about the severity of the
problems in MGIC's 2005 and 2006 books Rather,
the only cogent inference is that no one realized the
extent of the problem until the third quarter of 2007
Plaintiff's suspicion that defendants had internal data
showing alarming trends prior to this time is pure
speculation and does not give rise to a strong infer-
ence of scienter

### 3. Allegations Relating to C-BASS's Liquidity

Plaintiff's remaining allegations concern statements
that defendants made about C-BASS Plaintiff alleges
that on July 19, 2007, defendants made several posi-
tive statements about C-BASS that were rendered
misleading by their failure to disclose that between
July 1 and July 18, 2007, C-BASS had paid $145
million in margin calls Although plaintiff cites sev-
eral statements in support of this claim (Pl Br in

Slip Copy, 2010 WL 601364 (E D Wis )
(Cite as: 2010 WL 601364 (E.D.Wis.))

Opp [Docket # 65] at 29-30), it focuses on the following statement in MGIC's July 19, 2007 press release

*15 With respect to liquidity, the substantial majority of C-BASS's on-balance sheet financing for its mortgage and securities portfolio is dependent on the value of the collateral that secures this debt C-BASS maintains substantial liquidity to cover margin calls in the event of substantial declines in the value of its mortgages and securities While C-BASS's policies governing the management of capital risk are intended to provide sufficient liquidity to cover an instantaneous and substantial decline in value, such policies cannot guarantee that all liquidity required will in fact be available

(Chester Decl [Docket # 62] Ex 13 at 10 ) This statement appeared under a heading that read "Our income from joint ventures could be adversely affected by credit losses, insufficient liquidity or competition affecting those businesses " (Id ) Plaintiff argues that the above statement was misleading because C-BASS did not have "substantial liquidity" when measured against the $145 million in margin calls it received between July 1 and July 18. 2007

The background to C-BASS's liquidity situation during this time frame is as follows During the April conference call regarding MGIC's first quarter 2007 results, MGIC noted that one of the major reasons for its disappointing results was the performance of C-BASS In light of this fact, MGIC asked Bruce Williams (the CEO of C-BASS) to join the call Williams stated that the developing subprime crisis had "created liquidity issues for all subprime participants" and, among other things, led to "increased margin calls from all lenders " (Chester Decl [Docket # 62] Ex 12 at 4 ) Williams reported that C-BASS began the first quarter with $300 million in cash resources, that it paid $200 million in margin calls during the quarter, and that it had $200 million in cash resources left at the end of the quarter

Because the situation at C-BASS continued to be of interest to investors during the second quarter of 2007, MGIC asked Williams to participate in MGIC's second quarter 2007 conference call, which was held on July 19, 2007 This time, Williams was joined by John Draghi, C-BASS's Chief Operating Officer Williams reported that subprime participants such as

C-BASS continued to face liquidity issues and increased margin calls from lenders Draghi then summarized C-BASS's liquidity position and noted that as of "today"-July 19. 2007-C-BASS had $150 million in cash resources remaining He added that C-BASS planned to "remain conservative with [its] cash through the rest of the year " (Chester Decl [Docket # 62] Ex 14 at 4 ) Draghi did not mention the amount of margin calls C-BASS paid in the second quarter, but from C-BASS's later filings it appears that it paid $90 million

In the first eighteen days of the third quarter of 2007 (July 1 to July 18, 2007), however, C-BASS received and paid $145 million in margin calls No one on the second-quarter conference call mentioned this fact Moreover, in the days following the conference call MGIC was flooded with additional margin calls Between July 19, 2007 and July 26, 2007, C-BASS received and paid $140 million in margin calls Between July 26. 2007 and August 1, 2007-that is, in less than one week-C-BASS received an additional $330 million in margin calls

*16 On July 26, 2007, MGIC determined that in light of the accelerating margin calls at C-BASS, MGIC was required under applicable accounting standards to recognize that nearly its entire investment in C-BASS (approximately $516 million) was materially impaired On July 30th and 31st, respectively. MGIC and C-BASS issued press releases announcing the unprecedented margin calls On August 1, 2007. MGIC filed a Form 8-k with the Securities and Exchange Commission reporting that its investment in C-BASS was materially impaired In this report, MGIC stated that the turmoil caused by the subprime crisis "accelerat[ed] to unprecedented levels beginning in approximately mid-July 2007 " (Chester Decl [Docket # 62] Ex 16 at 2 )

Considering this background, I conclude that defendants' statement that C-BASS maintained "substantial liquidity" to cover margin calls was not false or misleading As of July 19, 2007, C-BASS had paid $145 million in margin calls and still had $150 million in cash remaining $150 million in cash is substantial liquidity Although this proved to be inadequate to cover the ensuing margin calls, MGIC did not say that C-BASS had *enough* liquidity To the contrary, MGIC's statement appeared in a section of the press release explaining that "insufficient liquidity"

© 2010 Thomson Reuters No Claim to Orig US Gov Works

Slip Copy, 2010 WL 601364 (E D Wis )
**(Cite as: 2010 WL 601364 (E.D.Wis.))**

(among other things) could adversely affect C-BASS's performance Furthermore, the press release qualified its statement about C-BASS's substantial liquidity by adding that, despite C-BASS's substantial cash resources, neither C-BASS nor MGIC could guarantee that those resources would be sufficient to cover all margin calls in the event of "an instantaneous and substantial decline in [the] value" of the securities that C-BASS had used as collateral (Chester Decl [Docket # 62] Ex 13 at 10 ) In light of the circumstances in which it was made, then, MGIC's statement about "substantial liquidity" could not reasonably have been interpreted as a signal that liquidity was not a concern [10]

> FN10 In a related argument, plaintiff argues that the press release contained misleading information because it stated that C-BASS maintained substantial liquidity to cover margin calls "in the event of substantial declines in the value of its mortgages and securities," which implied that such substantial declines had not yet occurred However, this part of the statement was not meant to be a report on any declines that might have already occurred but a warning that *future* declines were possible and that C-BASS might not have the liquidity needed to cover the ensuing margin calls Especially when considered in conjunction with the fact that Williams informed investors on the second-quarter conference call that C-BASS had been subject to increasing margin calls (which implies that, at least from the lender's perspective, the mortgages and securities had substantially declined in value), no reasonable investor could have been misled into thinking that CBASS's assets had not declined in value

