IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| JAMES L. PHILLIPS, | ) | |
| Individually and on Behalf of All | ) | |
| Others Similarly Situated, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:09CV71 |
| | ) | |
| TRIAD GUARANTY INC., | ) | |
| MARK K. TONNESEN, and | ) | |
| KENNETH W. JONES, | ) | |
| | ) | |
| Defendants. | ) | |

**RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE**

This matter comes before the Court on Defendants' motion to dismiss Plaintiff's amended class action complaint for failure to state a claim upon which relief may be granted pursuant to Fed. R. Civ. P. 12(b)(6). (Docket No. 24.) For the reasons set out below, the Court finds that the amended complaint is legally deficient in material respects.

**I. FACTUAL BACKGROUND AND CLAIMS**

Defendant Triad Guaranty, Inc. ("Triad") provided private mortgage insurance coverage throughout the United States to residential mortgage lenders and investors. (Docket No. 20, Amended Complaint ("Am. Compl."), ¶¶ 2, 26.) Defendant Tonnesen was, at relevant times, President and Chief Executive Officer of Defendant Triad. (*Id*. ¶ 18.) He

retired from his positions in August 2008. (*Id*.) Defendant Jones was, at all relevant times, Senior Vice President and Chief Financial Officer of Defendant Triad. (*Id*. ¶ 19.) In October 2008, he assumed the role of President and CEO of Triad. (*Id*.) On April 16, 2009, this Court appointed Western Pennsylvania Electrical Employees Pension Fund ("Plaintiff") as the lead Plaintiff in this action. (Docket No. 15.) The "class" consists of all purchasers of the publicly traded securities of Defendant Triad between October 26, 2006, and April 1, 2008 (the "class period"). (Am. Compl. at 4.)

According to Plaintiff, Defendants manipulated their internal risk models on bulk mortgage insurance to justify undercutting their competitors on price in order to achieve greater market share and short-term profits while at the same time exposing Triad to considerable risk in the event of a sudden decline in the housing market, which ultimately occurred. (Docket No. 27 at 9.) Plaintiff alleges that Defendants made false and misleading statements about Triad's capital position and financial future which caused the Plaintiff class to suffer losses as the value of Triad's stock declined. (*Id*. at 14.)

Plaintiff's complaint focuses on Triad's business in structured bulk insurance transactions wherein Triad underwrote and insured a group of loans with individual coverage for each loan, also known as modified pool insurance. (Am. Compl. ¶ 30.) Based partly on the perceived risk of the entire group of loans, Triad ran proprietary pricing models to determine a price to submit for insuring the entire group of loans through a bid process. (*Id*.)

Triad is domiciled in Illinois and is thus subject to Illinois law on such matters as providing a contingency or statutory reserve of at least 50% of earned premiums. (*Id*. ¶¶ 32, 33.) Plaintiff alleges that Triad, by setting its premiums too low, created insufficient contingency reserves and misstated its risk-to-capital ratio in a material manner. (*Id*. ¶ 63.) The numerator of the risk-to-capital ratio is Triad's "net risk in force" and the denominator is its "statutory capital." (*Id*. ¶ 33.) During the class period, Triad's stock price was in a general downward movement. On October 26, 2006, the stock sold for $52.75 per share, and on April 1, 2008, it closed at $5.25 per share. (Docket No. 25, Ex. 13.)

The types of misrepresentations allegedly made by Defendants fall into three general categories: (1) false statements that Triad was adequately capitalized and had reserved for the amount of risk it had assumed; (2) understatement of Triad's statutory contingency reserves and its risk-to-capital ratio; and (3) unwarranted optimistic statements about the company's risk portfolio, underwriting practices, internal controls, capital position, and future prospects. (Am. Compl. ¶¶ 3, 5.)

