# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

JAMES L. PHILLIPS, Individually )
and on Behalf of All Others Similarly )
Situated, )
                   )
         Plaintiff, )
                   )
         v. )           1:09CV00071
                   )
TRIAD GUARANTY INC., MARK )
K. TONNESEN, and KENNETH W. )
JONES, )
                   )
         Defendants. )

## ORDER, MEMORANDUM OPINION AND RECOMMENDATION

In this class action, lead Plaintiff, Western Pennsylvania Electrical Employees Pension Fund, alleges that Defendants Triad Guaranty, Inc. ("Triad"), Mark Tonnesen and Kenneth Jones committed securities fraud in violation of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. § 240.10b-5. Plaintiff is an institutional investor that brings this action on behalf of itself and other investors who purchased common stock between October 26, 2006, and April 1, 2008 (the "Class Period"). This matter is currently before the court on Defendants' motion to dismiss the second amended class action complaint for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6). (Docket Entry 63.) Also before the court is Plaintiff's motion to strike four exhibits (Ex. 8, 9, 10, and 11) to the Declaration of Robyn F. Tarnofsky, submitted by Defendants in support of their motion to dismiss. (Docket Entry 73.)

Plaintiff filed the original complaint in this matter on January 28, 2009. (Docket Entry 1.) Following the filing of an amended complaint, Defendants moved to dismiss the amended complaint for failure to state a claim. (Docket Entry 24.) On January 27, 2012, the Honorable P. Trevor Sharp, United States Magistrate, recommended that Defendants' motion to dismiss be granted "without prejudice to Plaintiff's opportunity . . . to file a further amended complaint . . . ." (Docket Entry 54.) Following the issuance of Judge Sharp's recommendation, Plaintiff moved to amend its class action complaint. This motion was granted on March 13, 2012. (Docket Entry 59.) Plaintiff subsequently filed the second amended complaint (Docket Entry 60) which is the subject of the pending motion to dismiss. On March 12, 2013, the Court heard arguments on Defendants' motion to dismiss and took the matter under advisement. For the reasons set forth below, Plaintiff's motion to strike is granted. Further, the Court recommends that the motion to dismiss be denied.

## I. FACTUAL BACKGROUND[1]

*The Company*

This case involves Defendant Triad Guaranty Inc., a company which provided private mortgage insurance coverage to residential mortgage lenders and investors in the United States through its wholly owned subsidiary, Triad Guaranty Insurance Corporation ("Triad Insurance"). (SAC ¶ 16, Docket Entry 60.).[2] Although Triad is a Delaware corporation, Plaintiff alleges that venue is proper in this district because Triad is

---

[1] The facts below, which are taken as true for purposes of the present motion to dismiss, are gleaned from Plaintiff's complaint.
[2] "SAC" refers to the 126-page long second amended complaint. For the sake of clarity and ease of analysis, however, the second amended complaint will be referred to in the text of this Recommendation as simply the "complaint," unless otherwise noted.

headquartered in Winston-Salem, North Carolina and "[m]any of the acts charged [in the complaint], including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District." (*Id.* ¶ 13.) Triad is publicly-traded via NASDAQ under the symbol "TGIC." (*Id.* ¶ 209(a).) During the Class Period, Triad's stock price dropped significantly. (*Id.* ¶¶ 191-207.)

*The Parties*

Defendant Tonnesen was, at relevant times, the President and Chief Executive Officer of Triad. (*Id.* ¶ 17.) He retired from his executive positions with Triad in August 2008. (*Id.*) Defendant Jones was, at relevant times, the Senior Vice-President and Chief Financial Officer ("CFO") of Triad; in October 2008 he assumed the position of President and CEO of the Company. (*Id.* ¶ 18.) On August 16, 2009, this Court appointed Western Pennsylvania Electrical Employees Pension Fund as the lead Plaintiff in this action. (Docket Entry 15.) The "Class" consists of all purchasers of the publicly traded securities of Defendant Triad between October 26, 2006, and April 1, 2008. (SAC at 1.)

Plaintiff relies on five confidential witnesses, all of whom were former high-ranking Triad officers or employees. (*See, e.g.,* SAC ¶¶ 29, 48, 51, 59.)

*Triad's Mortgage Insurance Business*

During the Class Period, Triad insured mortgages through two principal channels. In the first channel, known as the "flow" channel, Triad insured individual mortgages on a one-by-one basis. In the second channel, known as the "bulk" channel, Triad underwrote and insured a substantial number of mortgages that had been pooled and packaged into securities. Triad referred to these loans as modified pool insurance. These structured bulk

3

transactions are "typically initiated by underwriters of mortgage-backed securities, mortgage lenders and mortgage investors, such as Fannie Mae and Freddie Mac." (SAC ¶ 28.)

In 2003, modified pool insurance policies accounted for just 15% of the total policies underwritten by Triad. Triad held only a 4.4% market share in the structured bulk channel. (SAC ¶ 29.) Triad, in a conscious business decision, hired Ken Foster, who had expertise in this area, to facilitate the expansion of the structured bulk channel business. (*Id.*) Ultimately, Triad's market share increased from 4.9% market share in 2003 to a 9.1% market share in 2006, and Triad's structured bulk channel market share increased from 4.4% in 2003 to 14.5% in 2006. (*Id.* ¶ 31.)

Plaintiff alleges that as long as the housing market remained strong and Triad's business kept growing, the company's under-appreciation of risk had minimal impact on its operations. As alleged by Plaintiff, Defendants gambled that the true risk inherent in its modified pool insurance would never materialize because favorable market conditions and Fannie Mae coverage deductibles would protect Triad from defaults and claims. (SAC ¶¶ 46-47.)

Plaintiff alleges that during the Class Period, Defendants made materially false or misleading statements regarding Triad's business and financial results. Specifically, Plaintiff alleges that Defendants manipulated Triad's pricing models for insurance, allowing the company to under-bid its competitors, increase market share, and artificially boost revenues, all the while assuring investors that Triad's practices were sound, that its risk levels were appropriate and that it was properly capitalized for the risks it was taking. (*Id.* ¶ 36.) According to the allegations in the complaint, Triad's former Vice-President of Risk

4

Analytics stated that Triad's internal controls related to model adjustments were "reckless" and easily manipulated by Foster to get to the price point he desired. (*Id.*) According to this former officer, Foster "changed the dials for delinquencies and pay-offs" to get where he wanted to be. (*Id.* ¶ 37.) "To this end, the models' dials would be set so that the Company appeared to get a 12% return on capital on its Modified Pool insurance, regardless of the actual risk associated with the pools." (*Id.*) As long as Triad's business kept growing, the inadequate reserves were hidden. (*Id.* ¶ 57.)