Plaintiff argues that even if MGIC's statement in the press release was not technically false MGIC nonetheless had a duty to disclose the $145 million in margin calls that C-BASS received at the beginning of the third quarter because, on the conference call held when the press release was issued, Draghi stated that as of "today" (July 19th, 2007) C-BASS had $150 million in cash available Plaintiff argues that informing investors that C-BASS had $150 million in cash without also informing them that C-BASS had received $145 million in margin calls over the last

eighteen days caused investors to conclude that "C-BASS had ample liquidity and was not experiencing a ruinous assault of margin calls that threatened its viability " (Pl Br in Opp [Docket # 65] at 35 ) In other words, plaintiff argues that Draghi's statement was a half-truth However, on the same conference call. Williams noted that C-BASS, along with all subprime participants, had been subject to increasing margin calls and that liquidity was a "primary issue " (Chester Decl [Docket # 62] Ex 14 at 3-4 ) Thus investors were on notice that liquidity was a concern Further, the "ruinous assault of margin calls" did not really begin until after the July 19th conference call and press release, when C-BASS received $470 million in margin calls in less than two weeks Although in hindsight it appears that the $145 million received during the first eighteen days of July was part of this ruinous assault, plaintiff does not plead facts suggesting that defendants knew at the time of the call that additional (and more severe) margin calls were on the way And once it became clear that the margin calls received in early July were only the beginning and that C-BASS's viability was in jeopardy, both MGIC and C-BASS issued press releases reporting this fact

\*17 To be sure, investors would have been better informed had Draghi followed up his statement that C-BASS had $150 million in cash by adding that C-BASS had received $145 million in margin calls in the prior eighteen days However, "a corporation is not required to disclose a fact merely because a reasonable investor would very much like to know that fact " *In re Time Warner Inc Sec Lit*, 9 F 3d 259, 267 (2d Cir 1993), accord *Gallagher v Abbott Labs*, 269 F 3d 806, 808 (7th Cir 2001) (stating that firms do not have "an absolute duty to disclose all information material to stock prices as soon as news comes into their possession") And because defendants disclosed that liquidity was a concern, stated that C-BASS had been subject to increasing margin calls, and made truthful statements regarding the amount of cash that remained available, Draghi's failure to also disclose the precise dollar amount of the margin calls that C-BASS had received during the opening days of the third quarter cannot reasonably be considered an omission that rendered his statement about the amount of cash remaining misleading Accordingly, this claim must be dismissed on the ground that plaintiff has not pleaded facts giving rise to a reasonable belief that defendants made a misleading omission

© 2010 Thomson Reuters No Claim to Orig US Gov Works

Slip Copy, 2010 WL 601364 (E D Wis )
**(Cite as: 2010 WL 601364 (E.D.Wis.))**

Even if Draghi's omission could be considered reasonably misleading, plaintiff has not pleaded facts giving rise to a strong inference of scienter This is so because it is not at all clear that Draghi was himself aware of these margin calls, or that Williams or MGIC's executives were aware of them The fact that the margin calls formed a crescendo that peaked at the very end of July suggests that, as of July 19th, much of the $145 million in margin calls had been received only recently Thus, information concerning these calls may not have made its way up corporate channels or been fully processed by C-BASS's top executives by July 19th And in fact, plaintiff pleads facts giving rise to a fairly cogent inference that Draghi and Williams did not know about the margin calls Specifically, one of plaintiff's confidential witnesses states that he "prepared the data and analysis that John Draghi and Bruce Williams presented on the MGIC analyst call in July 2007 " (Compl [Docket # 49] ¶ 152 ) Tellingly, that witness does not state that he informed Draghi and Williams about the $145 million in margin calls If this witness was the source of the statements that Williams and Draghi made on the conference call, but that witness left out (or did not know about) the fact that C-BASS had received $145 million in margin calls in the last eighteen days, then this gives rise to a plausible inference that information about the recent margin calls had not made its way to C-BASS's top executives by July 19th In any event, regardless of whether the confidential witness's allegations actually favor defendants (as opposed to being neutral), the complaint contains no other allegations that give rise to a cogent inference that Draghi, Williams or MGIC's executives omitted reference to the margin calls as part of a scheme to mislead MGIC's investors (or out of recklessness) Therefore, I must conclude that plaintiff has not satisfied its burden to plead facts giving rise to a strong inference of scienter

**C. Control Person Liability Under Section 20(a)**

*18 Plaintiff's second theory of liability is control person liability against all of the individual defendants pursuant to Section 20(a) of the Securities Exchange Act of 1934, 15 U S C § 78t(a) To adequately plead a claim under Section 20(a), a plaintiff must first plead a primary violation of the securities laws See e g Pugh v Tribune Co, 521 F 3d 686 693 (7th Cir 2008) As explained above, I conclude

that plaintiff has not pleaded a viable claim under Section 10(b) and Rule 10b-5, and therefore I also conclude that plaintiff has not pleaded a viable claim under Section 20(a) Accordingly this claim will also be dismissed

### III. CONCLUSION

For the foregoing reasons, **IT IS ORDERED** that defendants' motions to dismiss are **GRANTED** to the extent that the consolidated class action complaint is **DISMISSED.** If plaintiff believes that it can cure the problems identified above with an amended pleading, it may move for leave to file an amended complaint pursuant to Civil L R 15 (E D Wis 2010) In its motion, plaintiff must explain how the amended complaint cures the problems identified above In accordance with Civil L R 7(b)-(c), defendants will have an opportunity to file a response to any such motion, and plaintiff may file a reply, if it chooses to do so If plaintiff does not file a motion for leave to file an amended complaint on or before **March 18, 2010,** I will direct the clerk of court to enter final judgment

**FINALLY, IT IS ORDERED** that plaintiff's motion for leave to file additional authority is **GRANTED.**

E D Wis ,2010
Fulton County Employees' Retirement System v MGIC Investment Corp
Slip Copy, 2010 WL 601364 (E D Wis )

END OF DOCUMENT

© 2010 Thomson Reuters No Claim to Orig US Gov Works

-- F 3d ----, 2010 WL 774311 (C A 2 (N Y ))
**(Cite as: 2010 WL 774311 (C.A.2 (N.Y.)))**