Plaintiff alleges that due to false and misleading statements, Triad's stock price was artificially inflated until "the relevant truth about Triad was revealed." (*Id*. ¶ 173.) These market revelations began on August 27, 2007, according to Plaintiff, when Triad filed a Form 8-K announcing that it had drawn down $80 million on a line of credit. (*Id*. ¶ 174.) Triad's stock price at opening on August 27, 2007 was $25.90 per share, and at closing on August 28, 2007 was $19.00 per share. (Docket No. 25, Ex. 13.) The next alleged disclosure was

on August 28, 2007, when Bear Sterns issued a report stating that the impact of Triad's $80 million draw-down was substantial and was a cause for concern. (Am. Compl. ¶ 174.) Triad's stock price closed at $16.20 per share on August 29, 2007. (Docket No. 25, Ex. 13.) On August 30, 2007, a disclosure occurred when Fitch Ratings downgraded the long-term issuer and senior debt ratings of Triad from "A+" to "A." (Am. Compl. ¶ 174.) Fitch also on the same day downgraded Triad's insurer financial strength rating from "AA" to "AA-." (*Id.*)

The fourth alleged disclosure occurred on October 24, 2007, when Triad issued a press release reporting a net loss of $31.8 million for the quarter ending September 30, 2007, and a substantial increase in its reserves. (*Id.*) Also, on the same day, Bear Sterns lowered its rating of Triad to "Underperform." (*Id.*) On February 13, 2008, Triad issued a press release reporting a $75 million loss for the fourth quarter of 2007 and a net loss of $77.5 million for the year ended December 31, 2007. (*Id.*)

Plaintiff alleges that the "true picture of Triad's business, operations and finances were finally disclosed to the market on April 1, 2008, when the Company filed its annual report for fiscal year 2007 on Form 10-K with the SEC." (*Id.* ¶ 177.) Triad's stock price fell from $5.25 when the market closed on April 1, 2008, to $2.15 at the close on April 4, 2008. (*Id.* ¶ 178.)

Count I of Plaintiff's amended complaint alleges that all Defendants violated Section 10(b) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated

thereunder, 17 C.F.R. § 240.10b-5. (Am. Compl. at 106.) Count II alleges that the individual Defendants violated Section 20(a) of the Exchange Act. (*Id* at 110.)

## II. DISCUSSION

**A.     Standard of Law**

The Rule 12(b)(6) standard for dismissal is modified in this action due to the allegations of fraud and the securities nature of the action. Rule 9(b), Fed. R. Civ. P., requires that "the circumstances constituting fraud" be pled "with particularity." In addition, under the Private Securities Litigation Reform Act of 1995 ("PSLRA"), "in pleading a material misrepresentation or omission, in violation of § 10(b) of the Exchange Act and Rule 10b-5, and the scienter necessary to such a misrepresentation or omission, the plaintiff must plead *facts*." *Teachers' Ret. Sys. of Louisiana v. Hunter*, 477 F.3d 162, 172 (4th Cir. 2007) (emphasis in original). Any complaint not meeting these pleading requirements must be dismissed. *Id*.

**B.     Analysis**

**1.     Count I – Section 10(b) and Rule 10b-5**

**a.     Elements**

To state a claim under section 10(b) and Rule 10b-5, a plaintiff must allege that: (1) the defendant made a false statement or omission of material fact; (2) with scienter; (3) upon which the plaintiff justifiably relied; (4) that proximately caused the plaintiff's damages. *Teachers' Ret. Sys.*, 477 F.3d at 172.

b. **Loss causation**

The proximate cause element of a securities fraud claim is sometimes referred to as "loss causation." *Id*. at 173 & n.2. Plaintiff must allege facts showing a causal connection between the alleged material misrepresentations and the plaintiff's loss. *Id*. Defendants argue that Plaintiff has failed to adequately plead loss causation in this case. (Docket No. 26 at 40-48.) The parties disagree on the appropriate pleading standard for this element. Defendants argue that Plaintiff fails to point to any disclosures of the supposed truth concerning the alleged misstatements or omissions and that Plaintiff does not plead any facts demonstrating that its losses were caused by the claimed fraud rather than by market forces or other intervening events. (*Id*. at 41-42.) Plaintiff, on the other hand, argues that isolating the causal factors that affected Triad's stock price is not an appropriate issue for the motion to dismiss. (Docket No. 27 at 38.)