According to the allegations in the complaint, by early 2007 two officers of Triad, the former Senior Vice-President of Audit and the former Assistant Vice President of Data Warehousing, were raising red flags about the process Triad was using to assess risk. (*Id.* ¶ 62.) Despite "these clear and well-documented warnings, Defendants trumpeted Foster's so-called successes to the market." (*Id.* ¶ 65.)

In light of the documented concerns, two other officers, the former Vice-President of Risk Analytics and former Vice-President for Risk Analysis and Forecasting, prepared a formal evaluation showing Triad's "systematic undervaluing of risk, resulting in pricing insurance policies below market value." (*Id.* ¶ 67.) Their findings were presented to Triad's Credit Committee on March 28, 2007. (*Id.*) Defendants Tonnesen and Jones attended this meeting, as did Foster and Steve Haferman, Triad's Senior Vice-President of Risk Management. (*Id.*) In the presentation, the two officers made specific recommendations which they considered necessary "to ensure that the Company properly evaluated risk, had proper mechanisms in place, and priced its insurance policies commensurate with the actual risk incurred." (*Id.* ¶ 72.)

Following the presentation to the Credit Risk Committee, Triad retained a consulting firm, Integrated Financial Engineering, Inc. ("IFE"), to evaluate the review model suggested by the two former officers. According to the complaint, IFE "validated" the earlier evaluation. (*Id.* ¶ 74.) In response to the IFE report, Triad placed certain restrictions on Foster, including a requirement that all future adjustments to Triad's risk and pricing models be done by Risk Management, not by Foster. Triad also precluded Foster from bidding "live" on any more modified pool transactions without company review. (*Id.* ¶ 75.)

Plaintiff alleges that Triad failed to disclose any of these matters to investors. In fact, these restrictions ultimately resulted in Triad not writing any modified pool insurance after the second quarter of 2007, but, according to Plaintiff, the true reasons for the shutdown of this portion of Triad's business, *i.e.*, the risky pricing models, among other reasons, were never revealed to investors. Rather, Triad continued to tout its "high quality portfolio" and strong risk management strategies. (*Id.* ¶ 87.)

*Corrective Disclosures*

Plaintiff alleges that Triad's failure to take corrective measures as recommended by experts and others resulted in material overstatements of the value of its balance sheet and the strength of its insured portfolio. Moreover, according to Plaintiff, even as the housing and mortgage markets deteriorated, Defendants continued to make rosy, and misleading, statements about Triad's capital position and financial future, thus artificially inflating Triad's stock price. (SAC ¶ 132.) However, beginning in August 2007, according to Plaintiff, certain market revelations began to occur.

On August 27, 2007, Triad filed a Form 8-K statement with the SEC announcing that it had drawn down $80 million on its line of credit. (SAC ¶ 135.) Triad's stock price on August 27, 2007 was $25.90 per share, but by closing on August 28, 2007 the stock price dropped to $19.00 per share. (Decl. of Robyn F. Tarnofsky, Ex. 13, Docket Entry 25-14.) Plaintiff alleges that, following this disclosure, on August 28, 2007, Bear Sterns issued a report stating that the impact of Triad's $80 million drawdown was substantial, reporting that "the uncertainty surrounding the company continues to concern us." (SAC ¶ 137.) Triad's stock price closed at $16.20 per share on August 29, 2007. (Tarnofsky Decl., Ex. 13, Docket Entry 25-14.) On August 30, 2007, Fitch Ratings downgraded Triad's long-term and senior debt ratings from "A+" to "A" and downgraded Triad's insurer financial strength rating from "AA" to "AA-." (SAC ¶ 139.)

Plaintiff alleges that on August 31, 2007, Defendants issued a press release, seeking to reassure the market. In this press release, Defendant Tonnesen stated that Triad was surprised at the drop in stock price following the announcement of the credit line drawdown, but that "[t]he decision to borrow these funds was made within the context of the historically conservative philosophy of Triad . . .against the backdrop of widespread volatility and liquidity concerns in the capital markets." (*Id.* ¶ 140.) Tonnesen went on to state, "As we navigate these turbulent times we are relying on our balance sheet and reserves and not the vagaries of the bond or mortgage-backed securities to pay our claims." (*Id.*) Following these reassurances, Plaintiff alleges that Triad's stock price was "artificially prop[ped] up," closing at $17.56 per share on September 4, 2007, the next trading day after the August 31, 2007 press release. (*Id.* ¶ 141.)

The next corrective disclosure alleged by Plaintiff occurred on October 24, 2007, when Triad issued a press release reporting a net loss of $31.8 million for the quarter ending September 30, 2007, and a substantial increase in its reserves. (*Id.* ¶ 143.) According to Plaintiff, "the market reacted negatively to this announcement, causing Triad's stock price to plummet by 30.94% on unusually high trading volume." (*Id.* ¶ 145.)

On April 1, 2008, in its 2007 Form 10-K, filed with the SEC, Triad disclosed for the first time the dire financial straits in which the company found itself, reporting that it had been unsuccessful in obtaining any new capital commitments and was facing a run-off, meaning that Triad could no longer write any new policies. (SAC ¶ 163.) Following this disclosure, Triad's stock price fell from $5.25 when the market closed on April 1, 2008, to $2.15 at the close on April 4, 2008. (*Id.* ¶ 166.)

Other specific facts will be addressed as relevant to the legal analysis below.

## II. DISCUSSION

### A. Motion to Dismiss Standard of Review

#### 1. In General

Under Federal Rule of Civil Procedure 12(b)(6), a defendant may seek dismissal of a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). A motion to dismiss for failure to state a claim should be granted if the complaint does not allege "enough facts to state a claim to relied that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In other words, the factual allegations must "be enough to raise a right to relief above the speculative level." *Id.* at 555. "Thus, while a plaintiff does not need to demonstrate in a complaint that the right to relief is 'probable,' the

complaint must advance the plaintiff's claim 'across the line from conceivable to plausible.'"

*Walters v. McMahen*, 684 F.3d 435, 439 (4th Cir. 2012) (*quoting Twombly*, 550 U.S. at 570). As explained by the United States Supreme Court:

> A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief.

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotations and citations omitted).

A 12(b)(6) motion tests the sufficiency of a complaint and "does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992). Accordingly, a court should "assume the truth of all facts alleged in the complaint and the existence of any fact that can be proved, consistent with the complaint's allegations." *E. Shore Mkts. Inc. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000). Although the truth of the facts alleged is assumed, courts are not bound by the "legal conclusions drawn from the facts" and "need not accept as true unwarranted inferences, unreasonable conclusions, or arguments." *Id.*

A motion to dismiss pursuant to Rule 12(b)(6) must be read in conjunction with Federal Rule of Civil Procedure 8(a)(2). Rule 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," so as to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests . . . ." *Twombly*, 550 U.S. at 555 (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957). Rule 8 does not, however, unlock the doors of discovery for a plaintiff armed with nothing more than

conclusions. Fair notice is provided by setting forth enough facts for the complaint to be "plausible on its face" and "raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact) . . . ." *Id.* at 555 (internal citations omitted). "Rule 12(b)(6) does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations." *Id.* at 556 (quoting *Scheuer v. Rhodes*, 416, U.S. 232, 236 (1974)).