**H**Only the Westlaw citation is currently available

United States Court of Appeals,
Second Circuit
In re OMNICOM GROUP, INC SECURITIES
LITIGATION
New Orleans Employees' Retirement System, Plaint-
iff-Appellant,
Philip Szanto, Dr Joseph S Fisher, M D Profit Shar-
ing Plan, on behalf of itself and all others similarly
situated, Dianee Glynn, on behalf of herself and all
others similarly situated, Richard Lehan, Peter "peter
Kim", Edward Kaminski, Susan Black, Matt Brody,
Amy Hoffman, Robert E Garren, and Alan Mirken,
Consolidated-Plaintiffs,
v
OMNICOM GROUP, INC, John Wren and Randall
J Weisenburger, Bruce Crawford and Philip J Ange-
lastro, Consolidated-Defendants-Appellees
**Docket No. 08-0612-cv.**

Argued May 5, 2009
Decided March 9, 2010

Appeal from an order of the United States District
Court for the Southern District of New York
(William H Pauley III, Judge) granting defendants'
motion for summary judgment The district court
held that defendants were entitled to summary judg-
ment on plaintiffs' claims under Section 10(b) of the
Securities Exchange Act of 1934 and Rule 10b-5
because plaintiffs failed to show loss causation We
affirm

John P Coffey, Bernstein Litowitz Berger &
Grossmann LLP, New York, NY, for Plaintiff-
Appellant and the Certified Class

Peter A Wald (Jeff G Hammel, Latham & Watkins
LLP, New York, NY, Janey Mallow Link, Latham &
Watkins LLP, Chicago, IL, of counsel, Abid R
Qureshi, Latham & Watkins LLP, Washington, D C,
of counsel, on the brief) Latham & Watkins LLP,
New York, NY, for Defendants-Appellees

Before FEINBERG, WINTER, and CABRANES,
Circuit Judges

WINTER, Circuit Judge

*1 The New Orleans Employees' Retirement System
the lead plaintiff in this class action, appeals from
Judge Pauley's grant of summary judgment dismiss-
ing its complaint alleging securities fraud in violation
of Section 10(b), 15 U S C § 78j(b), against Omni-
com Group, Inc and its managers The district court
held that appellant proffered no evidence sufficient to
support a finding of loss causation

For the reasons set forth below, we affirm

BACKGROUND

Given the procedural posture of this matter, an appeal
from a grant of summary judgment dismissing a
complaint, "we construe the evidence in the light
most favorable to the plaintiff, drawing all reasonable
inferences and resolving all ambiguities in [its] fa-
vor " Colavito v N Y Organ Donor Network, Inc.,
438 F 3d 214, 217 (2d Cir 2006)

a) *The Seneca Transaction*

Omnicom is a large global marketing and advertising
holding company Around 1996, Omnicom began
using its subsidiary, Communicade, to invest in inter-
net marketing and advertising companies The value
of the internet companies began to decline in 2000
Omnicom determined that these losses were not
"other-than-temporary impairment[s]," and thus non-
reportable, a position that was reviewed without ex-
ception by Arthur Andersen

During the first quarter of 2001, Omnicom entered
into a transaction with Pegasus Partners II, L P, a
Delaware private equity firm, that created a new
company, Seneca, owned by both Omnicom and
Pegasus In a press release, Omnicom and Pegasus
stated that the objective of the Seneca transaction was
to "maximize consolidation and other strategic op-
portunities among companies in the currently de-
pressed e-services consulting and professional ser-
vices marketplace " The Seneca transaction involved
Omnicom's transfer to Seneca of $47 5 million in
cash and its Communicade subsidiary, whose sole

© 2010 Thomson Reuters No Claim to Orig US Gov Works

- F 3d ----, 2010 WL 774311 (C A 2 (N Y ))
(Cite as: 2010 WL 774311 (C.A.2 (N.Y.)))

assets were the internet companies, and Pegasus's promise to transfer a total of $25 million in cash, $12 5 million up front and $12 5 million when Seneca requested it Omnicom received $325 million in Seneca's non-voting preferred stock, while Pegasus received all of Seneca's common stock Omnicom reported that it would incur no gain or loss from this transaction because it was exchanging the internet companies, purported to be worth $277 5 million, and $47 5 million in cash for preferred stock of equivalent value

Appellant alleges that the accounting for the Seneca transaction was fraudulent, a claim we assume to be true, albeit one that is disputed While Omnicom's auditors, it is claimed, viewed Pegasus's willingness to invest $25 million in Seneca as support for Omnicom's valuation of the internet companies at $277 5 million, there is evidence that, despite the representations that Pegasus would immediately transfer $12 5 million to Seneca, it instead transferred only $100 to Seneca, while transferring the $12 5 million to a Pegasus holding company Appellant argues that this fact, which was not disclosed to the market in any of the news articles that appellant relies on, raises doubts about Omnicom's valuation of the assets transferred to Seneca

*2 Appellant also claims that Omnicom misrepresented the value of its Seneca stock to its auditors at the end of 2001 To conceal the decline in the value of Seneca's assets, Omnicom is said to have arranged for Seneca, rather than Omnicom, to buy a technology license from Live Technology Holdings, Inc , one of Seneca's investee companies Seneca would then sell the license to Omnicom for $75 million The $75 million would nearly offset Seneca's yearly losses

b) *Publicly Available Information About the Seneca Transaction*

Several news articles at or near the time reported the Seneca transaction and suggested that it was an attempt to move the internet companies, whose value was deteriorating, off Omnicom's books [FN1] Indeed, observers expressed these views well into 2002 [FN2] However, Omnicom's stock never experienced any statistically significant drop in value at or near the time of these news reports

FN1 On May 7, 2001, *Advertising Age* published an article stating that the Seneca transaction "was seen by some as a way for Omnicom to get struggling stocks off of its books " Debra Aho Williamson, *The Fairy Tale Ends Interactive 100 Stumbles After Dot-Com Business Blows Away* Advertising Age, May 7, 2001, at S1 *InternetNews com* featured an article about the Seneca transaction on June 26, 2001, in which it stated that "[t]he merger comes out of a complicated effort by ad agency group Omnicom to lessen its losses in the interactive sector, by sharing its stakes in Agency com and other I-shops with a private equity firm, Pegasus Partners " Christopher Saunders, *Seneca to Absorb Agency com* InternetNews com. June 26, 2001 Later, on September 17, 2001, an article in *Fortune* stated that "[Omnicom's CEO John] Wren is just cleaning up the mess from his last big foray into untapped market terrain the Internet," and that "Wren is now getting all the Net assets off Omnicom's books by shoveling them into a private holding company called Seneca " Patricia Sellers, *Rocking Through the Ad Recession Omnicom Is Defying the Madison Avenue Slump Thanks to Its CEO's Aggressive Contrarian Strategy* Fortune, Sept 17, 2001, at 145