The Fourth Circuit clearly explained the pleading standard for loss causation in *Katyle v. Penn Nat'l Gaming, Inc.*, 637 F.3d 462 (4th Cir.), *cert. denied*, ___ U.S. ___, 132 S. Ct. 115 (2011). In addressing this issue, the Fourth Circuit considered the Supreme Court's decision in *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005), which Plaintiff heavily relies upon in briefing. In *Katyle*, the Fourth Circuit quoted with approval the Second Circuit's decision in *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 174 (2d Cir. 2005) for the proposition that when

> [T]he plaintiff's loss coincides with a marketwide phenomenon causing comparable losses to other investors, the prospect that the plaintiff's loss was caused by the fraud decreases, and a plaintiff's claim fails when it has not adequately pled facts which, if proven, would show that its loss was caused by the alleged misstatements [or omissions] as opposed to intervening events.

*Katyle*, 637 F.3d at 471. The Fourth Circuit noted that loss causation must be pled with "sufficient specificity," and that "[t]he degree of specificity demanded is that which will 'enable the court to evaluate whether the necessary causal link exists.'" *Id.* (citing *Teachers' Ret. Sys.,* 477 F.3d at 186). The facts alleged in the complaint need not *conclusively* show that the stock price decline is attributable *solely* to the alleged fraud rather than to other intervening factors; nonetheless, the facts alleged must show that the misrepresentations or omissions were a *substantial cause* of the investment's decline in value. *Id*. at 472. The court of appeals observed that if the connection between the alleged misrepresentations and the loss is attenuated, a fraud claim will not lie. *Id*. Therefore, this Court must reject Plaintiff's position that it is premature at this stage to examine whether Plaintiff has alleged facts to show that alleged misrepresentations were a substantial cause of the decline of Triad's stock price. The burden is on Plaintiff to allege such facts.

There can be no dispute that during the class period there was a market-wide collapse in the stock price of mortgage insurers such as Triad. *See Luminent Mortg. Capital, Inc. v. Merrill Lynch & Co.*, 652 F. Supp. 2d 576, 578 (E.D. Pa. 2009) (noting that after plaintiffs purchased their securities in August 2005, the mortgage industry and mortgage-backed securities "faced historically unprecedented declines with widespread consequences"). The

Court may take judicial notice of the trend of stock prices of the major mortgage insurers during relevant times. *See* Fed. R. Evid. 201; *Greenhouse v. MCG Capital Corp.*, 392 F.3d 650, 655 n.4 (4th Cir. 2004). Plaintiff in its amended complaint lists the seven major mortgage insurance companies during the relevant time period as Defendant Triad, Mortgage Guaranty Insurance Corporation, Radian Guaranty Inc., PMI Mortgage Insurance Co., United Guaranty Corporation, Genworth Financial Inc., and Republic Mortgage Insurance Company. (Am. Compl. ¶ 27.) Triad's stock price declined from $52.75 at the outset of the class period (October 26, 2006) to $5.25 at the end of the period (April 1, 2008). (Docket No. 25, Ex. 13.) Mortgage Guaranty's stock price fell during the class period from its high of $70.10 on February 6, 2007 to its $11.54 close on April 1, 2008. (*Id.*, Ex. 10.) Radian's stock price fell during the class period from a high of $67.35 on February 6, 2007 to its close on April 1, 2008 of $6.77. (*Id.*) The stock price of PMI Mortgage Insurance Co. fell from its high of $51.46 during the class period on February 6, 2007 to its closing price of $6.11 on April 1, 2008. (*Id.*) Republic Mortgage's stock price fell during the class period from its high of $23.74 on January 3, 2007 to its close of $13.76 on April 1, 2008. (*Id.*) Finally, the stock price of Genworth Financial fell from its class period high of $37.16 on February 21, 2007 to its close on April 1, 2008 of $23.91. (*Id.*) Although some of these declines are steeper than others, the figures reflect a devastating market-wide fall in the stock price of mortgage insurance companies during the class period. The record is clear that Triad's competitors suffered precipitous declines in stock price comparable to those experienced by Triad.