## 2. Heightened Pleading for Fraud

To survive a Rule 12(b)(6) motion to dismiss a fraud claim, a plaintiff must generally "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). To satisfy the heightened pleading requirements of Rule 9(b), a plaintiff must allege facts establishing the "who, what, when, where, and how" of the claimed fraud. *United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 379 (4th Cir. 2008). The general rule that pleadings are to be given liberal construction does not apply to claims of fraud. *Rosenthal v. Perkins*, 42 N.C. App. 449, 257 S.E.2d 63 (1979).

## 3. Securities Fraud Actions

Under the Private Securities Litigation Reform Act of 1995 ("PSLRA"), the pleading standard is even higher for claims alleging a violation of section 10(b) or Rule 10b-5. To state a claim for securities fraud under §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, a plaintiff must adequately allege six elements: (1) a material misrepresentation or omission; (2) scienter; 3) a connection between the misrepresentation and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation. *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*,

552 U.S. 148, 157 (2008); *see Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1317 (2011). A plaintiff must plead specific facts as to each element under the PSLRA.

First, a securities fraud complaint alleging that the defendant made a false or misleading statement must "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading." PSLRA § 101(b); *see* 15 U.S.C. § 78u-4(b)(1); *Matrixx Initiatives*, 131 S. Ct. at 1318 n.4; *Teachers' Ret. Sys. of La. v. Hunter*, 477 F.3d 162, 172 (4th Cir. 2007). The allegedly false or misleading statement must be material. *See Matrixx Initiatives*, 131 S. Ct. at 1318. As explained by the Fourth Circuit, section 10(b) and Rule 10b5 "decidedly do *not* prohibit *any* misrepresentation – no matter how willful, objectionable, or flatly false – of *im*material facts, even if it induces reactions from investors that, in hindsight or otherwise, might make the misrepresentation appear material." *Greenhouse v. MCG Capital Corp.*, 392 F.3d 650, 656 (4th Cir. 2004) (emphasis in original).

Second, with respect to each act or omission, a plaintiff must "state with particularity facts giving rise to a strong inference" of the required state of mind, or scienter. PSLRA § 101(b); *see* 15 U.S.C. § 78u-4(b)(2)(A); *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313-14 (2007); *Teachers Ret. Sys.*, 477 F.3d at 172. Thus, at the motion to dismiss stage, the court must consider "plausible, nonculpable explanations for the defendant's conduct." *Tellabs*, 551 U.S. at 324. "A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.*

In this circuit, "[p]leading recklessness is sufficient to satisfy the scienter requirement." *Matrix Capital Mgmt. Fund, LP v. BearingPoint, Inc.*, 576 F.3d 172, 181 (4th Cir.

2009). In a securities fraud claim, recklessness means conduct "so highly unreasonable and such an extreme departure from the standard of ordinary care as to present a danger of misleading the plaintiff to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Id.* (internal quotation omitted). But the scienter threshold is not crossed if the more compelling inference is that "defendants acted innocently, or even negligently." *Pub. Emps.' Ret. Ass'n of Colo. v. Deloitte & Touche LLP*, 551 F.3d 305, 313 (4th Cir. 2009).

In construing this standard, the Supreme Court of the United States has held that it must be ascertained "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets [the strong inference] standard." *Tellabs*, 551 U.S. at 323 (emphasis in original). Thus, to be "strong," such an inference of scienter must be more than "permissible" or "reasonable," "it must be cogent and compelling compared to other, nonculpable explanations. *Id.* at 324. It follows, therefore, that under the comparative analysis set forth in *Tellabs*, the first inquiry for a court is whether the facts alleged "permit an inference of scienter, and if so, the persuasiveness of that inference." *Matrix*, 576 F.3d at 183. Next, if the court finds the inference that the defendants "acted innocently, or even negligently, more compelling than the inference that they acted with the requisite scienter," the complaint should be dismissed. *Pub. Emps.' Ret. Ass'n*, 551 F.3d at 313.

Under the strong inference standard, then, negligence is insufficient to support a section 10(b) claim. *Id.* at 314. To establish a strong inference of scienter, "plaintiffs must do more than merely demonstrate that defendants should or could have done more." *Id.* at

314. Indeed, as noted by the Supreme Court, "Congress did not merely require plaintiffs to . . . allege facts from which an inference of scienter rationally *could* be drawn." *Tellabs*, 551 U.S. at 323 (emphasis in original). Plaintiffs must allege scienter by pleading intentional misconduct or severe recklessness. *Cozzarelli v. Inspire Pharm. Inc.*, 549 F.3d 618, 629 (4th Cir. 2008).

In the securities fraud context, a reckless act is one that is "so highly unreasonable and such an extreme departure from the standard of ordinary care as to present a danger or misleading the plaintiff to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Pub. Emps. Ret. Ass'n*, 551 F.3d at 313 (internal quotation omitted). Nevertheless, "when the facts as a whole more plausibly suggest that the defendant acted innocently—or even negligently—rather than with intent or severe recklessness, the action must be dismissed." *Cozzarelli*, 549 F.3d at 624. Additionally, where, as here, plaintiffs allege fraud claims against individual defendants, they "must allege facts supporting a strong inference of scienter as to each defendant." *Matrix*, 576 F.3d at 182 (citation omitted). "[I]f the defendant is a corporation, the plaintiff must allege facts that support a strong inference of scienter with respect to at least one authorized agent of the corporation, since corporate liability derives from the actions of its agents." *Teachers' Ret. Sys.*, 477 F.3d at 184 (4th Cir. 2007) (citation omitted).

Pleading practice in the Fourth Circuit "requires that a plaintiff, as a precursor to proof, allege loss causation in the complaint with sufficient specificity to enable the court to evaluate whether the necessary causal link exists." *Katyle v. Penn Nat'l Gaming, Inc.*, 637 F. 3d 462, 465-66 (4th Cir. 2011) (internal quotation and citation omitted). Moreover, "[b]ecause

loss causation is fact-dependent, the specificity sufficient to plead loss causation will vary depending on the facts and circumstances of each case." *Id.* at 471. In a securities fraud case such as this, where Plaintiff is asserting an economic loss based on a drop in value of stock, the alleged facts, therefore, must show "that the misrepresentation or omission was one substantial cause of the investment's decline in value." *Id.* at 472. In other words, "the complaint must allege a sufficiently direct relationship between the plaintiff's economic loss and the defendant's fraudulent conduct." *Id.*