FN2 In May 2002, *New Media Agencies* reported that if Omnicom hadn't entered into the Seneca transaction, it "might have faced the prospect of having to accept sizeable write-offs in the value of its [internet] investments and, in the case of Agency com, it would have had to deduct its share of the increasing losses from the profit that Omnicom would hope to report for 2001 " *How Omnicom Detached its Internet Ventures But Still Kept its Options Open* New Media Agencies Financial Intelligence, May 2002, at 2-1

On June 5, 2002, Omnicom filed a Form 8-K disclosing that Robert Callander, an outside director and Chair of Omnicom's Audit Committee, had resigned from its board of directors on May 22, 2002 Although the Form 8-K did not disclose the reason for Callander's resignation, appellant argues that it was

© 2010 Thomson Reuters No Claim to Orig US Gov Works

--- F 3d ----, 2010 WL 774311 (C A 2 (N Y ))
**(Cite as: 2010 WL 774311 (C.A.2 (N.Y.)))**

because of Callander's concern over the accounting of the Seneca transaction Appellant relies on Callander's request for a review of the Seneca transaction by a separate accounting firm, his handwritten notes on a copy of Omnicom's 2001 Form 10-K, his request for Seneca's financial statements, questions he asked during audit committee meetings, and his request for advice regarding his responsibilities from a Columbia Business School professor Appellant also relies on the fact that Callander resigned the same day that the board rejected his suggestion that the audit committee review Omnicom's proposal to reacquire two of the internet companies recently transferred to Seneca

On June 6, 2002, Omnicom's stock price declined as rumors circulated that *The Wall Street Journal* would be publishing a negative article about accounting issues at Omnicom That same day, Salomon Smith Barney issued a report noting "an article circulated on Briefing com which speculated that The Wall Street Journal was set to break a potentially negative story about accounting issues at Omnicom " Joint App at 1566 However, this report also expressed the belief that Callander resigned because his "relationship with other board members had become increasingly strained and counter-productive," noting that "[h]ad Mr Callander complained about or disagreed with something in particular, Omnicom would have had to disclose it " *Id* The next day, June 7, 2002, UBS Warburg published a report stating that '[w]e believe that [Callander's] resignation has more to do with 'fit' than actual auditing improprieties, but note that the director who headed the audit committee has given fuel to concerns with auditing irregularity " *Id* at 1570

*3 On June 10, 2002, *The Wall Street Journal* published a short article in which it stated that Callander ' quit the board after expressing concerns about the creation of an entity that houses Omnicom's Internet assets," and, in particular, his "unhapp[iness] with Omnicom management's limited disclosure to the audit committee about the entity that holds many of Omnicom's former Internet assets " Vanessa O'Connell & Jesse Eisinger, *Leading the News Omnicom Director Quits Due to Entity Concerns* Wall St J , June 10, 2002, at B4 The article further suggested that Callander left due to "some broader corporate governance concerns," but quoted Omnicom's Chairman as reassuring investors that " 'there is no issue' with Seneca " *Id*

Late on June 11, 2002, the *Financial Times* published an article describing Omnicom's investors' "post-Enron concerns about disclosure " Richard Tomkins & Christopher Grimes, *Omnicom Shares Wobble Amid Disclosure Fears* Fin Times, June 11, 2002 It acknowledged that "there is no suggestion of impropriety, still less any breaking of the rules," but noted that, nonetheless, industry executives and analysts were still concerned with Omnicom's methods of calculating organic growth *Id* The article also stated that investors were concerned with the Seneca transaction, which the article stated had been described as "a clever ploy" and "very skillful financial engineering," but the article stated that "there is no suggestion of impropriety or rule-breaking " *Id*

On June 12, 2002, *The Wall Street Journal* published the rumored article on Omnicom that discussed Callander's resignation and the Seneca transaction Vanessa O'Connell & Jesse Eisinger, *Unadvertised Deals At an Ad Giant Nimble Financing Fuels Rapid Growth-But Omnicom's Web Stakes Spark Board Controversy A Question of Disclosure-The Impact of Acquisitions* Wall St J , June 12, 2002, at A1 The article stated that Callander had "resigned amid questions about how the company handled a series of soured Internet investments," that "[h]e questioned whether something wasn't being disclosed to the board about the initial off-loading of the problematic investments and the proposal to buy two Internet firms," that "he had voiced doubts about Seneca's purpose for months," and that he had concerns that management "had engaged in transactions without running it through the board " *Id* (internal quotation marks omitted) In further discussing the Seneca transaction, the article stated that it "allowed the company to avoid the possibility of writing down the value of its investments in some of the online firms " *Id* It quoted Omnicom's CEO as saying that "Seneca was smart because instead of just walking away from these [Internet investments] and taking a write-off we said we believe that Pegasus, through Seneca, could restructure the assets and make them valuable again " *Id* (internal quotation marks omitted) (alteration in original)

*4 The article also quoted Omnicom's general counsel, who stated that he had told Callander that the board had not approved Seneca *Id* This information was mistaken because "the still-unnamed venture

© 2010 Thomson Reuters No Claim to Orig US Gov Works

--- F 3d ----, 2010 WL 774311 (C A 2 (N Y ))
**(Cite as: 2010 WL 774311 (C.A.2 (N.Y.)))**

wasn't called Seneca then, so the word hadn't shown up in automated searches of board minutes," even though the transaction had been approved *Id* (internal quotation marks omitted) Furthermore, the June 12 article referred to statements by two accounting professors, one who thought that Seneca "raises a red flag," and one who said, "[y]ou really have to wonder where this fair value is coming from in this environment, in this area " *Id* (internal quotation marks omitted)