The burden is thus upon Plaintiff to allege facts tending to show that the alleged fraud was a substantial cause of the decline of Triad's stock price in the midst of this market-wide collapse. *Katyle*, 637 F.3d at 472. Moreover, the PSLRA authorizes "the court to assume that the plaintiff has indeed stated *all* of the facts upon which he bases his allegation of a misrepresentation or omission." *Teachers' Ret. Sys.*, 477 F.3d at 172 (emphasis in original). Because Plaintiff has argued that distinguishing fraud from other factors influencing stock price at this motion stage is "not the law," Plaintiff fails to point to specific facts showing that fraud was a substantial cause of Triad's declining stock price. (Docket No. 27 at 40.)

Plaintiff argues that it is enough that it has described the above-listed market disclosures over an eight-month period and described the adverse reaction of the market to each disclosure and the resulting fall of Triad's stock price. (*Id*. at 41.) Plaintiff contends that nothing more is required in response to Defendants' motion. (*Id*.)

The disclosures of Triad that Plaintiff relies upon are: (1) the August 2007 $80 million draw-down of credit by Triad, and the resultant negative analyst commentary; (2) the October 2007 announcement of a net loss of $31.8 million and an increase in reserves and related commentary; (3) the February 2008 announcement of Triad's $75 million loss for the fourth quarter of 2007 and the $77.5 million loss for the year ending December 2007; and (4) the April 2008 Form 10-K filing of Triad announcing that it had not obtained new capital commitments and was facing the possibility of a run-off of its business. (Docket No. 27 at 41-42.) The factual summary above undoubtedly shows that these announcements had a

negative impact on Triad's stock price. However, these revelations concerning increasingly negative operating results, and the resulting fall of Triad's share price, do not affirmatively demonstrate a link to the alleged *fraud*. The question remains unanswered by the amended complaint: what facts suggest that the decline in Triad's stock price was greater than would be accounted for simply by the "historically unprecedented" contraction of the housing industry? Based on the record now before the Court, the housing crisis is just as likely the cause, if not more likely the cause, of Triad's deteriorating performance and resultant stock price decline. Plaintiff's claim of loss caused in substantial part by fraud is simply not plausibly stated under the limited allegations of the amended complaint. As a specific example, under Plaintiff's theory, the first revelation to the market of Triad's fraud occurred on August 27, 2007. Triad's stock price had *before that time* declined from $52.75 at the beginning of the class period to $25.88 on August 24, 2007. (Docket No. 25, Ex. 13.) This halving of the value of Triad's stock could not have been due to any market revelation of alleged fraud. These facts sharply undercut the plausibility of Plaintiff's loss causation allegations and arguments. As explained by the Fourth Circuit in *Katyle*, when the plaintiff's loss does no more than mirror a market-wide phenomenon, as here, the likelihood of causation by fraud is lessened, and the plaintiff must specifically plead facts that tend to show a causal link.

Because Plaintiff has failed to allege facts tending to show that the alleged fraudulent acts committed by Defendants was a substantial cause of the decline in value of Triad's

stock during the class period, Plaintiff's Section 10(b) and Rule 10b-5 claims are deficient. *See Katyle*, 637 F.3d at 472.

      c.    **<u>Scienter</u>**

In addition to adequately alleging loss causation, Plaintiff must also properly allege scienter. *Teachers' Ret. Sys.*, 477 F.3d at 172. Scienter refers to the "wrongful state of mind" of a defendant. *Id*. at 173 n.2. To allege scienter against an individual defendant, a plaintiff must "allege facts that support a 'strong inference' that *each* defendant acted with at least recklessness in making the false statement." *Id*. at 184. For a corporation, the plaintiff must allege such facts with respect to at least one of its authorized agents. *Id*.

Although this Court has no occasion at this time to closely examine whether the alleged fraudulent statements made by Defendants were in fact false, the scienter or state of mind of the Defendants when they made these allegedly fraudulent statements is linked to the truth or falsity of the statements. If there were no false statements, there can be no scienter. *Id*. Therefore, in reviewing the showing of scienter in the amended complaint, the Court observes that Plaintiff's allegations of fact designed to show the alleged falsity of Defendants' statements are relatively weak.