## B. Analysis

### 1. Use of Confidential Sources

Plaintiff relies on several confidential witnesses who provided information in the complaint with regard to the alleged misrepresentations made by Defendants. Defendants urge this court to disregard or heavily discount these statements because Plaintiff has not alleged that at least several of these witnesses were employed by Triad during the putative class period. "As a general matter, a plaintiff may rely on confidential sources to substantiate his claims for securities fraud." *In re Cree, Inc. Sec. Litig.*, 333 F. Supp. 2d 461, 472 (M.D.N.C. 2004). While the identity of the employees here technically remains confidential, Plaintiff has provided their titles and the dates that they worked for Triad. The information provided by these witnesses arises from their individual personal knowledge and relates to the core facts underlying the complaint. *See In re Trex Co., Inc. Sec. Litig.*, 454 F. Supp. 2d 560, 573 (W.D. Va. 2006) ("A confidential witness' testimony can be used in pleading under the PSLRA so long as the testimony involves facts of which the witness had personal knowledge.") Defendant points out that one of the confidential witnesses, the former Vice-

14

President of Audit, left Triad at least two years before the class period begins. (*See* SAC ¶ 48 n.9.) However, the allegations with regard to this witness all relate to information he possessed and conversations he had with other Triad officers. As such, the witness's statements are properly alleged. With regard to the other confidential witnesses, some of whom were not employed at Triad during the entire class period, the court will consider the statements and information. At this stage in the litigation, factual issues concerning the credibility and weight of the employee statements must be construed in favor of Plaintiff. *See Tellabs*, 551 U.S. at 322.[3]

## 2. Section 10(b)

Section 10(b) of the Securities Exchange Act of 1934 makes it unlawful for any person, directly or indirectly "[t]o use or employ, in connection with the purchase or sale of any security . . ., any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j. The implementing regulation, SEC Rule 10b-5, declares it unlawful:

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

---

[3] Defendants cite *Teachers' Ret. Sys.* for the proposition that a complaint is insufficient when it fails to allege facts to support how the confidential witness obtained his claimed knowledge. 477 F.3d at 182. A review of the complaint in this matter, however, reveals sufficient allegations with regard to the positions, experience and direct knowledge, together with access to information, of these witnesses, at least at this stage of the proceedings.

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

The Supreme Court of the United States has "implied a private cause of action from the text and purpose of [Section] 10(b)" for purchasers or sellers of securities injured by its violation. *Matrixx Initiatives*, 131 S. Ct. at 1317. As outlined above, the elements of a private securities fraud claim, based on violations of § 10(b) and Rule 10b-5,[4] are: (1) a material misrepresentation of omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation. *Id.* at 1317.

Defendants argue that Plaintiff's 126-page second amended complaint lacks any substantive facts to support a claim under Section 10(b) and Rule 10b-5 and assert that the complaint fails as a matter of law for the following reasons: (1) Plaintiff has failed to adequately plead scienter; (2) Plaintiff has failed to state a coherent theory of loss causation; and (3) Plaintiff has failed to adequately allege that Defendants made any false statements. The court will consider each of these arguments, though not in the same order as Defendants. For the sake of analysis, it is more helpful to discuss the misrepresentation and scienter arguments before addressing the loss causation allegations.

---

[4] Because the scope of Rule 10b–5 is coextensive with the coverage of Section 10(b), the Court will use "Section 10(b)" to refer to both the statute and the rule. *See SEC v. Pirate Investor, LLC*, 580 F.3d 233, 237 n.1 (4th Cir. 2009) (citations omitted).

As a preliminary matter, in determining whether the complaint satisfies the standard under the PSLRA, a court must make a case-by-case assessment of the complaint as a whole. This court will consider the number and level of detail of the facts; the plausibility and coherence of the facts; the sources of the facts alleged, together with the reliability of those sources; and any other criteria that inform how well the facts support Plaintiff's allegations. *Teachers' Ret. Sys.*, 477 F.3d at 174. When a complaint relies on facts put forth by confidential sources, it must describe the sources "with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged . . ." *Id.*

Moreover, while it is generally accepted that a plaintiff seeking to state a cause of action for securities fraud under Section 10(b) must meet a rigorous pleading standard, it is not necessary for Plaintiff to prove absolute, incontrovertible falsity at this stage of the proceeding. Section 78u-4(b)(1) requires a plaintiff to allege sufficient facts to support a reasonable belief in the allegation that a defendant's statement was misleading. This tests only the legal sufficiency of the complaint and logically follows from the inquiry necessary under Rule 12(b)(6). Thus, the appropriate inquiry under the PSLRA becomes, if those facts alleged in a complaint are true, whether relief could be granted on the plaintiff's claim. *Teachers' Ret. Sys.*, 477 F.3d at 173.

### a. Rule 10b-5(b): Material Misrepresentation or Omission

It is well-settled that there can be no liability under Rule 10b-5 in the absence of a material fact. A defendant must make "a public misrepresentation for which it may be found primarily liable." *Gariety v. Grant Thornton, LLP*, 368 F.3d 356, 369 (4th Cir. 2004).

The statements identified "must be false, or the omission must render public statements misleading" and "any statement or omission of fact must be material." *Longman v. Food Lion, Inc.*, 197 F.3d 675, 682 (4th Cir. 1999). "[A] fact stated or omitted is material if there is a substantial likelihood that a reasonable purchaser or seller of a security (1) would consider the fact important in deciding whether to buy or sell the security or (2) would have viewed the total mix of information made available to be significantly altered by disclosure of the fact." *Id.* at 683 (citing *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988); *see also* I*n re Gentiva Sec. Litig.*, No. 10-cv-5064, 2013 WL 1200334 at*10 (E.D.N.Y. Mar. 25, 2013) ("At the pleading stage, a plaintiff satisfies the materiality requirement of Rule 10b-5 by alleging a statement or omission that a reasonable investor would have considered significant in making investment decisions.")). Furthermore, where plaintiffs allege that a defendant omitted material information, they must identify specific public statements and identify how any omitted facts render those statements misleading. *Longman* 197 F.3d at 682. Finally, a plaintiff cannot bring a claim for securities fraud based on the omission of information that was already known to the market. *Id.* at 684.

To establish their claims under § 10(b) and Rule 10b-5(b), Plaintiff relies on numerous misrepresentations and omissions by Defendants regarding the viability of its modified pool insurance business and the sufficiency of its capital reserves to cover the risk inherent in the mortgage insurance business. Plaintiffs contend that throughout the Class Period Defendants failed to disclose the faulty risk model upon which its aggressive modified pool strategy was based. Plaintiffs further allege that Defendants concealed from

the investing public the concerns of both internal risk officers and outside consultants as to its undercapitalization.