The June 12 article also raised questions about Omnicom's general accounting practices For example, the article stated that "[i]n the wake of the collapse of Enron Corp , investors are demanding clearer and simpler financial statements from big companies, putting particular pressure on tangled webs of deals " *Id* It noted that Omnicom "uses a more aggressive means than its competitors to calculate the critical statistic of how much of its growth it generates from existing operations " *Id* The article also claimed that "[t]he clash over Seneca [between Callander and management] signals new concern about the financial side of the Omnicom juggernaut " *Id* In addition, it suggested that Omnicom may have a cash flow problem because "if cash spent on acquisitions is subtracted, the company has a negative cash flow," further noting that "Omnicom has sharply increased its borrowing lately " *Id* Finally, the June 12 article discussed Omnicom's use of earn-out payments in its deal structures, stating that "[w]ith such a high volume of acquisitions, Omnicom's obligations to make future earn-out payments amount to a substantial potential liability [that Omnicom does not] carry on its balance sheet " *Id*

Later that day, Omnicom held a telephone conference to reassure investors During the conference, Omnicom's CEO stated that there was no dissent among the board members, but acknowledged that "Mr Callander's reasons [for resigning from the board] were presented accurately as in 'The Journal' this morning "

A number of articles and analyst reports also responded to the June 12 article, some of which suggested that the article raised questions about Omnicom's accounting practices For example, a *Reuters* article that day stated that Omnicom "was forced to play defense on Wednesday amid questions about its accounting," and suggested that Omnicom's man-

agement's credibility was harmed by the June 12 article Adam Pasick, *UPDATE 1-Omnicom Defends Accounting as Stock Plunges* Reuters, June 12, 2002 Nonetheless, the article also noted that "Omnicom said Callander's resignation was the result of a misunderstanding that he was told, erroneously, that the board had not approved the creation of Seneca when it [sic] fact it had " *Id* A *New York Times* article on June 13 also suggested that Omnicom "scrambled yesterday to repair damage caused by a newspaper article critical of its accounting practices " Stuart Elliott, *Omnicom Shares Tumble 20%* N Y Times June 13, 2002, at C11 Similarly, an analyst report from Lehman Brothers on June 13, 2002, stated that '[i]nvestors' concerns focus on whether or not the assets should have been written down either at the time of the transaction or at the end of last year," yet it noted that "yesterday's Wall Street Journal article did not bring up any substantial 'new' issues " On June 21, 2002 a *Campaign* article stated that "[t]he questions now being asked are about whether the [Seneca] deal was entirely at arm's length, whether it was adequately disclosed and whether there might still be some lingering potential liabilities that might come back to haunt Omnicom in the future " Bob Willott, *Omnicom Could Stand Test of WSJ Allegations* Campaign, June 21, 2002

**\*5** However, some analyst reports and news articles also indicated that the June 12 article did not raise any new factual issues and suggested that the market's negative reaction was due to the article's negative tone and innuendo in the post-Enron market *See e g* Merrill Lynch, FlashNote, *Omnicom Group Inc Good News No New News in WSJ Article* June 12, 2002, Richard Morgan, *Hatchet Job* TheDeal com, June 14, 2002, Bear Stearns, Omnicom Group (OMC-62 30)-*Buy Follow Up On WSJ Article* June 13, 2002, SalomonSmithBarney, *Omnicom Group Inc (OMC) Comments on Management Meeting* June 13, 2002, SalomonSmithBarney, *Omnicom Group Inc (OMC) Comments on WSJ Article* June 12, 2002, Richard Tomkins, *Omnicom Slides on S & P's Move to Cut Outlook* Fin Times, June 13, 2002, UBS Warburg, *Global Equity Research Omnicom Group (OMC)* June 13, 2002

In the two days following the June 12 article, Omnicom's stock dropped over twenty-five percent relative to trading prices and activity in the market and the industry However, after Omnicom announced that its

© 2010 Thomson Reuters No Claim to Orig US Gov Works

--- F 3d ----, 2010 WL 774311 (C A 2 (N Y ))
**(Cite as: 2010 WL 774311 (C.A.2 (N.Y.)))**

new auditor, KPMG, reviewed the accounting for the Seneca transaction and had not recommended any changes, Omnicom's stock increased substantially relative to the industry and the market

#### c) *The Present Action*

On June 13, 2002, as Omnicom's closing price fell, appellant and other plaintiffs filed this action On May 19, 2003, appellant filed an amended complaint, which appellees moved to dismiss The district court granted appellees' motion in part, dismissing claims involving Omnicom's organic growth calculations and its earn-out and put-out liabilities, but denied the motion with regard to the Seneca transaction

The complaint made three allegations of fraud concerning the Seneca transaction First, it alleged that *Omnicom should have written down the value of the internet companies before engaging in the Seneca transaction* Second, it alleged that the accounting of the Seneca transaction was fraudulent because Omnicom failed to appropriately value the internet companies Third, it alleged that Omnicom should have accounted for Seneca's losses after the Seneca transaction occurred because Omnicom controlled Seneca Each allegation, therefore, focused on the loss in value of the internet companies and the failure to reflect that loss on Omnicom's books

The class action complaint invoked the rebutable presumption of shareholder reliance established in *Basic, Inc v Levinson*, 485 U S 224, 241-42 (1988) It alleged that Omnicom was an actively traded company and that the market for its shares promptly reflected public information about the company

In July 2005, appellant moved to certify a class "consisting of all persons and entities who purchased or otherwise acquired the securities of Omnicom from February 20, 2001 through June 11, 2002 and who were damaged thereby" Appellant's Br at 24 The district court certified the class on April 30, 2007

*6 After extensive discovery and in response to appellees' motion for summary judgment, appellant proffered, *inter alia* a report of its expert witness, Dr Scott D Hakala Dr Hakala prepared an event study analysis and was prepared to testify that "the investing public's initial reactions to the partially corrective disclosures in June 2002 were tied to the news of

Omnicom's inappropriate accounting for investments in Internet-related entities and not to other news during that time period " Joint App at 1221 He claimed that "[i]nvestors legitimately feared that Omnicom's transfers of its Internet investments created the potential for losses and hidden liabilities and/or had allowed Omnicom to hide losses in the past " Joint App at 803 Dr Hakala also stated that

[T]he declines from June 5 to June 13, 2002, would not have occurred on those dates had Defendants not previously engaged in the fraudulent scheme alleged by Plaintiffs The information revealed in that time period constituted a partial revelation of information about this scheme

*Id* at 793-94 (internal citation omitted)

On January 29, 2008, the district court granted appellees' motion for summary judgment *See In re Omnicom Group, Inc Sec Litig*, 541 F Supp 2d 546 (S D N Y 2008) The district court, in a thorough and well-reasoned opinion, held that appellant had failed to proffer sufficient evidence that the fraud alleged-the Seneca transaction-caused the drop in stock price that damaged the class We agree