Plaintiff's allegations of falsity in the amended complaint follow a pattern of attacking the broad, general statements of Defendants regarding the financial health of Triad without asserting that the underlying data is false. By way of example, Plaintiff argues that Defendant Tonnesen misled investors on October 26, 2006, by stating during a conference

call with analysts that "[w]e believe we are being appropriately compensated for [] risk, and given the growth of our capital base we are in a position where we can accept the higher level of volatility." (Docket No. 27 at 17; Am. Compl. ¶ 71.) Plaintiff does not allege that Triad's capital base had not grown. Indeed, the press release issued by Triad on the same day as this conference call set out net income figures showing an increase over income figures from a year prior. (Am. Compl. ¶ 68.) Plaintiff does not allege that these income figures were false. Plaintiff also argues that Defendant Tonnesen made a false statement on July 25, 2007, when he said during another conference call with analysts that, "We're comfortable with our capital position today." (Docket No. 27 at 17; Am. Compl. ¶ 109.) To back up that statement, Defendant Tonnesen referred to "rais[ing] $80 million in the line" and noting the positive effect it would have on Triad's risk-to-capital ratio. (Am. Compl. ¶ 109.) Plaintiff does not allege that Triad did not raise the $80 million or that it would not have a positive effect on Triad's risk-to-capital ratio. Plaintiff does not allege any falsity with regard to the income figures released by Triad in a press release on the same day as this conference call. (*Id*. ¶ 107.)

Plaintiff also points out that Triad was required by statute to maintain at least 50% of its earned premiums in reserve. (Docket No. 27 at 18; Docket No. 26 at 27.) Plaintiff does *not* allege facts showing that Triad did not maintain this amount of premiums in reserve or that any statements of compliance with this requirement by Defendants were false. Rather, Plaintiff argues that Triad charged premiums that were too low for its insurance

policies which resulted in an inadequate reserve amount in case of an economic downturn. (*Id.*)

Plaintiff charges that Defendants made false and misleading statements when they claimed that Triad's modified pool insurance segment was generating strong revenue and earnings growth. (*Id.*) Again, Plaintiff does not allege that this segment was not generating strong revenue and earnings growth. (*Id.* at 18-19.) Rather, Plaintiff attacks the basis for this revenue growth. (*Id.* at 19.)

The broad and general nature of the alleged misleading statements makes it especially important that Plaintiff adequately allege facts tending to show that Defendants acted with scienter. Plaintiff contends that one or two Triad employees in early 2004 began raising concerns about the adequacy of Triad's loss reserves with regard to its bulk transactions. (Am. Compl. ¶¶ 46-52.) Throughout the amended complaint, Plaintiff relies on the statements of five confidential sources, former employees of Triad, to show that the individual Defendants were aware that some employees disagreed with the company's method of evaluating the risk posed by the bulk insurance being sold and the prices at which it was sold. (*See* Am. Compl. ¶ 54.) On March 28, 2007, two of these employees presented a formal evaluation of Triad's risk and pricing models to Triad's risk management committee to which the individual Defendants belonged. (*Id.*) These employees proposed certain changes which they believed would ensure that Triad properly evaluated risk and appropriately priced its products. (*Id.* ¶¶ 58-59.) Plaintiff alleges that, after this

presentation, Triad retained a firm to evaluate the employees' model review. This evaluation by the outside firm "validated" the model review. (*Id*. ¶ 59.) Triad made several changes as a result of these evaluations and primary among them, according to Plaintiff, was to place restrictions on the authority of Ken Foster, a Triad executive vice-president in charge of pricing bulk or pool transactions, to adjust Triad's pricing and risk models. (*Id*. ¶ 60.)

Plaintiff's allegations regarding alleged manipulation of Triad's pricing and risk models do not support a strong inference that any Defendant acted with intention or recklessness in making false representations regarding Triad's financial condition. The allegations concerning employee concerns about loss reserves, especially as they relate to the time period before March 28, 2007, are exceedingly sparse. They do not remotely support a strong inference that Defendants recklessly disregarded material negative information about the risk inherent in Triad's bulk loans during that early time period. Accordingly, none of the representations made by Defendants before March 2007 could have been made with an intent to deceive or recklessness as to the truth thereof.