There are numerous allegations in the complaint of specific false and misleading statements made by Defendants, beginning with a press release issued on October 26, 2006, which outlined an increased net income for the third quarter of 2006 and contained statements such as: "The Triad team has demonstrated deftness this quarter balancing growth, credit quality, prudent investment and attention to balance sheet fundamentals." (SAC ¶ 80.) In a conference call on the same day, similar statements were made, including this statement by Defendant Tonnesen: "We believe we are being appropriately compensated for this risk, and given the growth of our capital base we are in a position where we can accept the higher level of volatility on a portion of our capital for a higher overall return." (*Id.* ¶ 83.) In the same call, Defendant Jones, in answering a question about the reserves, acknowledged the increase in defaults and stated that the reserves had been increased accordingly, but went on to state: "they're almost irrelevant to the total reserve inventory. It's almost exclusively a function of the default counts, which were right in line with our expectations." (*Id.* ¶ 84.) Plaintiff alleges that these statements, together with other alleged misrepresentations, artificially inflated the price of Triad's stock. (*see, e.g.,* ¶¶ 85-87.) Plaintiff further alleges that these statements were false and misleading because Triad's exposure to losses was far greater than what Defendants disclosed to investors, as a result of its underpricing modified pool insurance and under-estimating the risks, and, further, Triad lacked effective internal controls to recognize manipulation in its pricing and risk assessment processes. Plaintiff also alleges that the statements made to investors about

Triad's contingency reserves, credit quality and risk-to-capital ratio were part of a scheme to artificially inflate Triad's stock price. Later statements in Triad's 2006 annual report made similar claims of sound risk management and prudent growth. (*Id.* ¶ 102.) The complaint alleges that the statements in the annual report were materially false and misleading because they failed to disclose the risks and lack of internal controls.

As alleged by Plaintiff, by ignoring or under-appreciating known risks in its insurance pool, Triad was able to undercut its competition on price and consequently gain market share and grow revenue. These gains, however, were based on risks not disclosed to investors. Plaintiff alleges that Triad was under-capitalized as a result of its failure to reserve sufficient capital, yet Defendants continued to assure investors that Triad was well-capitalized with adequate reserves. (*See, e.g.,* SAC ¶¶ 108, 123.) Additionally, Plaintiff alleges that Defendants knew that they were under-cutting Triad's competitors through aggressive pricing, thereby making Triad's portfolio appear less risky to the market. (*Id.* ¶ 54-56.)

Here, Plaintiff has adequately specified the content of the alleged misrepresentations and misleading omissions. Plaintiff has listed specific misrepresentations and omissions which occurred during the Class Period. For each alleged misrepresentation, Plaintiff has identified the speaker and stated where and when the statements or omissions were made. Defendants contend that rather than alleging misrepresentations and fraud, Plaintiff has simply presented "a classic example of a difference of opinion" and that at most Plaintiff alleges that "[D]efendants made a bad 'gamble' on pricing and imprudently ignored or overrode the differing opinions of certain Triad employees." (Def. Br. Supp. Mot. to Dismiss at 38, Docket Entry 64.) However, Plaintiff does more than allege a bad gamble

and a difference in opinions. Plaintiff alleges that Defendants failed to disclose that the bad gamble and difference of opinion rendered their Class Period statements false and misleading. Moreover, Plaintiff clearly alleges that Defendants knew they were systematically altering the pricing models for modified pool insurance and reducing Triad's reserves in an attempt to boost market share and revenues and artificially inflate the stock price. (SAC ¶¶ 36-47, 57-58.) Additionally, Plaintiff alleges that Triad Chairman of the Board Will Ratliff admitted to the Senior Vice-President of Audit that the Vice-President was correct about Triad's inadequate reserves. (*Id.* ¶ 64.) According to the allegations in the complaint, despite warnings from Triad employees and others, Defendant Tonnesen "trumpeted Foster's so-called business successes" in a conference call with analysts on January 25, 2007. (*Id.* ¶ 65.) Plaintiffs also adequately allege that Defendants knew they were underpricing Triad's competition through aggressive pricing, thus making Triad's portfolio appear less risky to the market than it actually was.

Finally, Plaintiff alleges that a reasonable investor would have relied on Defendants' statements and omissions as useful and valuable information about Triad. Thus, Plaintiff contends that the alleged statements and omissions satisfy the materiality component of a § 10(b) claim. Defendants argue that Triad's optimistic statements were simply "immaterial corporate puffery" which is not actionable under federal securities law. *See Longman*, 197 F.3d at 683 (noting that "opinion or puffery will often not be actionable, [however], in particular contexts when it is both factual and material, it may be actionable"). Here, the statements by Defendants were not simply limited to expressions of optimism or vague generalizations. Plaintiff has alleged specific statements regarding Triad's risk modeling, loan

portfolios, credit quality, risk-to-capital ratio, liquidity and capital position. (*See, e.g.*, SAC ¶¶ 76, 80, 84, 87-89, 93-96.) Plaintiff has also alleged failures to disclose the under-capitalization and risk manipulation employed by Defendants. (*Id.* at ¶¶ 102-104.) Thus the Court finds that Plaintiff has alleged material misrepresentations and omissions in satisfaction of the first element of section 10(b).

**b. Scienter Allegations**

A plaintiff seeking to establish liability under Section 10(b) must allege a defendant "acted with scienter, 'a mental state embracing intent to deceive, manipulate, or defraud.'" *Matrixx*, 131 S. Ct. at 1323 (internal quotations and citations omitted). To plead the necessary mental state, "negligence is not enough[,]" rather, "[a] plaintiff must show either 'intentional misconduct ' or such 'severe recklessness' that the danger of misleading investors was 'either known to the defendant or so obvious that the defendant must have been aware of it.'" *Cozzarelli*, 549 F.3d at 623 (4th Cir. 2008) (citing *Ottmann v. Hanger Orthopedic Grp., Inc.*, 353 F.3d 338, 343-44 (4th Cir. 2003). The United States Supreme Court, in considering the scienter pleading requirement, has held that in private securities actions, "[a] complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs.*, 551 U.S. at 324. As the court in *Tellabs* noted, "[t]he inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the smoking-gun genre, or even the most plausible of competing inferences." *Id.* (internal quotations and citations omitted).

Plaintiff has put forward an array of allegations, which taken collectively, it believes give rise to a cogent and compelling inference that Triad and the individual defendants

22

misled the market intentionally or with severe recklessness. Defendants argue that Plaintiff's allegations describe "economically irrational conduct" which would not support an inference of scienter. A review of the allegations in the complaint, however, supports a strong inference of scienter with regard to Defendants Tonneson and Jones. Plaintiff has pled that Defendants made a conscious decision to focus its business on structured bulk insurance. (SAC ¶¶ 29-31.) As part of this decision, Triad hired Ken Foster, who was successful in tripling Triad's structured bulk market share, doubling Triad's overall market share and increasing revenues for Triad. (Id. ¶¶ 31, 51.) Plaintiff alleges that the individual Defendants, as members of Triad's Risk Management Committee,[5] were responsible for setting underwriting guidelines, received monthly reports of losses and claims, and had access to internal documents which included "updates on loss rates by FICO scores, region and mortgage originator." (Id. ¶¶ 57-59.) Additionally, the complaint alleges that Defendants Tonnesen and Jones participated in weekly operations meetings which provided a general operational overview of the company. (Id. ¶ 60.)