#### DISCUSSION

##### a) *Standard of Review*

"We review the grant of summary judgment de novo *Lawrence v Cohn*, 325 F 3d 141, 147 (2d Cir 2003) Summary judgment is only appropriate if the record shows "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law " Fed R Civ P 56(c), *see also Celotex Corp v Catrett*, 477 U S 317, 322-24 (1986) An issue of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party " *Anderson v Liberty Lobby, Inc*, 477 U S 242, 248 (1986) In looking at the record, we "constru[e] the evidence in the light most favorable to the nonmoving party and draw[ ] all inferences and resolv[e] all ambiguities in favor of the nonmoving party " *Doro v Sheet Metal Workers' Int'l Ass'n*, 498 F 3d 152, 155 (2d Cir 2007) Nonetheless, summary judgment is appropriate where a defendant

has moved for summary judgment on the ground that

© 2010 Thomson Reuters No Claim to Orig US Gov Works

undisputed facts reveal that the plaintiff cannot establish an essential element of the claim, on which element the plaintiff has the burden of proof, and the plaintiff has failed to come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on that element

*Burke v Jacoby*, 981 F 2d 1372, 1379 (2d Cir 1992), *see also Anderson*, 477 U S at 248-49

**b)** *The Section 10(b) Claims*

*7 To sustain a claim under Section 10(b), appellant must show (i) a material misrepresentation or omission, (ii) scienter, (iii) "a connection with the purchase or sale of a security[,]" (iv) reliance by the plaintiff(s), (v) economic loss, and (vi) loss causation *Dura Pharms, Inc v Broudo*, 544 U S 336, 341-42 (2005) The district court granted summary judgment on the ground that appellant failed to proffer sufficient evidence to show loss causation

Use of the term "loss causation" is occasionally confusing because it is often used to refer to three overlapping but somewhat different concepts It may be used to refer to whether the particular plaintiff or plaintiff class relied upon-or is refutably presumed to have relied upon-the misrepresentation *AUSI Commc'ns, Inc v Shaar Fund, Ltd*, 493 F 3d 87, 107 (2d Cir 2007) Generally, however, courts use the term "transaction causation" to refer to this element *See, e g Dura Pharms*, 544 U S at 341-42, *Emergent Capital Inv Mgmt, LLC v Stonepath Group, Inc*, 343 F 3d 189, 197 (2d Cir 2003) ("Like reliance, transaction causation refers to the causal link between the defendant's misconduct and the plaintiff's decision to buy or sell securities ")

"Loss causation" may also refer to the requirement that the wrong for which the action was brought is a but-for cause or cause-in-fact of the losses suffered, also a requirement for an actionable Section 10(b) claim *Dura Pharms*, 544 U S at 342, *see also* 15 U S C § 78u-4(b)(4)("In any private action arising under this chapter, the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages ") In short, plaintiffs must show "a sufficient connection between [the fraudulent conduct] and the losses suffered " *Lattanzio v Deloitte & Touche LLP*, 476

F 3d 147, 157 (2d Cir 2007)[15] This requirement exists because private securities fraud actions are "available, not to provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause " *Dura Pharms*, 544 U S at 345

FN3 Appellant argues that

It is not Lead Plaintiff's burden, on this motion, to show that the entire relative price drop in June 2002 was due to the fraud Rather, summary judgment may be granted only if Defendants can prove as a matter of undisputed fact that none of the price drop could have resulted from the fraud

Appellant's Br at 42 (emphasis omitted) In doing so, it misstates the parties' burdens on summary judgment Although "a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying [the evidence] which it believes demonstrate the absence of a genuine issue of material fact," this does not relieve appellant of its burden of making "a showing sufficient to establish the existence of an element essential to [appellant's] case, and on which [appellant] will bear the burden of proof at trial " *Celotex*, 477 U S at 322 As a result, summary judgment is appropriate if appellant cannot show that at least some of the price drop was due to the fraud

A third concept sometimes referred to as "loss causation" relates to the question whether events that are a cause-in-fact of investor losses fall within the class of events from which Section 10(b) was intended to protect the particular plaintiffs and which the securities laws were intended to prevent This issue, one of proximate cause, was the subject of extended (to say the least) discussion in three opinions in *AUSA Life Ins Co v Ernst & Young*, 206 F 3d 202 (2d Cir 2000) Subsequently, we adopted the "zone of risk" test outlined in the dissenting opinion in *AUSA See Lentell v Merrill Lynch & Co*, 396 F 3d 161, 172-75(citing *AUSA*, 206 F 3d at 235, 238(Winter, J, dissenting))

--- F 3d ----, 2010 WL 774311 (C A 2 (N Y ))
**(Cite as: 2010 WL 774311 (C.A.2 (N.Y.)))**

**\*8** To one degree or another all three of these overlapping but somewhat differing issues are involved in the present matter

With regard to reliance appellant's complaint invokes the presumption of reliance based on the fraud-on-the-market theory adopted in *Basic* 485 U S at 241 42(reliance of investors on misrepresentations is presumed where market for securities is open and developed) The complaint alleges active trading by Omnicom in a ' highly efficient and automated market,' Omnicom's provision of information to the public through SEC filings and other means of disclosure and scrutiny of available information by professional analysts *who themselves communicate with the public* Joint App at 152 It further alleges that ' [a]s a result the market for Omnicom's securities promptly digested current information regarding Omnicom from all publicly available sources and reflected such information in Omnicom's stock price " *Id* at 153

Having sought to establish investor reliance by the fraud-on-the-market theory, appellant faces a difficult task The fraud alleged-the Seneca transaction and failure to write down the value of the internet companies-was the subject of continuing media reports beginning in May 2001 *See supra* notes 1 & 2 The stock price decline, which is the basis for the damages claim occurred in June 2002 In short appellant must concede that the numerous public reports on the Seneca transaction were ' promptly digested" by the market and "reflected in Omnicom's stock price' in 2001 while seeking to recover for a stock price decline a year later in 2002

Appellant seeks to do so through two means first by claiming the existence of cause-in-fact on the ground that the market reacted negatively to a corrective disclosure of the fraud, *Lentell* 396 F 3d at 175, and second, by arguing the existence of proximate cause on the ground that negative investor inferences drawn from Callander's resignation and from the news stories in June 2002 caused the loss and were a foreseeable materialization of the risk concealed by the fraudulent statement *ATSI* 493 F 3d at 107 (2d Cir 2007) (citing *Lentell,* 396 F 3d at 173) Establishing either theory as applicable would suffice to show loss causation