With regard to Triad's pricing of insurance policies, Plaintiff attempts to walk a fine line between alleging that Defendants priced their products so low that the severe economic downturn doomed Triad, but not so low that Defendants knew they would lose money on each policy–an allegation of economically irrational conduct that would not support an inference of scienter. *See Cozzarelli v. Inspire Pharms., Inc.*, 549 F.3d 618, 627 (4th Cir. 2008); Docket No. 27 at 32 & n.21. Plaintiff concedes that pricing products below the

prices of competitors increased Triad's market share and was a desired consequence for Triad. (*Id.*) This very narrow range of pricing between what would be a possibly successful business practice and an economically irrational practice makes it extremely difficult for Plaintiff to raise a strong inference that Defendants acted recklessly in describing the effect their pricing or risk modeling strategies had on the financial condition of the company, and Plaintiff has not done so.

At bottom, the evaluation of risks with regard to Triad's bulk insurance products necessarily involves technical concepts. The amended complaint does not contain sufficient factual allegations to cause the Court to find it plausible that Defendants acted outside the range of objectively reasonable valuation and risk assessment in the environment in which they were operating in mid-2007 and beyond.[1] To allege only that several persons within the company argued for another risk model, and that an outside company "validated" this model, falls short of raising a strong inference that Defendants knowingly or recklessly misled the market as to the financial position and risk exposure of the company.

Finally with regard to scienter, courts have recognized that a defendant's purchase of a company's stock during relevant times may be considered by the Court. *See In re Inspire Pharms., Inc. Secs. Litig.*, 515 F. Supp. 2d 631, 640 (M.D.N.C. 2007), *aff'd sub*

---

[1] As noted above, Plaintiff's allegations regarding the period before March 28, 2007, raise no significant inference of scienter on the part of any Defendant with regard to disclosures made during that early time within the class period.

*nom. Cozzarelli*, 549 F.3d 618. The individual Defendants show through public SEC filings, of which this Court may take notice,[2] that they each made purchases of Triad stock during the class period. (Docket No. 25, Exs. 1, 2.) Defendant Tonnessen acquired significant quantities of Triad stock on July 31, 2007 and on October 30, 2007. (*Id.*, Ex. 2.) Defendant Jones acquired Triad stock on August 2, 2007. (*Id.*, Ex. 1.) Although the Court does not weigh this factor significantly in its analysis, it seems unlikely that they would have purchased these shares of stock if they knew or had recklessly disregarded the possibility that their public statements of Triad's financial position were materially false.

Accordingly, Plaintiff has failed to sufficiently allege scienter on the part of any Defendant. This is an independent basis upon which the amended complaint is deficient. Finding that the amended complaint is deficient in two major respects, the Court does not address other grounds for dismissal raised by Defendants.

### 2.     **Count II – Section 20(a)**

Section 20(a) of the Exchange Act imposes liability on each person who "controls any person liable under any provision of this chapter" to the "same extent as such controlled person." 15 U.S.C. § 78t(a). This claim therefore "requires a predicate allegation of a violation of law." *Teachers' Ret. Sys.*, 477 F.3d at 188. Because Plaintiff has failed to state a predicate violation of law, Count II states no claim. *See Cozzarelli*, 549 F.3d at 628

---

[2] *See In re PEC Solutions, Inc. Secs. Litig.*, 418 F.3d 379, 390 n.10 (4th Cir. 2005).

(claims under section 20(a) were derivative of section 10(b) and Rule 10b-5 claims, and thus were properly dismissed).

## Conclusion

For the foregoing reasons, **IT IS RECOMMENDED** that Defendants' motion to dismiss (Docket No. 24) be granted. Such a grant may, in the Court's discretion, be without prejudice to Plaintiff's opportunity, as requested at oral argument, to file a further amended complaint that adequately addresses the pleading deficiencies identified in this Recommendation.

/s/ P. Trevor Sharp
United States Magistrate Judge

Date: January 27, 2012