Viewing the complaint in its entirety, as this court must, Plaintiff clearly alleges that Defendants knew, or were severely reckless in not knowing, that Triad had both underpriced its bulk, or modified pool, insurance and under-estimated the risk associated with these policies, resulting in Triad being under-reserved in the event of significant defaults. (Id. ¶¶ 59-79.) Plaintiff alleges, in fact, that Defendants Tonnesen and Jones had actual notice as to the incorrect pricing assumption used by Triad to price its modified pool insurance and the

---

[5] According to the complaint, the Risk Management Committee was comprised of senior executives, including Defendants Tonnesen and Jones, along with Ken Foster, Executive Vice-President of Sales and Operations Ken Lard, and Senior Vice Presidents Ron Kessinger and Steve Haferman. (SAC ¶ 59.)

resulting understated risk and low premiums which meant that the premiums did not cover the actual risk assumed by the policies. Both internal experts and outside consultants had raised serious concerns about the inadequacy of the reserves to cover the risks. (*See* SAC ¶ 63-64, 66-74.) By 2007, following a report from the retained consulting firm Integrated Financial Engineering, Triad placed restrictions on Foster, including requiring all adjustments to the company's risk and pricing models to be set by the Risk Management Committee, and precluding Foster from bidding live on any modified pool transactions unless they were first reviewed by Steve Haferman. (*Id.* ¶ 75.) These restrictions led to a significant decline in the modified pool insurance written by Triad from 2006-2008. (*Id.*)

The alleged facts in this case indicate that, in spite of the concerns raised about Triad's pricing models and its manipulation of the risks, Defendants continued to make statements, through press releases and conference calls, to investors which applauded Triad's risk portfolio, capital position and future prospects. Plaintiff has alleged that Defendants received the reports and other materials which clearly put them on notice as to the falsity and misleading nature of the information they caused to be disseminated to investors and the public. Defendants assert that Plaintiff's allegation that Defendants should have known that their pricing model was objectively unreasonable is insufficient to adequately plead scienter; however, it appears to this court that the amount of information available and the number of people who were cautioning Defendants about the pricing model support the "stronger" inference that Defendants possessed the information and either ignored it or actively misled investors in pursuit of higher returns. To be sure, there is no "smoking gun" lending irrefutable proof that Defendants acted with scienter. Yet, as instructed by the

24

Supreme Court, there is no requirement that the inference be irrefutable. *Tellabs*, 551 U.S. at 324. Rather, "[t]he proper focus of a court's inquiry with respect to scienter is whether 'all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard.'" *In re Massey Energy Co. Sec. Litig.*, 883 F. Supp. 2d 597, 622 (S.D.W.Va. 2012) (quoting *Tellabs*, 551 U.S. at 323). The facts as alleged in this case meet that standard.

A court must decide between competing inferences in a case like this, attempting to determine which inference is stronger, that Defendants acted with intent to defraud or that they had no knowledge of the falsity or misleading nature of its representations. The competing inference presented by Defendants is that they did not have motive and that it would have been economically irrational for Defendants' to have acted as alleged by Plaintiff. Here, the stronger inference in the context of this case is that Defendants acted with intent to defraud. Indeed, Plaintiff alleges that Defendants made rational, calculated business decisions. (SAC ¶ 29-30.) That these risky decisions later backfired does not make them irrational and thus negate scienter. The scienter allegations here go beyond those that other courts have dismissed for lack of particularity. *See, e.g., Carlucci v. Han*, 886 F. Supp. 2d 497 (E.D.N.C. 2012). The allegations, "taken collectively," give rise to a "cogent and compelling" inference that Triad elected not to disclose the internal risk management issues and the fact that despite warnings the modified pool insurance was underpriced and the company was undercapitalized with respect to the risks taken. "[A] reasonable person' would deem the inference that Triad acted with deliberate recklessness "at least as compelling as any opposing inference from the facts alleged." *Tellabs*, 551 U.S. at 324. The

inquiry required under Tellabs and its progeny is "made in the context of a traditional motion to dismiss—assuming the well-pleaded facts of the complaint to be true—and that all the facts alleged, taken collectively, must be considered in deciding whether the pleading gives rise to a strong inference of scienter." *City of Brockton Ret. Sys. v. Shaw Grp. Inc.*, 540 F. Supp. 2d 464, 472 (S.D.N.Y. 2008). Several courts, noting the "at least as likely" language of *Tellabs*, "have concluded that even if the plaintiff demonstrates only that an inference of scienter is at least as compelling as any nonculpable explanation for the defendant's conduct, the 'tie . . . goes to the plaintiff.'" *Id.*; *see also Gentiva*, 2013 WL 1200334 at *15; *Sawabeth Info. Servs. Co. v. Brody*, 832 F. Supp.2d 280, 295 (S.D.N.Y. 2011). Plaintiff's proposed inference of scienter is cogent and at least as compelling as Defendants' opposing inference. Accordingly, Plaintiff's allegations that Defendants were aware of or had access to information contrary to their public statements are sufficient to meet the PSLRA's scienter pleading requirements.

### c. Loss Causation

The PSLRA requires a plaintiff to prove "that the act or omission of the defendant alleged to violate this chapter caused the loss for the plaintiff seeks to recover damages." 15 U.S.C. § 78u-4(b)(4). Loss causation, thus, is the proximate cause element of a securities fraud claim. *See In re Mut. Funds Inv. Litig.*, 566 F.3d 111, 119 (4th Cir. 2009), *rev'd on other grounds, Janus Capital Group, Inc. v. First Derivative Traders*, 131 S. Ct. 2296, 2305 (2011). "Loss causation is not one of the elements with respect to which the PSLRA imposes a more stringent pleading requirement." *Teachers' Ret. Sys.*, 477 F.3d 162, 185 (4th Cir. 2007). Thus, to satisfy the pleading requirements for loss causation under a § 10(b) claim, a plaintiff must

allege "that the defendant's misrepresentation (or other fraudulent conduct) proximately caused the plaintiff's economic loss." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 346 (2005). In other words, as explained by the Supreme Court, the pleading rules for loss causation were "not meant to impose a great burden upon a plaintiff," and plaintiffs need only plead "a short and plain statement," pursuant to Fed. R. Civ. P. 8(a)(2), that provides defendants with some indication of the loss and the causal connection that the plaintiff has in mind. *Id.* at 346-47.

"The essence of loss causation is the notion that the alleged misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." *In re Mun. Mortg. & Equity, LLC, Sec. and Derivative Litig.*, 876 F. Supp. 2d 616, 645-46 (D. Md. 2012) (internal quotation and citation omitted). "[T]o plead causation, a complaint can allege that the market reacted negatively to a corrective disclosure regarding the falsity of the defendant's statements. . . . A complaint may also plead loss causation by alleging that a previously concealed risk materialized." *Id.* at 646.