*1) Corrective Disclosure*

A fraud regarding a company's financial condition in May 2001 if concealed, may cause investors' losses in June 2002 when disclosure of the fraud is made and the available public information regarding the company's financial condition is corrected *See Lentell,* 396 F 3d at 175 n 4 (acknowledging that loss causation can be established by a ' corrective disclosure to the market' that ' reveal[s] the falsity of prior recommendations") Appellant argues that information disclosed to the market in June 2002, particularly by the June 12 article constituted a partial corrective disclosure of the fraud and that the disclosure caused the market to respond negatively

**\*9** To reiterate the June 12 article reported that Callander a director and Chair of Omnicom's Audit Committee, had resigned amid questions he had raised for months regarding the purpose of the Seneca transaction Callander was also reported to have questioned whether the board had received full information about the initial Seneca transaction and about the new proposal to buy back two of the internet companies The article also noted concerns, including those of accounting professors about Omnicom's aggressive accounting strategy and about Omnicom's cash flow and increased borrowing In opposing the motion for summary judgment, appellant offered the expert testimony of Dr Hakala regarding causation issues

However none of these matters even purported to reveal some then-undisclosed fact with regard to the specific misrepresentations alleged in the complaint concerning the Seneca transaction *See In re Flag Telecom Holdings, Ltd Sec Litig,* 574 F 3d 29 40-41 (2d Cir 2009) (holding that plaintiffs' evidence of news events and the expert's event study did not provide sufficient evidence of causation) The use of the Seneca transaction as an accounting method to remove losses from Omnicom's books was known to the market a year before Callander's resignation *See supra* notes 1 & 2 There was no ambiguity in that regard in these articles

All that the June 12 article stated was that Callander's resignation was due to general concerns over an aggressive accounting strategy including perhaps Omnicom's year-old failure to write down the value of the internet companies and other matters concern

© 2010 Thomson Reuters No Claim to Orig US Gov Works

--- F 3d ----, 2010 WL 774311 (C A 2 (N Y ))
**(Cite as: 2010 WL 774311 (C.A.2 (N.Y.)))**

ing governance, in particular management's keeping the board informed At best, from appellant's viewpoint, it has shown that the market may have reacted as it did because of concerns that Callander's resignation and the negative tone of the June 12 article implied accounting or other problems in addition to the known Seneca transaction

Appellant also relies on comments in the June 12 article by the two accounting professors to support a nexus between the fraud alleged and the June 2002 decline in share price They argue that "a reasonable jury could conclude that the professor found Omnicom's accounting suspicious in light of Callander's resignation and Omnicom's decision to unwind Seneca, which were newly disclosed facts " Appellant's Br at 55 However, the conclusory suspicions of the accounting professors and the unwinding of the Seneca transaction added nothing to the public's knowledge that the Seneca transaction was designed to remove losses from Omnicom's books [FN4]

> FN4 Appellant also relies on the fact that Omnicom's stock price recovered after Omnicom announced that KPMG had reviewed its accounting of the Seneca transaction and did not recommend any changes Appellant's Br at 52-53 However, KPMG's conclusion that there was no fraud in the Seneca transaction hardly supports a finding that fraud in the Seneca transaction caused a loss

What appellant has shown is a negative characterization of already-public information *See Teacher's Ret Sys of La v Hunter*, 477 F 3d 162, 187-88 (4th Cir 2007) (negative characterization of previously known information cannot constitute a corrective disclosure), *In re Merck & Co Sec Litig*, 432 F 3d 261, 269-70 (3d Cir 2005) (same) A negative journalistic characterization of previously disclosed facts does not constitute a corrective disclosure of anything but the journalists' opinions After all, no hard fact in the June 12 article suggested that the avoidance of the write-down was improper

**\*10** Dr Hakala's study does not alter our conclusion It is true that "[w]here, as here, there are conflicting expert reports presented, courts are wary of granting summary judgment " *Harris v Provident Life & Accident Ins Co*, 310 F 3d 73, 79 (2d Cir 2002) (inter-

nal quotation marks omitted) However, summary judgment is not *per se* precluded because there are conflicting experts *See Raskin v Wyatt Co*, 125 F 3d 55, 65 (2d Cir 1997) ("As we read the opinion, [the district court] concluded that the [expert's] report was probative of no material fact, from which we deduce that it was, in [the district court's] view, irrelevant and inadmissible We therefore can review this ruling as evidentiary in character ") (citations omitted) Although the reports must be construed in the non moving party's favor, "if the admissible evidence is insufficient to permit a rational juror to find in favor of the plaintiff, the court remains free to direct a verdict or grant summary judgment for defendant " *Amorgianos v Nat'l R R Passenger Corp*, 303 F 3d 256, 267 (2d Cir 2002), *see also Raskin*, 125 F 3d at 66 ("[A]n expert's report is not a talisman against summary judgment ")

Summary judgment is appropriate here because Dr Hakala's testimony does not suffice to draw the requisite causal connection between the information in the June 12 article and the fraud alleged in the complaint His event study merely "links the decline in the value of [the company's] stock to various events " *Flag Telecom*, 574 F 3d at 41

If Dr Hakala is opining that Omnicom's stock dropped because investors first became aware in June 2002 of the fraud alleged in the complaint, that opinion is, as a matter of law, unsustainable on this record It runs squarely into the undisputed fact that the internet company losses and the failure to write them down was known in May 2001 and into appellant's allegation that the market for Omnicom's securities at all times promptly digested and reflected in its share price all public information [FN5] If he is opining that Omnicom's stock dropped because the fraud in May 2001 caused the negative press of June 2002 attending Callander's resignation, then his testimony is irrelevant because these events were not proximately caused by the fraud alleged, for reasons discussed immediately below The remainder of his report establishes only that, as previously noted, the June 12 article raised questions about potential accounting concerns, including the Seneca transaction

> FN5 Appellant is mistaken to compare this to our cases in *Suez Equity Investors, L P v Toronto-Dominion Bank*, 250 F 3d 87 (2d Cir 2001), *Rothman v Gregor*, 220 F 3d 81