Reading the PSLRA in conjunction with Rule 9(b), the Fourth Circuit requires that a plaintiff, as a precursor to proof, allege loss causation in the complaint with "sufficient specificity," so as to "'enable the court to evaluate whether the necessary causal link exists.'" *Katyle* 637 F.3d at 471 (quoting *Teachers' Ret. Sys.*, 477 F.3d at 186.) In other words, "the complaint must allege a sufficiently direct relationship between the plaintiff's economic loss and the defendant's fraudulent conduct." *Katyle*, 637 F.3d at 472 (citing *Miller v. Asensio & Co.*, 364 F.3d 223, 232 (4th Cir. 2004)). The facts alleged in the complaint need not conclusively show that the stock price decline is attributable solely to the alleged fraud rather

than to other intervening factors; nonetheless, the facts alleged must show that the misrepresentations or omissions were a substantial cause of the investment's decline in value. *Katyle*, 627 F.3d at 472. As noted by the Court of Appeals, if the connection between the alleged misrepresentations and the loss is attenuated, a claim will not lie. *Id.*

Loss causation is a "fact dependent" inquiry, and "the specificity sufficient to plead loss causation" must be evaluated on a case-by-case basis. *Id.* at 471. Clearly, stock prices are influenced by multiple factors, including "changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events." *Dura*, 544 U.S. 336, 343 (2005). As recognized by the Fourth Circuit,

> '[W]hen the plaintiff's loss coincides with a market wide phenomenon causing comparable losses to other investors, the prospect that the plaintiff's loss was caused by the fraud decreases, and a plaintiff's claim failed when it has not adequately pled facts which, if proven, would show that its loss was caused by the alleged misstatements [or omissions] as opposed to intervening events.

*Katyle*, 637 F.3d at 471 (quoting *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 172 (2d Cir. 2005).

Loss causation may be shown by alleging that the stock price declined when material conditions concealed by the alleged fraud were revealed to the market ("fraud on the market"), or by alleging materialization of a concealed risk, causing a drop in the stock price ("materialization of risk"). *See Katyle*, 637 F.3d at 477 n.10; *Teachers' Ret. Sys.*, 477 F.3d at 187. "[A] plaintiff asserting a fraud on the market theory must demonstrate a causal relationship by identifying 'corrective disclosures' that 'revealed to the market the undisclosed truth' and causes the decline in share price." *Massey*, 883 F. Supp. 2d at 625. Under the "materialization of the risk"

approach, "a plaintiff can successfully allege [loss] causation . . . by pleading that a previously concealed risk materialized, causing the plaintiff's loss." *Id.*

Here, Plaintiff alleges that Triad's numerous class-period misrepresentations and omissions proximately caused Plaintiff's loss. In the complaint, Plaintiff alleges that the fraud began to be revealed through the three disclosures on August 27, 2007, October 24, 2007, and April 1, 2008, which put the market on notice that the risks and underwriting practices of Defendants were having a detrimental effect on Triad's financial and operating condition. Defendants argue that Plaintiff has not sufficiently pled loss causation because the complaint does not allege that the corrective disclosures "revealed to the market the undisclosed truth" about the alleged misstatements, or that the disclosures "resulted in a decline" of the defendants' share price. (Def. Br. at 23) This argument misses the mark.

In its complaint, Plaintiff alleges Defendants engaged in a course of conduct that artificially inflated the price of Triad stock by failing to disclose that:

> (a) Triad had far greater exposure to losses as a result of its practice of underpricing Modified Pool and other structured bulk insurance than the Company told investors; (b) Triad had far greater exposure to losses as a result of its practice of under-estimating risk on its Modified Pool and other structured bulk insurance than the Company told investors; (c) the Company failed to engage in proper underwriting practices for its book of business related to insurance written in 2006 and 2007, including the insurance related to its Alt-A and pay-option ARM products; (d) the Company lacked effective internal controls to detect manipulation in the pricing and risk assessment processes; (e) the Company failed to disclose the true risks associated with its ability to continue to write new business; (f) as a result of its underpricing and manipulation of risk assessment models, Triad was inadequately funding its contingency reserve; (g) Triad was significantly understating its risk-to-capital ratio because it was undervaluing the risk associated with its insurance policies and not reserving capital commensurate with its actual risk; and (h) the effort to reassure investors about Triad's contingency reserves, liquidity, credit quality and risk-to-capital ratio was part of a scheme to inflate the stock price.

29

(SAC ¶ 188.)  Plaintiff then alleges that once these false and misleading statements were revealed, Triad's stock prices could no longer remain artificially inflated, and that "[t]he rapid decline in Triad's stock price following the Company's April 1, 2008 disclosure was a direct and foreseeable consequence of the revelation of the falsity of Defendants' Class Period misrepresentations and omissions to the market, as well as the materialization of the risk created by Defendants' fraud." (*Id.* ¶ 196.)  In support of these allegations, Plaintiff cites the various disclosures issued by Triad between August 27, 2006 and April 1, 2008, followed by the drop in Triad's stock price with each disclosure.

Defendants argue that the drop in stock price was most likely caused by changing economic conditions and the general decline in stock prices.  Defendants' attempts to have the Court draw alternate inferences for the drop in Triad's stock price, however, are of no value at this point in the proceedings, where Plaintiff need only plead a plausible cause of action.  *See Dura*, 544 U.S. at 347.

This court has reviewed the allegations in the complaint as to loss causation. Plaintiff's allegations are sufficient with regard to the foreseeability of the monetary losses suffered by Triad investors and the cause of the losses, the materialization of the concealed risk.  The alleged disclosures in the complaint each reflected the partial materialization of the concealed risks. For example, in the August 24, 2007 disclosure, as alleged by Plaintiff, Triad announced the $80 million drawdown, causing the one-day 24% drop in stock price. According to Plaintiff, this announcement was the materialization of the risk created by Triad's underpricing of its modified pool insurance and its under-estimation of the risk connected with this insurance.  (*See* SAC ¶ 53-58; 77-78.)

Plaintiff clearly alleges that as the truth about Defendants' prior misrepresentations and concealments was revealed, Triad's stock price dropped as the artificial inflation was revealed and the risk continued to materialize. For example, it is sufficient that Plaintiffs' allegations as to the October 24, 2007 disclosure reflect a stock price drop of 30% from one day to the next, following the disclosure of the $31.8 million net loss, the increase in reserves and the fact that Triad had no Modified Pool transactions in the third quarter of 2007 compared with $3.0 billion for the same period in 2006. (SAC ¶ 192.)