© 2010 Thomson Reuters No Claim to Orig US Gov Works

--- F 3d ----, 2010 WL 774311 (C A 2 (N Y ))
**(Cite as: 2010 WL 774311 (C.A.2 (N.Y.)))**

(2d Cir 2000), and *Mfrs Hanover Trust v Drysdale Sec Corp*, 801 F 2d 13 (2d Cir 1986) Those cases are factually distinguishable because in each case the plaintiffs demonstrated a specific causal connection between the loss and the alleged fraud *See Suez Equity*, 250 F 3d at 96-97 (facts omitted from executive's background report would have indicated executive's inability to run company and forecast company's eventual liquidity problems), *Rothman*, 220 F 3d at 87, 89, 95 (company's misleading accounting of royalty expenses caused later losses when market became aware that a massive write-down was imminent), *Mfrs Hanover*, 801 F 2d at 16-17, 19, 21-22 (defendant accounting firm's misrepresentations as to company's solvency induced plaintiff to do business with the company which ultimately led to the plaintiff's loss)

Because appellant failed to demonstrate any new information in the June 12 article regarding Omnicom's alleged fraud, appellant has failed to show a price decline due to a corrective disclosure

2) The Materialization of the Risk Theory

Appellant argues that, even if no new financial facts were revealed in June 2002, Callander's resignation and the ensuing negative media attention were foreseeable risks of the fraudulent Seneca transaction and caused the temporary share price decline in June 2002 The losses suffered by the class are, the argument goes, due to the materialization of that risk

*11 As noted, plaintiffs can prove loss causation by showing "that the loss was foreseeable and caused by the materialization of the risk concealed by the fraudulent statement" *ATSI*, 493 F 3d at 107 A misrepresentation is "the 'proximate cause' of an investment loss if the risk that caused the loss was within the zone of risk *concealed* by the misrepresentations " *Lentell*, 396 F 3d at 173 Because Omnicom's internet company losses were publicly known, the matter concealed must be the invalidity of Omnicom's accounting for those losses in the Seneca transaction

The zone of risk is determined by the purposes of the securities laws, *i e* "to make sure that buyers of se-

curities get what they think they are getting " *Chem Bank v Arthur Andersen & Co*, 726 F 2d 930, 943 (2d Cir 1984) In this context, therefore, recovery is limited to only the foreseeable losses "for which the intent of the laws is served by recovery " *AUSA*, 206 F 3d at 234 (Winter, J , dissenting)

Fraud may lead to a director's resignation-to escape personal liability, if for no other reason, *see e g* 15 U S C § 77k(b)(1) (providing exemption from civil liability for director who resigns before effective date of fraudulent registration statement)-and to negative stories by the media In such circumstances, it is generally the facts underlying the fraud and resignation that causes a compensable investor's loss In the present case, as noted, the facts were known a year before the resignation, and the resignation did not add to the public knowledge any new material fact about the Seneca transaction The essence of the claim is that Callander's resignation concerned the Seneca transaction and that the resultant negative publicity suggesting possible accounting malfeasance may lead to recovery for a temporary drop in share price

To be sure, the record shows that Callander was concerned over general accounting practices and governance problems In that regard, he was concerned about the Seneca transaction, but he had also been mistakenly informed that the Board had never approved it On the present record, appellant has at best shown that Callander's resignation and resulting negative press stirred investors' concerns that other unknown problems were lurking in Omnicom's past Indeed, there is no allegation that investors were ever told that improper accounting had in fact occurred with regard to the Seneca transaction, either in the June 2002 stories or later

The generalized investor reaction of concern causing a temporary share price decline in June 2002, is far too tenuously connected-indeed, by a metaphoric thread-to the Seneca transaction to support liability The securities laws require disclosure that is adequate to allow investors to make judgments about a company's intrinsic value Firms are not required by the securities laws to speculate about distant, ambiguous, and perhaps idiosyncratic reactions by the press or even by directors To hold otherwise would expose companies and their shareholders to potentially expansive liabilities for events later alleged to be frauds, the facts of which were known to the invest-

© 2010 Thomson Reuters No Claim to Orig US Gov Works

--- F 3d ----, 2010 WL 774311 (C A 2 (N Y ))
**(Cite as: 2010 WL 774311 (C.A.2 (N.Y.)))**

ing public at the time but did not affect share price, and thus did no damage at that time to investors A rule of liability leading to such losses would undermine the very investor confidence that the securities laws were intended to support

## CONCLUSION

**\*12** Appellant has failed to raise a material issue of fact that would support a finding of loss causation and, as a result, the district court properly granted defendants' summary judgment motion [FN6] For the foregoing reasons, we affirm

> FN6 Plaintiffs also rely on Section 20(a) of the Securities Exchange Act of 1934 15 U S C § 78t However in order to establish control person liability, appellant must first establish a primary violation *See ATSI,* 493 F 3d at 108 Because appellant fails to establish a primary violation, the district court properly granted defendants' summary judgment motion on the Section 20(a) claims

C A 2 (N Y ),2010
In re Omnicom Group, Inc Securities Litigation v Omnicom Group, Inc
--- F 3d ----, 2010 WL 774311 (C A 2 (N Y ))

END OF DOCUMENT

© 2010 Thomson Reuters No Claim to Orig US Gov Works

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
CIVIL ACTION NO.: **1:09-CV-00071**

JAMES L. PHILLIPS, Individually )
and on Behalf of All Others Similarly )
Situated, )
     Plaintiff, )
  )
v. )
  )
  )
TRIAD GUARANTY INC., MARK )
K. TONNESEN, and KENNETH W. )
JONES, )
     Defendants. )

## CERTIFICATE OF SERVICE

I hereby certify that on the 12th day of March, 2010, I caused the foregoing

to be electronically filed with the Clerk of the Court using the CM/ECF system which

will send notification of such filing to **LESLIE BRUCE MCDANIEL,**

mcdas@mcdas.com, **JACK REISE,** jreise@csgrr.com, **PAUL J. GELLER,**

pgeller@csgrr.com.

/s/ Robyn F. Tarnofsky
ROBYN TARNOFSKY, NEW YORK
ATTORNEY REGISTRATION NO. 2757102
Email:  rtarnofsky@paulweiss.com
**PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP**
*1285 Avenue of the Americas*
New York, NY 10019-6064
Telephone:  212/373-3000
Facsimile:  212/757-3990
**ATTORNEY FOR DEFENDANTS**