Similarly, following Defendants' April 1, 2008 disclosure, which for the first time revealed the true nature of Triad's dire financial condition, including its inability to obtain new capital commitments and its need for significant capital resources to continue to write new insurance, Triad's stock price fell 59%. (*Id.* ¶¶ 193-194.) Plaintiff also alleges that under well-recognized indices, while Triad's stock price fell, other similar stocks did not experience similar declines. (SAC ¶ ¶ 199-205.) Plaintiff alleges, therefore, that the drop in stock value is directly attributable to the alleged fraud on the part of Defendants.

In sum, Plaintiff has adequately pleaded the loss causation element of its 10b-5 claim.

### 3. Section 20(a)

In its second count, Plaintiff asserts a claim under Section 20(a) of the Securities and Exchange Act of 1934 against the individual Defendants by contending that the Individual Defendants by virtue of their positions, their ownership and contractual rights and their actions were controlling persons of Triad who "had the power to influence and control and did influence or control, directly or indirectly, the decision making of [Triad], including the content and dissemination of the various statements which . . . Plaintiff contends are false

and misleading." (SAC ¶ 224.) Plaintiff alleges that the "Individual Defendants were provided with or had unlimited access to copies of [Triad's] reports, press releases, public filings and other statements alleged . . . to be misleading prior to and/or shortly after these statements were issued . . ." (*Id.*) Plaintiff alleges that each of the Individual Defendants, by virtue of their direct and supervisory day-to-day involvement in Triad's operations, "is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations" alleged in the complaint. (*Id.* ¶ 225.)

Under Section 20(a) of the Securities Exchange Act of 1934:

> Every person who, directly or indirectly controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . . unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a). To state a *prima facie* case under Section 20(a), a plaintiff must allege (1) a predicate violation of Section 10(b), and (2) control by the defendant over the primary violator. *Mut. Funds Inv. Litig.*, 566 F.3d at 129-30. "[U]ltimately, as a complex factual question, assessing control person liability is not ordinarily subject to resolution on a motion to dismiss, and dismissal should be granted only when a plaintiff does not plead any facts from which it can reasonably be inferred the defendant was a control person." *Id.* at 130 (internal citations and quotations omitted).

Defendants argue that because Plaintiff fails to plead a predicate violation under Section 10(b), the dependent Section 20(a) claim must also fail. (*See* Def. Br. at 45.) As noted by Plaintiff, in a footnote in its brief in opposition (Pl. Opp. Br. at 50, n.36), Defendants do not dispute that they were controlling persons at Triad, but rather seek

dismissal based on Plaintiff's failure to plead a predicate violation. Because this court has found that Plaintiff has properly pled the predicate Section 10(b) violation, the Section 20(a) claim should likewise survive the motion to dismiss.

## 5. Motion to Strike

Plaintiff has moved to strike four exhibits which Defendants submitted as attachments to the Declaration of Robyn F. Tarnofsky. (Docket Entry 66.) These four exhibits are copies of "Forms 4" filed with the Securities and Exchange Commission ("SEC") showing that the individual Defendants, along with two other Triad officers, purchased stock during the Class Period. Courts may consider documents attached to a motion to dismiss only "so long as they are integral to complaint and authentic." *Sec'y of State for Def. v. Trimble Navig. Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007.) Thus, courts may generally take judicial notice of SEC Forms 4 under certain circumstances. *See, e.g., City of Royal Oak Retirement Sys. v. Juniper Networks, Inc.*, 880 F. Supp. 2d 1045 (N.D. Cal. 2012) (taking judicial notice of two Forms 4 where offered to prove that stock sales were made pursuant to a Rule 10b5-1 trading plan). However, where the complaint did not mention stock sales and contained no allegations of insider trading, other courts have declined to take notice of individual Forms 4. *In re Adaptive Broadband Sec. Litig.*, No. C 1-1092, 2002 WL 989478 (N.D. Cal. Apr. 2, 2002). In this case, there is no allegation of insider trading or any reliance by Plaintiff on stock sales by individual Defendants. As such, the facts of this case are distinguishable from the primary case cited by Defendants, *In re PEC Solutions, Inc. Sec. Litig.*, 418 F.3d 379, 390 n.10 (4th Cir. 2005). Plaintiff in *PEC Solutions* relied on "unusual or suspicious" class period sales to support an inference of scienter, and the complaint

specifically referenced the information contained in the documents sought to be stricken. *Id.* at 390. Here, there is no reference in the complaint to the information contained in the exhibits, nor are the exhibits integral to the allegations in the complaint. Neither does the court consider the documents to be "highly relevant" to the question of scienter.

The court has considered the arguments of the parties, the applicable procedural rules, and the Federal Rules of Evidence as they pertain to judicial notice. Additionally, the court is mindful that this matter is before the court at the motion to dismiss stage. Having reviewed the law regarding what matters are properly considered on a Rule 12(b)(6) motion, the court finds that the four exhibits are not subject to judicial notice under the law of this circuit. Accordingly, the court will grant Plaintiff's motion to strike.

## III. CONCLUSION

This court has conducted an exhaustive review of numerous PSLRA cases, many of which have been cited by one side or the other in this matter, including cases submitted after oral argument. While this review has been instructive as to the analysis required on a motion to dismiss under the PSLRA, it is also clear that the analysis is highly fact-driven and requires a case-by-case determination.[6]

The undersigned concludes as a matter of law that Plaintiff has alleged with sufficient particularity, viewed individually and collectively, false and misleading statements made by

---

[6] This court also has given considered review to Judge Sharp's January 27, 2012 recommendation in which he recommended that the motion to dismiss the first amended complaint be granted. (Docket Entry 54.) Defendants argue that Plaintiff's second amended complaint does not cure the deficiencies noted by Judge Sharp. The court notes that Judge Sharp's recommendation addressed only scienter and loss causation. The second amended complaint, moreover, contains substantial differences from the prior complaint, particularly with regard to loss causation and specific references to misrepresentations allegedly made by Defendants. The court has addressed the second amended complaint and the motions related thereto on their own merits.

Defendants, taken as true, as the law requires, to withstand Defendants' motion to dismiss. The court also concludes as a matter of law that the Plaintiff has sufficiently met the legal standard to withstand Defendants' motion to dismiss the complaint on the grounds that Defendants lacked the requisite scienter. The court concludes that a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposite inference one could draw from the facts alleged. Finally, the court also concludes as a matter of law that Plaintiff has set forth sufficient allegations at the pleading stage of the litigation that the acts or omissions of Defendants violated the PSLRA and caused the losses for which Plaintiff seeks to recover.

**IT IS THEREFORE RECOMMENDED** that Defendants' motion to dismiss the second amended complaint (Docket Entry 63) be **DENIED**. **IT IS FURTHER ORDERED** that Plaintiff's motion to strike (Docket Entry 73) is **GRANTED**.


_____
Joe L. Webster
United States Magistrate Judge


Durham, North Carolina
May 31, 2013