**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | | |
|---|---|---|
| JAMES L. PHILLIPS, Individually and on Behalf of All Others Similarly Situated, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | 1:09CV71 |
| TRIAD GUARANTY INC., MARK K. TONNESEN, and KENNETH W. JONES, | ) ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM OPINION AND ORDER

The Order and Recommendation of the United States Magistrate Judge (Doc. #87) was filed with the Court in accordance with 28 U.S.C. § 636(b) and, on May 31, 2013, was served on the parties in this action. Counsel for Defendants filed timely objections to the Order and Recommendation. (Doc. #90.) Pursuant to 28 U.S.C. § 636(b)(1), the Court has appropriately reviewed the portions of the Magistrate Judge's Order and Recommendation to which objection was made. The Court has made a determination that the Order was not clearly erroneous or contrary to law. However, the Court has made a de novo[1] determination to reject the Recommendation.

---

[1] Lead Plaintiff Western Pennsylvania Electrical Employees Pension Fund (referred to as "Plaintiff") argues in response to Defendants' objections to the Recommendation that Defendants' objection "does not contain any

I.

a.

The Magistrate Judge's Order and Recommendation presents a comprehensive procedural history and compilation of the factual background in this case to which this Court directs the parties. (Doc. #87 at 1-8.)  After the issuance of the Order and Recommendation, Triad Guaranty, Inc. ("Triad") filed a petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware.  The petition operates as a stay of litigation against Triad. (Doc. #89 (citing 11 U.S.C. § 362(a).)  On June 25, 2013, this Court entered an order recognizing that the proceeding against Triad is stayed pending the outcome of the Bankruptcy Court proceedings and ordering the clerk to terminate Triad as a party to the instant action. (Doc. #91.)  On October 18, 2013, Plaintiff voluntarily dismissed Triad with prejudice. (Doc. #100.)  Thereafter,

---

specific or particularized objections to [the Magistrate Judge's] analysis, nor does it identify a single error contained therein.  Rather, it simply rehashes the arguments raised in their Motion . . . ." (Doc. #92 at 2.)  While Defendants' objections are similar to their arguments in support of their motion to dismiss, Defendants have objected to specific findings and, as such, those findings have received de novo review.

the parties filed notices of subsequently decided authority. (Docs. # 101-103, 106.)

b.

Defendants Mark K. Tonnesen ("Tonnesen") and Kenneth W. Jones ("Jones") (collectively "Defendants") have objected to (1) the Order granting Plaintiff's Motion to Strike Exhibits 8-11 to the Declaration of Robyn F. Tarnofsky (Docs. #66, 73) and (2) the Recommendation that Defendants' Motion to Dismiss Plaintiff's Second Amended Complaint ("SAC" or "Complaint") be denied (Doc. #63).[2]

In the brief in support of their motion to dismiss and the objections to the Order and Recommendation, Defendants repeatedly refer to and quote from an earlier Recommendation to grant Defendants' Motion to Dismiss the First Amended Complaint. (See, e.g., Doc. #64 at 8-10, 14-15; Doc. #90 at 5-6, 7, 12-13, 16-20.)  Defendants go so far as to argue that the "Court should resist revisiting [the earlier] decisions, because under the 'law of the case' doctrine, in the absence of extraordinary circumstances, when a court

---

[2] In their objection, Defendants requested oral argument.  In the Court's December 2, 2014, Order, the Court denied the request "[b]ecause the parties have thoroughly briefed the matter, [and] oral argument will not aid the Court's decisional process." (Doc. #107.)

decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." (Doc. #64 at 12; see also id. at 14, 15 (describing what the Magistrate Judge "held").)  The earlier Recommendation was never referred to this Court for adoption, because Plaintiff filed a Second Amended Complaint before any party filed objections to that Recommendation. (See Docs. #56, 59, 60.)  Therefore, not only did this Court not review the earlier Recommendation, that Recommendation remained just that – a recommendation to this Court, which became moot upon Plaintiff's filing of the Second Amended Complaint.  As much as Defendants preferred the earlier Recommendation to the one before this Court, the Magistrate Judge gave "considered review to [the earlier]. . . recommendation. . . [and] addressed the second amended complaint and the motions related thereto on their own merits." (Recommendation p.34 n.6.)  This Court has done the same.

## II.

Defendants have objected to the Order granting Plaintiff's motion to strike Exhibits 8-11 to the Declaration of Robyn F. Tarnofsky (Doc. #66).  Those exhibits are copies of Form 4 filed with the Securities and Exchange Commission ("SEC") showing that Defendants, among others, purchased

stock in Triad during the class period.  The Order striking those exhibits

properly analyzed and applied relevant case law in doing so and was neither

clearly erroneous nor contrary to law.  <u>See</u> Fed. R. Civ. P. 59(a).  Therefore,

Defendants' objection to the Order is denied, and the Order stands.  Exhibits

8-11 to the Declaration of Robyn F. Tarnofsky (Doc. #66) are stricken.

III.

Next, Defendants have objected to that portion of the

Recommendation that Defendants' Motion to Dismiss Plaintiff's Second

Amendment Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil

Procedure be denied.

"To survive a motion to dismiss, a complaint must contain sufficient

factual matter, accepted as true, to 'state a claim to relief that is plausible

on its face.'" <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949

(2009) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570, 127 S. Ct.

1955 (2007)).  "Facial plausibility" is "when the plaintiff pleads factual

content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged." <u>Id.</u>, 129 S. Ct. 1949.  The

Court accepts as true all well-pleaded allegations and views the complaint in

the light most favorable to Plaintiff. See Mylan Labs, Inc. v. Matkari, 7 F.3d 1130, 1134 (4th Cir. 1993).

Plaintiff alleges violations of sections 10(b) and 20(a) of the Securities Exchange Act of 1934. Section 10(b) of the Securities Exchange Act of 1934 makes it unlawful "[t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention" of Commission rules and regulations. 15 U.S.C. § 78j. Commission Rule 10b-5 makes it unlawful for a person to "employ any device, scheme, or artifice to defraud," "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading," or "engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person" "in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5. Section 20(a) provides, in relevant part, that "[e]very person who, directly or indirectly, controls any person liable under [the Act or related rule or regulation] shall also be liable jointly and severally with and to the same extent as such controlled person . . . ." 15 U.S.C. § 78t.

To prevail in a securities fraud action, a plaintiff must show (1) a material misrepresentation or omission, (2) scienter, (3) a connection with the purchase or sale of a security, (4) reliance, (5) economic loss, and (6) loss causation. Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 341-42, 125 S. Ct. 1627, 1631 (2005). "These substantive elements of a securities fraud claim are demanding." Cozzarelli v. Inspire Pharm. Inc., 549 F.3d 618, 623 (4th Cir. 2008). While Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a plaintiff include in his complaint only "a short and plain statement of the claim showing that the pleader is entitled to relief," a plaintiff alleging securities fraud must do more. First, Rule 9(b) of the Federal Rules of Civil Procedure requires a plaintiff alleging fraud to state his claims "with particularity." See Katyle v. Penn Nat'l Gaming, Inc., 637 F.3d 462, 471 (4th Cir. 2011) (reviewing allegations of loss causation for "sufficient specificity," similar to Rule 9(b)'s requirement of particularity). He must provide the "who, what, when, where, and how" of the alleged fraud. United States ex rel. Willard v. Kellogg Brown & Root, Inc., 525 F3d 370, 79 (4th Cir. 2008) (internal quotations and citations omitted). In addition, the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4, provides "[e]xacting pleading requirements" in cases, such as this

one, where a plaintiff alleges that the defendant made false or misleading statements. Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 313, 127 S. Ct. 2499, 2504 (2007). Under the PSLRA, a plaintiff (1) "shall specify each statement alleged to have been misleading and the reason or reasons why the statement is misleading,"[3] and (2) "shall, with respect to each act or omission . . . state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." Id. at § 78u-4(b)(1) and (2). In other words, the PSLRA provides heightened pleading requirements beyond Rule 9(b) for the elements of misrepresentation and scienter. Katyle, 637 F.3d at 471 n.5. The PSLRA also states that "the plaintiff shall have the burden of proving that the act or omission of the defendant . . . caused the loss for which the plaintiff seeks to recover damages." Id. at § 78u-4(b)(4). Defendants argue that Plaintiff fails to plead sufficiently scienter, any false or actionable statements, and loss causation and, therefore, object to the Recommendation's suggestion otherwise.

---

[3] If a plaintiff alleges a false or misleading statement "upon information and belief," he must also "state with particularity all facts on which the belief is formed." 15 U.S.C. § 78u-4(b)(1)(B). Here, Plaintiff has not alleged false and misleading statements upon information and belief.

A.

First, Defendants allege that Plaintiff has not sufficiently pled scienter. Scienter is "a mental state embracing intent to deceive, manipulate, or defraud." Tellabs, Inc., 551 U.S. at 319, 127 S. Ct. at 2507. In the Fourth Circuit, scienter also encompasses "severe recklessness," Teachers' Ret. Sys. of La. v. Hunter, 477 F.3d 162, 183-84 (4th Cir. 2007), defined in the securities fraud context as "'an act so highly unreasonable and such an extreme departure from the standard of ordinary care as to present a danger of misleading the plaintiff to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it,'" Ottmann v. Hanger Orthopedic Grp., Inc., 353 F.3d 338, 343 (4th Cir. 2003) (quoting Phillips v. LCI Int'l, Inc., 190 F.3d 609, 621 (4th Cir. 1999)).

Although the PSLRA requires a plaintiff to "state with particularity facts giving rise to a strong inference" of scienter, "Congress left the key term 'strong inference' undefined." Tellabs, Inc., 551 U.S. at 314, 127 S. Ct. at 2504. The Supreme Court determined that "[t]o qualify as 'strong' within the intendment of [the PSLRA], . . . an inference of scienter must be more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." Id., 127 S.

Ct. at 2504; see also id. at 323, 127 S. Ct. 2509 (instructing that when determining whether plaintiff has pled facts that give rise to a strong inference of scienter, "the court must take into account plausible opposing inferences"). "The inquiry . . . is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." Id. at 322-23, 127 S. Ct. 2509. "[W]hen the facts as a whole more plausibly suggest that the defendant acted innocently – or even negligently – rather than with intent or severe recklessness, the action must be dismissed." Cozzarelli, 549 F.3d at 624. "In order to establish a strong inference of scienter, plaintiffs must do more than merely demonstrate that defendants should or could have done more." Public Emps.' Ret. Ass'n of Colo. v. Deloitte & Touch LLP, 551 F.3d 305, 314 (4th Cir. 2009). In addition, a plaintiff must allege facts supporting a strong inference that each defendant acted with the requisite scienter. Teachers' Retirement Sys. of La., 477 F.3d at 184.

1.

Defendants argue that "Plaintiff must allege that the misconduct itself is rational" (Doc. #90 at 5), because "allegations of irrational conduct can

raise no cogent inference of scienter" (Doc. #64 at 13). In support of this

argument, Defendants cite <u>Cozzarelli</u>, 549 F.3d 618 and <u>Atl. Gypsum Co.,

Inc. v. Lloyds Int'l. Corp.</u>, 753 F. Supp. 505 (S.D.N.Y. 1990), but neither

case is on point, particularly the latter as it does not involve allegations of

securities fraud. Moreover, it would not necessarily be irrational for a

reasonable person to infer that Defendants would intentionally price modified

pool insurance policies so low that the company was at risk of being unable

to cover the claims if the housing market deteriorated, considering the

possible net income if the market did not deteriorate. Nevertheless,

Plaintiff's scienter allegations do not support a strong inference of intentional

or severely reckless conduct.

2.

Nearly all of the facts that Plaintiff alleges in an effort to give rise to a

strong inference of scienter are from confidential sources.[4] "When the

complaint chooses to rely on facts provided by confidential sources, it must

describe the sources with sufficient particularity to support the probability

---

[4] As part of their argument that Plaintiff failed to adequately plead false or
misleading statements, Defendants argue that the Complaint's confidential
witnesses are unreliable, an argument that applies equally as well to
Plaintiff's failure to plead scienter sufficiently.

that a person in the position occupied by the source would possess the information alleged or in the alternative provide some other evidence to support their allegations." Teachers' Retirement Sys. of La., 477 F.3d at 174; see also In re Trex Co., Inc. Sec. Litig., 454 F. Supp. 2d 560, 573 (W.D. Va. 2006) ("A confidential witness' testimony can be used in pleading under the PSLRA so long as the testimony involves facts of which the witness had personal knowledge."). Plaintiff's allegations fall short of this requirement.

The confidential source identified as the "former Assistant Vice President and Regional Underwriting Manager in Triad's Horsham, PA office was employed with the Company from 2003 through 2008" and "oversaw three underwriters and provided underwriting in the Company's 'flow' channel."[5] (SAC ¶ 29 n.2.) Plaintiff has attributed its allegations of motive to this confidential source. (See id. ¶ 29.) Even if Plaintiff had described this source with sufficient particularity to support the probability that he[6] would know of Triad's business interests, which it did not, these broad

_____

[5] This is the extent of Plaintiff's description of this confidential source. As it has done with this confidential source, the Court will describe each of Plaintiff's confidential witnesses to the complete extent that Plaintiff does.
[6] Plaintiff refers to these confidential sources in the masculine form (SAC p.10 n.1.), and so does the Court.

statements attribute no scienter to any defendant. See Ottmann, 353 F.3d at 352 (noting that "courts have repeatedly rejected these types of generalized motives – which are shared by all companies – as insufficient to plead scienter under the PSLRA").

The confidential source identified as the "former Triad Consultant worked for Triad on and off from 1997 through 2007 . . . [and] was responsible for developing the Company's Bid Management Software, which the Company used to bid on Modified Pool insurance." (SAC ¶ 29 n.4.) While Plaintiff has sufficiently pled facts to support the probability that this confidential source would have the requisite knowledge attributed to him (see id. ¶ 29), his statement provides nothing more than the same generalized motive allegations as noted above which are insufficient to attribute scienter.

The confidential source identified as the "former Assistant Vice President of Data Warehousing worked at Triad in a variety of positions from 1998 until 2008, with the witness's last position being Assistant Vice President of Data Warehousing." "[H]e was responsible for providing data for financial and risk management reporting[,]" initially to Ken Foster and later to Steve Haferman. (Id. ¶ 29 n.5.) Plaintiff does a better job of alleging

the responsibilities of the Assistant Vice President of Data Warehousing than it does when describing the other confidential sources. However, this makes little difference, because the facts that this confidential source alleges are either immaterial (id. ¶ 29), admittedly not based on personal knowledge (id. ¶ 48), or not plausibly based on personal knowledge based on the confidential source's job responsibilities (id. ¶ 62). In addition, the confidential source allegedly described the Senior Vice President of Audit as "raising red flags over the process of assessing risk." (Id. ¶ 62.) However, not only does Plaintiff not allege to whom the red flags were raised, but the Senior Vice President of Audit left Triad in 2004 (id. ¶ 29 n.6.).

Plaintiff relies heavily on the confidential source identified as the "former Vice President of Risk Analytics" who "worked for Triad from November 2006 until August 2007." The former employee initially reported to Foster, whose title is not alleged, but who is alleged to have been hired for his expertise in structured pool insurance. Then, the former employee reported to Haferman, who was at some time Senior Vice President of Risk Management. (Id. ¶ 29 n.6.) Plaintiff does not allege the job responsibilities of this confidential source, and the title of Vice President of Risk Analytics is too vague, especially in light of the similarly vague titles of the other

14

confidential sources, to infer those responsibilities.  Other than alleging that the former Vice President of Risk Analytics reported to Foster until early 2007, there are no allegations of the interactions between the two during that time, how frequently the confidential source reported to Foster, what or how he reported to Foster, or what interactions, if any, he had with Foster after early 2007.  In other words, Plaintiff seems to have assumed that by simply alleging the confidential source's vague title, employment period, and individuals to whom he reported, it would be probable that the confidential source would have personal knowledge of the facts attributed to him throughout Plaintiff's complaint.

Plaintiff's description of this former employee supports the probability that he would know certain facts alleged, (id. ¶¶ 29, 45, 48, 66-72), many of which describe actions that he personally took, (id. ¶¶ 45, 48, 66-72). However, while it is probable that the witness knew of actions he personally took, Plaintiff's allegations surrounding those actions fall short.  While Plaintiff alleges that this confidential source "ran the models" (id. ¶ 45), Plaintiff does not allege when he did so, if this was part of his responsibilities, or whether the data used was the actual data available to Triad at the time that it would have been pricing the loans at issue.

Although Plaintiff alleges that this confidential source "personally began to raise significant concerns about the prices and bidding . . . and undocumented adjustments" (id. ¶ 66), Plaintiff does not allege to whom the source raised these concerns.[7] In addition, Plaintiff has not alleged facts to support the probability that this former employee would know the remainder of the information attributed to him. (See id. ¶¶ 35-38, 40-44, 46-49, 58, 75[8].)

The confidential source identified as the "former Senior Vice President of Audit" was a founder of Triad, "had risk management, audit, and underwriting responsibilities[,]" but left its employment in December 2004. However, "he remained in contact with his former colleagues[.]" (Id. ¶ 48 n.9.) The allegations attributed to him are actions that he took in 2003, 2004, and 2005 – well before the beginning of the class period. (E.g., id. ¶

---

[7] Plaintiff has alleged that this source presented the results of his analysis to Triad's Credit Committee, and the Court will analyze separately whether the content of that presentation supports an inference of scienter. See infra at 22-23.

[8] Even if Plaintiff had sufficiently alleged facts to support the probability that the former Vice President of Risk Analytics would know the facts attributed to him in paragraph 75, those facts actually support an inference that Triad did not act recklessly when, after an independent consulting firm allegedly verified the results of the March 28, 2007, presentation, Triad prohibited Foster from making adjustments to the company's risk and pricing models and from bidding live on any Modified Pool insurance transactions.

57.)  At some point in time, he allegedly raised "red flags over the process of assessing risk," but Plaintiff does not allege to whom or when he did so. (Id. ¶ 62.)  He allegedly "raised serious concerns about Foster and the Company's inadequate reserves [and under-reporting of loss ratios on some of its bulk transactions] in an October 2004 meeting with Darryl Thompson, the Company's then-CEO, and General Counsel Earl Wall." (Id. ¶ 63.) Plaintiff does not allege Thompson's or Wall's tenure at Triad, nor that the former Senior Vice President of Audit notified Tonnesen or Jones.  The confidential source is alleged to have "again raised his concerns about the reserves" in a January 3, 2005 e-mail with David Whitehurst, a member of Triad's Board of Directors. (Id.)  He allegedly discussed the reserves in a conference call in early 2006 "attended by representatives" from Ernst & Young and Whitehurst. (Id.)  Plaintiff does not allege that any of this source's concerns were made known to Tonnesen or Jones.  Not only does Plaintiff not allege that Tonnesen or Jones were informed of the former Senior Vice President of Audit's concerns about the company's reserves, but the former Senior Vice President of Audit's employment with Triad ended nearly two years before the class period is alleged to have begun. See In re Trex Co., Inc. Sec. Litig., 454 F. Supp. 2d at 573 (finding information from

witnesses who were not employed during the class period to be unreliable). The source of any of his knowledge thereafter is from "contact[s] with former colleagues." These allegations do not support the probability that the former Senior Vice President of Audit had any personal knowledge of the class period conduct at issue in the Complaint.

The confidential source identified as the "former Vice President of Risk Analytics and Forecasting was employed with the Company from November 2006 through December 2007." (Id. ¶ 51 n.11.) There are no facts alleging the responsibilities of this position, with whom this confidential source worked, or to whom he reported. Nevertheless, it is plausible that the former Vice President of Risk Analytics and Forecasting would know his motivation for evaluating Triad's pricing/risk modeling and the content of his findings that he presented on March 28, 2007 to the Credit Committee. (Id. ¶¶ 67-71.)

The confidential source identified as the "former Senior Vice President/Director of Underwriting worked for Triad from 1993 until January 2007 and reported to Senior Vice President of Operations Shirley Gaddy who, in turn, reported directly to Defendant Tonnesen." (Id. ¶ 59 n.12.) Although this confidential source's title supports the probability that he

would have personal knowledge of the only alleged fact attributed to him, "that the Company's Risk Committee was responsible for setting the underwriting guidelines[,]" it is immaterial to an inference of scienter. (Id. ¶ 59.)

The confidential source identified as the "former Vice President of Product and Strategic Development worked for Triad from approximately August 2006 until August 2007" and "reported directly to Foster." (Id. ¶ 59 n.13.) The confidential source alleges that, as members of the Risk Management Committee, Tonnesen and Jones were provided certain information and "'were very well aware'" of Triad's loss rates and claims. (Id. ¶ 59.) He also alleges that Tonnesen and Jones participated in Weekly Operations Committee Meetings. (Id. ¶ 60.) However, the confidential source is not alleged to have been a member of the Risk Management Committee or the Weekly Operations Committee or to have attended any of those meetings. He does not state at which meetings Tonnesen or Jones would have received the referenced information or that he was at those meetings to witness Tonnesen's or Jones' presence. See In re Coventry Healthcare, Inc. Sec. Litig., No. 08:09-CV-2337-AW, 2011 WL 1230998, *5 (D. Md. Mar. 30, 2011) (finding allegation that the witness periodically

attended meetings, at which defendants occasionally were present, not of

sufficient particularity to support inference that witness could reasonably

attribute scienter to defendants because there was no indication of when or

how frequently the witness attended the meetings where defendants were

alleged to have been present and no indication as to what meetings the

witness attended with defendants).  In addition, Plaintiff does not allege

what responsibilities the title of Vice President of Product and Strategic

Development encompasses, what information the former Vice President of

Product and Strategic Development reported to Foster, or what interactions

the confidential source had with Foster.

3.

Next, the Complaint also includes a section entitled, "Additional

Scienter Allegations." (SAC ¶¶ 175-181.)  However, as a whole, these

allegations fail to support a strong inference of scienter.  First, they rely

almost entirely on information provided by the confidential sources above.

(See id. ¶¶ 178, 180.)  In addition, Plaintiff makes broad statements such as

"[t]he ongoing fraud as described herein could not have been perpetrated

over a substantial period of time, as has occurred, without the knowledge

and/or severe recklessness and complicity of the personnel at the highest

level of the Company, including" Tonnesen and Jones. (Id. ¶ 176.)  Plaintiff

attempts to allege scienter as a result of Tonnesen's and Jones' "receipt of

information[,] . . . control over and/or receipt of Triad's allegedly materially

misleading misstatements[,] and/or associations with the Company that

made them privy to confidential proprietary information concerning Triad[.]"

(Id.)  Not only do some of these allegations sound like res ipsa loquitur,

which is insufficient, but case law could not be clearer that allegations such

as these are not enough to meet the pleading requirements for scienter in

securities fraud cases. See In re Cree, Inc. Sec. Litig., 333 F. Supp. 2d 461,

475 (M.D.N.C. 2004) ("Plaintiffs cannot claim that the individual

Defendants' titles or positions . . . establish that they must have known of

the alleged fraud."); Smith v. Circuity City Stores, Inc., 286 F. Supp. 2d

707, 715 (E.D. Va. 2003) (finding scienter allegations insufficient where

Plaintiff argued that "Defendants must have acted with scienter because

they were senior officers of Circuit City and 'were privy to confidential and

proprietary information concerning Circuit City' [and] that Defendants

obtained this confidential information through 'internal corporate documents,

conversations and connections with other corporate officers and

employees'"); In re First Union Corp. Sec. Litig., 128 F. Supp. 2d 871, 888

(W.D.N.C. 2001) (finding "group pleading" where Plaintiffs alleged that "because of [defendants'] positions as corporate officers, defendants must have known of the allegedly false and misleading nature of the alleged misstatements" "clearly inconsistent" with pleading requirements and "contrary even to pre-Reform Act law").

In addition to these allegations, Plaintiff also attaches to its Complaint a copy of the written portion of the former Vice President of Risk Analytic's and the former Vice President for Risk Analysis and Forecasting's March 28, 2007, presentation to the Credit Committee, for which Tonnesen and Jones are alleged to have been present. (SAC ¶¶ 67, 178 & Ex. A.)  Plaintiff alleges, and the written portion of the presentation confirms, that, among the "Near Term Recommendations," was an immediate need for a process for evaluating and bidding deals that included bid-specific, written explanations of the choice of model settings and ROC, capital, and bid price; disclosure and review of the sharing of responsibilities by Products, Risk Management, and Finance of all model overrides; a standard package of documentation and reports created and distributed; and formal approval delegations and signoff. (Id. ¶ 70 & Ex. A at 12.)  After the presentation, Triad retained an independent consulting firm to evaluate the results, which

were allegedly confirmed. (Id. ¶ 73-74.)  After the independent evaluation,

Triad allegedly prohibited Foster from making any adjustments to the risk

and pricing models and required all adjustments to be performed by Risk

Management. (Id. ¶ 75.)  Triad also prohibited Foster from bidding live on

any more Modified Pool Insurance transactions without Hafterman's initial

review. (Id.)

Plaintiff's allegations as a whole do not support a strong inference of

scienter where a reasonable person would deem the inference of scienter

cogent and at least as compelling as any opposing inference one could draw

from the facts alleged.  Instead, Plaintiff's allegations support the more

convincing inference that Triad, Tonnesen, and Jones used their business

judgment when it came to the company's pricing practices, were motivated

to succeed in the changing mortgage insurance industry, and, once aware

that independent evaluators recommended immediate changes to bidding,

revised the company's practices for doing so.  In other words, the inference

of scienter is not as strong as the opposing inference that Defendants were

conducting their business in an effort to build a stronger market share and, if

anything, may have been at most negligent in some of their practices. As a result, Plaintiff has not sufficiently pled scienter for purposes of the PSLRA.[9]

B.

Next, Defendants argue that not only has Plaintiff failed to plead scienter sufficiently, but it also has not sufficiently alleged that Defendants "made a false statement or omission of material fact." <u>Longman v. Food Lion, Inc.</u>, 197 F.3d 675, 682 (4th Cir. 1999) (citation omitted). The Court agrees.

A plaintiff must allege "a <u>factual</u> statement or omission – that is, one that is demonstrable as being true or false." <u>Id.</u> "[T]he statement must be <u>false</u>, or the omission must render public statements <u>misleading</u>." <u>Id.</u> "And finally, any statement or omission of fact must be <u>material</u>." <u>Id.</u> "A fact is material if there is a substantial likelihood that a reasonable purchaser or seller of a security (1) would consider the fact important in deciding whether to buy or sell the security or (2) would have viewed the total mix of information made available to be significantly altered by disclosure of the

---

[9] The Court's finding that Plaintiff failed to plead scienter adequately is a sufficient basis on which to grant Defendants' motion to dismiss. However, for completeness, the Court will also address Defendants' challenges to Plaintiff's allegations of false statement or omission of material fact and loss causation.

fact." In re PEC Solutions, Inc. Sec. Litig., 418 F.3d 379, 387 (4th Cir. 2005) (internal quotation omitted).  With respect to an omission, "[t]he securities laws require disclosure of information that is not otherwise in the public domain, not information that has already been publicly – indeed, officially – disclosed by the company." Hillson Partners Ltd. P'ship v. Adage, Inc., 42 F.3d 204, 212 (4th Cir. 1994) (explaining, in response to plaintiff's allegation that defendant's failure to disclose in more detail its subsidiary's problems constituted an omission of material fact, that those problems were already detailed in defendant's annual report and Form 10K); Smith, 286 F. Supp. 2d at 721 ("Disclosure of information already publicly available does not materially alter the 'total mix' of available information.").

A statement is considered "puffery," and, therefore immaterial, if it is "a certain kind of rosy affirmative commonly heard from corporate managers and familiar to the marketplace – loosely optimistic statements that are so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important to the total mix of information available." In re Cable & Wireless, PLC, 332 F. Supp. 2d 896, 900 (E.D. Va. 2004) (citing Hillson Partners Ltd. P'ship, 42 F.3d at 213 & Raab v. Gen. Physics Corp., 4 F.3d 286, 288-90 (4th Cir. 1993)).

If a statement is forward-looking, the PSLRA provides a safe harbor

from liability if certain conditions are met. See 15 U.S.C. § 78u-5. A

statement is forward-looking if it is

> (A) a statement containing projection of revenues, income
> (including income loss), earnings (including earnings loss) per
> share, capital expenditures, dividends, capital structure, or other
> financial items;
> (B) a statement of the plans and objectives of management for
> future operations, including plans or objectives relating to the
> products or services of the issuer;
> (C) a statement of future economic performance, including any
> such statement contained in a discussion and analysis of
> financial condition by the management or in the results of
> operations included pursuant to the rules and regulations of the
> Commission;
> (D) any statement of the assumptions underlying or relating to
> any statement described in subparagraph (A), (B), or (C);
> . . .

Id. at § 78u-5(i)(1).

Liability does not attach to a forward-looking statement if it is

"identified as a forward-looking statement, and is accompanied by

meaningful cautionary statements identifying important facts that could

cause actual results to differ materially from those in the forward-looking

statement[.]" Id. at § 78u-5(c)(1); see also 15 U.S.C. § 87u-5(c)(2) (Oral

forward-looking statements must direct listeners to "additional information

concerning factors that could cause actual results to materially differ from

those in the forward-looking statement" that "is contained in a readily available written document" that includes "a cautionary statement[.]"). "'Cautionary language is 'meaningful' if it conveys 'substantive information about factors that realistically could cause results to differ materially from those projected in the forward-looking statement, such as, for example, information about the issuer's business.'" In re Humphrey Trust, Inc. Securities Litigation, 219 F. Supp. 2d 675, 683-84 (D. Md. 2002) (citing H.R. Conf. Rep. No. 104-369 (1995)).  A forward-looking statement is also afforded a safe harbor if "the plaintiff fails to prove that the forward-looking statement . . . was made with actual knowledge by that person that the statement was false or misleading[.]" Id.  In addition, if the forward-looking statement is immaterial, it is shielded from liability. 15 U.S.C. § 78u-5(c)(1). Similarly, "projections of future performance not worded as guarantees are generally not actionable." Raab, 4 F.3d at 290 (pre-PSLRA).

1.

Nearly sixty pages of Plaintiff's 126-page Second Amended Complaint detail Defendants' alleged material false and misleading statements or omissions of material facts made on October 26, 2006, November 9, 2006, January 25, 2007, March 7, 2007, April 26, 2007, May 9, 2007, July 25,

27

2007, August 9, 2007, August 31, 2007, October 24, 2007, October 25,

2007, November 9, 2007, February 13, 2008, and February 14, 2008.[10]

(SAC ¶¶ 80-162.)[11]  Plaintiff has clearly alleged the date, setting, content,

and speaker of each of the aforementioned statements.  Plaintiff also alleges

the effect of the statements and the reasons why each of the statements

was materially false and misleading or omitted material facts that would

have made the statement not false or misleading.

However, few of these statements or omissions that Defendants are

alleged to have made are material statements or omissions of facts, and

Plaintiff has not alleged that those facts are actually false.  Most of the

statements that Defendants are alleged to have made are puffery, forward-

looking, cautionary, or otherwise immaterial.  In addition, throughout the

---

[10] Plaintiffs have alleged a class period from October 26, 2006, to April 1, 2008. SAC p.1.

[11] Within each of Defendants' alleged statements quoted in the SAC, Plaintiff has emphasized with italics and bold font particular sentences, some of which are quoted in this Opinion with Plaintiff's emphasis.  However, Plaintiff does not explain the importance, if any, of the emphasized sentences.  Plaintiff does not explain how it intends for those emphasized sentences to be treated compared to the remainder of the statements quoted in the SAC.  Nevertheless, the Court has analyzed each sentence within each larger statement to determine if Plaintiff has sufficiently alleged that Defendants made a false statement or omission of material fact. See 15 U.S.C. § 78u-4(b)(1).

class period, publicly available information informed investors of the potential risks associated with the mortgage insurance industry and Triad's business specifically. As for the reasons why certain statements or omissions are allegedly misleading, Plaintiff relies largely on confidential witnesses; however, as explained above, Plaintiff has failed to allege sufficient facts to determine that the confidential witnesses probably had personal knowledge of the facts attributed to them.

2.

a.

Plaintiff has alleged that, on October 26, 2006, Triad issued a press release in which it reported net income, diluted earnings per share, the effects of realized investment losses and realized investment gains, increased earned premiums, expected loss ratio, and increased reserves. (Id. ¶ 80 p.38.) Tonnesen reported that, "***Our operating income . . . set a record this quarter***," expenses were higher, and reserves and stockholders' equity were up. (Id.) These allegations are the extent of the alleged statements in the October 26, 2006, press release that are factual and material. See In re PEC Solutions, Inc. Sec. Litig., 418 F.3d at 387 (defining "materiality");

Longman, 197 F.3d at 682 (defining "fact"). Plaintiff does not allege that any of these facts are false.

That same day, Tonnesen and Jones are alleged to have participated in a conference call with various securities analysts. (SAC ¶¶ 82-84.) The only factual material statements among the statements that Plaintiff alleges Tonnesen and Jones made are Jones' reporting of the evolution of the portfolio and the upward trend in the Alt-A and ARM segments in both Primary and Modified Pool, which contributed to higher earned premium rates in the several prior quarters, (id. ¶ 82 p.39), and his explanation of the effect of the seasoning of the book and the seasonality associated with the third quarter on reserves (id. ¶ 84 p.40). But, Plaintiff does not allege that these facts are false.

Plaintiff also alleges that Triad reported a risk-to-capital ratio of 12.0:1 as of September 30, 2006. (Id. ¶ 81.) Plaintiff argues that, because it believes that Triad was "undervaluing the risk associated with its insurance policies," "Triad was significantly understating its risk-to-capital ratio." (Id. ¶ 91(h).) However, Plaintiff does not allege that using Triad's risk and capital as they were recorded on Triad's books as of September 30, 2006, would

30

total a ratio different than 12.0:1.  In other words, Plaintiff does not allege

that reported risk-to-capital ratio was actually false.

The remainder of the October 26 statements are either puffery (e.g.,

id. ¶ 84 p.42 ("*[T]here's a lot of wind at our back* . . ."); see also id. ¶ 80

p.38-39, ¶ 83, ¶ 84 p.40-42) or explanatory cautionary statements (e.g., id.

¶ 82 p.39 (describing fourth quarter change to the timing of processing of

data that comes late from lenders and the effect of the change on Triad's

reported defaults); see also id. ¶ 83, ¶ 84 p.41-42).  The statements of

puffery are the type of "rosy affirmative" opinions that "no reasonable

investor could find . . . important to the total mix of information available,"

see In re Cable & Wireless, PLC, 332 F. Supp. 2d at 900 (defining

"puffery"), especially in light of the material factual information also

contained in the press release.  As such, they are not actionable.  The

explanatory, cautionary statements inform investors of expected changes

and remind them of inherent risks.  As with similar cautionary statements

that Plaintiff quotes, it would seem strange that these alleged statements

warning investors would be actionable under securities law.

b.

Plaintiff also alleges that Triad's report for the third quarter of fiscal year 2006 filed with the Securities and Exchange Commission ("SEC") on November 9, 2006, "reaffirmed the financial results and statements announced in the [October 26] press release" and contained three false statements.[12] (SAC ¶ 87.)  The only one of the three statements that could be construed as a factual material statement is, "Our Modified Pool insurance in force at September 30, 2006 grew significantly during the past year primarily due to our strong production in the structured bulk channel." (Id. ¶ 87 p.43.)  Not only does Plaintiff not allege that fact is false, but Plaintiff actually cites that information as a fact in its substantive allegations. (See id. ¶¶ 50, 52.)  The other two statements that Plaintiff alleges are false – statements of a belief in continued business opportunities and the company's objective for growth – are "[s]oft, puffing statements [that] generally lack materiality because the market price of a share is not

---

[12] In addition to Plaintiff's quotation of excerpts from Triad's third quarter Form 10-Q, Defendants attached to their brief in support of their motion to dismiss excerpts from this Form 10-Q.  Because the Court can take judicial notice of the content of relevant SEC filings, particularly those cited in the Complaint, Yates v. Mun. Mortg. & Equity, LLC, 744 F.3d 874, 881 (4th Cir. 2014), the Court has reviewed Triad's complete Form 10-Q for the third quarter of 2006 ("2006 3Q Form 10-Q").

inflated by vague statements predicting growth." Raab, 4 F.3d at 289

(internal quotations and citations omitted).  In addition, the quoted excerpts

from the third quarter report for 2006 do not alter the total mix of

information available to the public when compared to the complete third

quarter report. See 2006 3Q Form 10-Q (discussing, among other things,

loss reserves, forward-looking statements, profitability factors, growth in

insurance in force, pay option ARMs, factors affecting Modified Pool

insurance, risk characteristics, effect of interest rates on persistency, captive

reinsurance, net losses and loss adjustment expenses, credit risk, liquidity,

statutory surplus and reserves, risks and uncertainties affecting future plans,

expectations, and performance).  Plaintiff also attempts to argue that the

Sarbanes-Oxley certifications are false and misleading by grouping them

together with the statements in paragraphs 80-84 and 87-89, "which

touted, among other things, the Company's loan portfolio, credit quality, and

pricing objectives[.]" (SAC ¶¶ 88-89, 91.)  This argument fails because

Plaintiff has not alleged that the material facts were false.

3.

a.

Plaintiff next alleges that, on January 25, 2007, Triad issued a press release in which Triad reported a decrease in its net income and diluted earnings per share, and the effects of its realized investment losses. (Id. ¶ 93.)  Tonnesen reported an on-target increase in defaults and the number of paid claims, a "significant[]" increase in the average cost per paid claim, the "impact of the slowing housing market" on "mitigation efforts," "[a] larger percentage of . . . claims paid . . . [that] were full option settlements, [which] caus[ed] the average severity on both Primary and Modified Pool business to increase . . .," the necessity "to adjust the severity factors" used in "reserving methodology" which increased reserves and incurred losses, and an "increase in severity factors [which] was the major driver of the $24.2 million increase in reserves during the quarter, although a portion of the increase was attributable to changes in . . . frequency factors and the natural growth and seasoning of [the] portfolio." (Id. ¶ 93 p.47.)  Tonnesen also reported "a 28% increase in insurance in force from the end of 2005," a 29% increase in earned premiums for the fourth quarter, a 25% increase in earned premiums for the full year, an increase of "only 5% during 2006"

of "reserved default counts," and a drop in the "expense ratio from the fourth quarter . . . to 22.8% . . . primarily the result of the increase in written premiums." (Id. ¶ 93 p.47-48.)  Triad allegedly attached an exhibit to the press release which reported, among other things, a 29% premium growth, an increase in year-end reserves of "just 5%[,]" and "default counts [which] showed a moderate increase."  (Id. ¶ 95.)  These are the only allegations of material fact in the press release, and Plaintiff does not allege that these facts are false.

On the same day, Tonnesen and Jones participated in a conference call with various securities analysts. (Id. ¶ 96.)  Tonnesen is alleged to have said, "roughly $5.8 million [of the reserve change] is associated with normal change in the default inventory[,] . . . roughly $4.9 million has to do with the changing expectations and model refinements on frequency[,] . . . [and] $12.6 million, [sic] is a function of the new trends in severity, which became apparent only this quarter[;]" "year-end reserve defaults are up just 5%[;]" and "normal changes in the default inventory added $5.8 million to the reserve" in the fourth quarter. (Id. ¶ 96 p.49.)  Tonnesen also allegedly reported an increase of 28% in the insurance in force, "growth in the modified pool line[,]" "moderate increases" in defaults, and the "highest ever

flow market share at 7.7%." (Id. ¶ 96 p.50, 51.)  He also said that Triad

"exited 2006 with a higher credit quality portfolio in terms of FICO scores

than we had at the beginning of the year." (Id. ¶ 96 p.50.)  These are the

only material factual statements allegedly made in the conference call, and

Plaintiff has not alleged these facts are false.

Triad allegedly reported a risk-to-capital ratio of 12.5:1 as of

December 31, 2006. (Id. ¶ 94.)  However, not only has Plaintiff not alleged

that this ratio was false, but it alleged the ratio as a fact among its

substantive allegations. (Id. ¶ 56 ("Indeed, although Triad's risk-to-capital

ratio was 12.5-to-1 at December 31, 2006, by the end of the Class Period,

the ratio ballooned to 20.5-to-1 . . . .").)

The remainder of the alleged statements on January 25, 2007, are

inactionable puffery (e.g., id. ¶ 93 p.47 ("***Our fundamentals remain***

***strong***."); see also id. at ¶ 93, ¶ 95, ¶ 96 p.49-53), or otherwise immaterial

or forward-looking cautions (e.g., id. ¶ 96 p.50 ("[W]e expect total earned

premium growth to slow somewhat in 2007[,] . . . the total number of loans

in default in both our primary and modified pool business to trend upward[,]

. . . [and] that overall severity will continue to trend upward."); see also id. ¶

96 p.50, 51).  Furthermore, in light of Triad's filing of its Form 10-Q for the

third quarter of 2006 on November 9, 2006, these statements are not

actionable because they do not alter the total mix of information available to

the public. See 2006 3Q Form 10-Q (discussing, among other things, loss

reserves, forward-looking statements, factors affecting profitability, effect of

growth of insurance in force, pay option ARMs, factors affecting the

Modified Pool insurance, captive reinsurance, persistency, net losses and

loss adjustment expense, factors affecting reserves, credit risk management,

liquidity and capital resources, statutory surplus and statutory contingency

reserve, and various risks and uncertainties that can affect future plans,

expectations, and performance).

b.

Plaintiff also alleges that Triad's annual report for the fiscal year 2006

filed with the SEC on March 7, 2007, "reaffirmed the financial results and

statements announced in the [January 25, 2007,] press release" and

contained additional false statements.[13] (SAC ¶ 102.) Unlike other alleged

statements that Plaintiff quotes, most of the statements that Plaintiff quotes

from the Form 10-K are material and factual. For example, Plaintiff alleges

_____

[13] The Court has taken judicial notice of the complete Form 10-K for the
fiscal year 2006 ("2006 Form 10-K"). See supra n.12.

that Triad stated, "Through the structured bulk channel, we participate in bids for structured bulk transactions that meet our loan quality and pricing criteria," and "[W]e have expanded the risk characteristics that we pursue in both the Primary and Modified Pool marketplaces . . . ." (Id. ¶ 102 p.55, 56; see also id. ¶ 102 p.55-56 bullet pts. 3 & 5.)  However, Plaintiff has not alleged that these facts are false.

Plaintiff also quotes statements of puffery (see id. ¶ 102 p.55, 56 bullet pts. 2, 4, 7) that are immaterial and forward-looking statements (see id. ¶ 102 p.56 bullet pt. 6) that are surrounded by meaningful cautionary language throughout the Form 10-K.  Furthermore, the selected passages from the Form 10-K do not alter the total mix of information available to the public when the entire Form 10-K is reviewed. See 2006 Form 10-K (discussing, among other things, premium rates, risk management, underwriting process, reinsurance, loss reserves and reserves for losses and loss adjustment expenses, direct risk in force, regulation, risk factors, forward-looking statements, factors affecting profitability, insurance in force, risk in force, persistency, paid claims, severity, liquidity and capital resources, statutory surplus and statutory contingency reserve, and various risks and uncertainties relevant to future plans, expectations, and

performance).  In sum, the statements that Plaintiff has quoted from the Form 10-K are not actionable.

4.

a.

Next, Plaintiff alleges that statements made in Triad's April 26, 2007, press release are materially false and misleading or omitted material facts. Triad reported its net income, diluted earnings per share, effect of realized investment gains, growth in insurance in force, top line growth in earned premiums, building of reserves, and quarterly loss ratio. (SAC ¶ 108 p.59-60.)  Plaintiff has not alleged that these material facts, the only such facts in the quoted press release excerpt, are false.

Plaintiff has also alleged that Tonnesen and Jones made materially false statements or omitted material facts during a conference call with various securities analysts the same day. (Id. ¶ 110.)  The only alleged material factual statements are those by Jones reporting Triad's increase in primary and modified pool insurance in force, structured transaction volume, decrease in seed rate, increase in average basis points, increase in earned premiums, percentage of portfolio attributed to pay option ARMs, and debt-to-capital ratio, (id. ¶ 110 p.60, 62), and by Tonnesen reporting that Triad's

39

flow production was the strongest since 2003, (id. ¶ 110 p.61).  Plaintiff

has not alleged these facts are false.

Plaintiff has alleged that Triad reported a risk-to-capital ratio of 13.8:1

as of March 31, 2007.  For the same reasons as explained above, supra at

30-31, this statement is not actionable.

The remainder of the statements made on April 26, 2007, are

inactionable puffery, cautionary, or forward-looking statements.  For

example, Tonnesen allegedly stated, "***Changes in the market place . . . have***

***favored our business.  We view this as an opportunity for Triad***." (SAC ¶

108 p.59; see also id. ¶ 108 p.59, 60, ¶ 110 p.60-62.)  Among the alleged

cautionary statements is Tonnesen's warning, "That said, it remains difficult

navigating through unsettled times . . . [,]" and "***These products continue to***

***perform as expected but require our ongoing diligent review as they season***

***further***." (Id. ¶ 108 p.59, 60; see also id.)  As noted earlier with similar

alleged cautionary statements, it would seem strange if these statements

were actionable under securities law when they inform the public of

difficulties and challenges in the mortgage insurance industry, particularly

with respect to Triad's portfolio of business.  Forward-looking statements

tinged with puffery include, among others, "[W]e continue to see strong

40

growth in the Alt-A segments and in mortgages with the potential for negative amortization, primarily pay option ARMs." (Id. ¶ 110 p.60; see also id. ¶ 110 p.61, 62.) In addition, Jones made a forward-looking statement that Triad was "looking at putting on a committed credit facility in the $75 million to $100 million range to give us some additional flexibility to continue to pursue the business opportunities that we see in the market now." (Id. ¶ 110 p.62.) Indeed, Triad would report in its second quarter reporter for 2007,[14] that on June 28, 2007, Triad "entered into a three-year $80.0 million revolving unsecured credit facility with three domestic banks to provide short term liquidity for insurance operations and general corporate purposes." 2007 2Q Form 10-Q at 7, 35. Plaintiff does not allege that Triad did not enter into such an agreement. Moreover, in light of the publicly available information from, for example, Triad's 2006 annual report, these statements do not alter the total mix of information.

b.

Plaintiff alleges that Triad's quarterly report for the first quarter of fiscal year 2007 filed with the SEC on May 9, 2007, "reaffirmed the

---

[14] The Court has taken judicial notice of the complete second quarter Form 10-Q ("2007 2Q Form 10-Q"). See supra n.12.

financial results and statements announced in the press release" and made

two false statements. (SAC ¶ 116.)  The only material factual statement

that Plaintiff includes in its excerpts reports that "the number of Modified

Pool defaults subject to deductibles and those without deductibles increased

. . . ." (Id.)  However, Plaintiff does not allege that that fact is false.  The

other statement is mere inactionable puffery.  Furthermore, when combined

with the information presented in the complete Form 10-Q for the first

quarter of 2007,[15] these selected statements do not alter the total mix of

information available to the public. See 2007 1Q Form 10-Q (discussing,

among other things, statutory requirements, loss reserves, forward-looking

statements, profitability factors, earned premiums, growth in insurance in

force, trends in production, risk in force, indicators of possible increased

risk, seasonality of portfolio, captive reinsurance, net losses and loss

adjustment expenses, severity, loss reserve model, credit risk, various risks

and uncertainties related to future plans, expectations, and performance,

and no material change in market risk exposure since 2006 Form 10-K).

---

[15] The Court has taken judicial notice of the complete Form 10-Q for the first
quarter of 2007 ("2007 1Q Form 10-Q"). See supra n.12.

Plaintiff also attempts to argue that the Sarbanes-Oxley certifications are false and misleading by grouping them together with the statements in paragraphs 116 and 117, "which touted, among other things, the success of the Company's Modified Pool portfolio and risk management strategies." (SAC ¶¶ 117, 119.)  This argument fails because Plaintiff has not alleged that the material facts are false.

5.

a.

Plaintiff also alleges that statements made in Triad's July 25, 2007, press release were materially false and misleading or omitted material facts. Triad allegedly reported its net income, diluted earnings per share, effect of realized investment gains, total insurance in force, and new insurance written. (Id. ¶ 121 p.67-68.)  These are the only material factual statements in the press release, and Plaintiff does not allege that these facts are false.

Plaintiff alleges statements that Tonnesen and Jones made to securities analysts during a conference call on the same day were also materially false and misleading or omitted material facts. (Id. ¶ 123.) Tonnesen allegedly reported Triad's risk-to-capital ratio, growth in insurance in force, high loan-to-value lending, decline in pay option ARMs, reduction in

live bids in the structured bulk market, trading of stock below book value, raising of $80 million, and customer's FICO scores. (Id. ¶ 123 p.68-71.) Jones allegedly stated that "the pay-option ARM product line right now is performing better on a vintage-to-vintage basis than the rest of the product. ***That is as it pertains to our most recent pay-option ARM business***[.]" (Id. ¶ 123 p.72.) He also reported that the pay-option ARMs in 2004 and 2005 were not performing as well. (Id.) These are the only statements of material fact made during the conference call, and Plaintiff has not alleged that these facts are false.

The remainder of statements made on July 25, 2007, are statements of puffery, cautionary forward-looking statements, or otherwise immaterial statements, none of which is actionable. (See id. ¶ 121 p.67, ¶ 123 p.68-72.) Moreover, they do not alter the total mix of information available to the public at the time, which included the 2006 annual report and the 2007 first quarter report.

b.

Plaintiff also alleges that Triad made false and misleading statements in its quarterly report for the second quarter of fiscal year 2007 filed with the SEC on August 9, 2007. (Id. ¶ 130.) Plaintiff alleges that the Form 10-

Q[16] "reaffirmed the financial results and statements announced in the [July 25, 2007] press release" and made two additional false statements. (Id.) The only material factual statement quoted is "the number of Modified Pool defaults subject to deductibles and those without deductibles increased at June 30, 2007 from June 30, 2006[,]" but Plaintiff does not allege that fact is false. The remaining statements are inactionable puffery. In addition, when compared to the complete Form 10-Q for the second quarter of 2007, the quoted statements do not alter the total mix of information available to the public. See 2007 2Q Form 10-Q (discussing, among other things, statutory capital, surplus, and contingency reserves, loss reserves, the $80 million credit facility, forward-looking statements, profitability factors, loans in default, new insurance written, factors affecting structured bulk transactions, loan-to-value risk, indicators of possible increased risk, risk in force, seasonality of portfolio, net losses and loss adjustment expenses, mitigation efforts, severity, growth in insurance in force, reserve model, various risks and uncertainties related to future plans, expectations, and

---

[16] Plaintiff mistakenly alleges in paragraph 130 that Triad made false and misleading statements in its "2007 first quarter 10-Q." (Emphasis added.) However, the context of the paragraph supports the conclusion that Plaintiff meant to refer to the second quarter Form 10-Q, as it does elsewhere in paragraph 130 and in surrounding paragraphs.

performance, and risk factors).  Plaintiff also alleges that Tonnesen and Jones made materially false statements or omitted material facts when they signed Sarbanes-Oxley certifications "which, [along with statements contained in paragraphs 130 and 131], touted, among other things, the success of the Company's Modified Pool portfolio and risk management strategies," (SAC ¶ 131, 133), but those statements are not actionable because Plaintiff has not alleged that material facts are false.

6.

Plaintiff also alleges that Defendants made materially false statements or omissions in their August 31, 2007, press release, just days after Triad announced that it had drawn the $80 million principal amount of the credit facility. (Id. ¶¶ 135, 140.)  In addition to reporting a decline in stock price, Tonnesen allegedly stated, "***The decision to draw down these funds was made by the Board of Directors at a regularly scheduled Board meeting and not in response to any liquidity issues.  In fact, at June 30, 2007, we had $26.7 million cash on hand and a very liquid portfolio of municipal and corporate bonds at our disposal.  These bonds, totaling $618 million, of which $592 million are municipal bonds, have an average credit quality at the AAA level***." (Id. ¶ 140.)  He also allegedly reported that the proceeds of

the loan were with the holding company and were invested in short-term instruments. (Id.) Plaintiff does not allege that these material facts are false. The remainder of Tonnesen's alleged statements are inactionable puffery. (Id.)

### 7.

#### a.

Next, Plaintiff alleges that Defendants made materially false statements or omissions in an October 24, 2007, press release in which Triad reported its net loss, diluted loss per share, the effect of realized investment gains, net of taxes, total insurance in force, new insurance written, and "*no Modified Pool transactions in the third quarter of 2007* . . . ." (Id. ¶ 143 p.82.)  Plaintiff does not allege these material facts are false.  Plaintiff also alleges that Tonnesen and Jones made false statements during a conference call with securities analysts the following day. (Id. ¶¶ 146-47.)  Tonnesen allegedly reported that Triad had "*ceased originating*" "*primary bulk product*" which accounted for 13% of Triad's total portfolio, that early payment default trends were of significant focus, that the portfolio consisted of 68% 100%-LTV, and that Triad had $600 million plus of hard capital, $100 million of excess of loss coverage, and $185 million of current

47

captive balances. (Id. ¶ 146 p.83-84, 85; ¶ 147 p.86.)  Jones allegedly

reported that "[o]n a risk adjusted basis, we were well in excess of AAA

risk-to-capital ratio using standard in force risk adjusted capital model[,]"

that the supplemental information contained components of Triad's capital

position, that Triad had drawn down its $80 million credit facility, and that it

had $100 million of liquidity in the holding company. (Id. ¶ 146 p.83.)

Plaintiff has not alleged these material facts are false.

Plaintiff has alleged that Triad reported its risk-to-capital ratio of

17.8:1 as of September 30, 2007, (id. ¶ 144), but Plaintiff has failed to

allege that the ratio itself is false, even though Plaintiff believes that the

variables used to determine the ratio underestimate Triad's true risk. See

supra at 30-31.  The remainder of the statements in the press release and

conference call are inactionable puffery or cautionary statements. (SAC ¶

143 p.82-83; ¶ 146 p.83-87.)

b.

Plaintiff also alleges that Triad made materially false statements or

omissions in its quarterly report for the third quarter of fiscal year 2007 on

Form 10-Q, filed with the SEC on November 9, 2007.[17] (Id. ¶ 152.)  Plaintiff

alleges that Triad "reaffirmed the financial results and statements announced

in the [October 24, 2007] press release" and made one additional false

statement. (Id.)  However, the statement alleged to have been false is

nothing more than a statement of puffery and is, therefore, not actionable.

Furthermore, when compared to the complete third quarter report, the

excerpted statements do not alter the total mix of information available to

the public. See 2007 3Q Form 10-Q (discussing, among other things,

statutory capital, surplus, and contingency reserve, loss reserves, the draw-

down of the $80 million credit facility, forward-looking statements,

profitability factors, losses and loss adjustment expenses, mortgage

originations in market, reduced volume, trend in new insurance written,

factors affecting structured bulk transactions, credit quality, loan type, and

loan-to-value of new insurance written, indicators of increased risk, risk in

force, seasonality of portfolio, mitigation, various risks and uncertainties

related to future plans, expectations, and performance, and risk factors).  In

addition, as with Triad's previous Sarbanes-Oxley certifications, Plaintiff also

---

[17] The Court has taken judicial notice of the complete Form 10-Q for the
third quarter of 2007 ("2007 3Q Form 10-Q"). See supra n.12.

alleges they were materially false and misleading or omitted material facts because, along with statements in paragraph 152, they "touted, among other things, the success of the Company's Modified Pool portfolio and risk management strategies[.]" (Id. ¶ 153, 155.) However, Plaintiff has not alleged material facts are false.

8.

Next, Plaintiff alleges that Triad made materially false and misleading statements or omissions in its February 13, 2008, press release. (SAC ¶ 157.) Triad allegedly reported its net loss, diluted loss per share, and effect of realized investment losses. (Id.) Tonnesen allegedly explained that Triad's new guidelines addressing loan-to-value limitations, credit scores, and loan documentation led to reduced fourth quarter production. (Id.) Plaintiff has not alleged that these material facts, the only ones in the press release, are false. The remaining statements in the press release are either inactionable puffery (e.g., "[W]e took a leadership role in our industry . . . ."), cautions ("[A]t this time, we can give no assurance that we will be able to successfully implement our plan."), or cautionary forward-looking statements ("Our new guidelines . . . are expected to further limit production in 2008."). (Id.)

Plaintiff also alleges that Tonnesen made false statements to securities analysts during a conference call on February 14, 2008. (Id. ¶ 159.) Tonnesen is alleged to have said that "during the fourth quarter, we implemented tighter underwriting guidelines [for] loan-to-value limitations, credit scores and loan documentation and also incorporate [sic] volume limitations in distressed markets," "we have eliminated products and programs that present high volatility," "fourth quarter production . . . fell . . . [,]" and "[w]e have also established at the Board level a special committee to review financing and capital-raising alternatives." (Id. ¶ 159 p.92, 93.) These are the only statements of material fact made during the conference call, and Plaintiff does not allege the facts are false. The remainder of the statements are inactionable puffery (e.g., "*. . . we believe that these guidelines will go a long way toward ensuring a long-term quality portfolio . . .*") or forward-looking cautionary statements (e.g., "[T]he short-term consequence will be to restrict our over-all volume of business."). (Id. ¶ 159 p.92; see also id. ¶ 159 p.92-94.)

Plaintiff also alleges that Triad reported a risk-to-capital ratio of 20.5:1 as of December 31, 2007. (Id. ¶ 158.) Just as before, Plaintiff has not

alleged that the ratio is false, even though it believes that the information used to calculate that ratio underestimates Triad's risk. See supra at 30-31.

9.

In addition, not only has Plaintiff failed to allege sufficiently that Defendants made materially false and misleading statements or omitted material facts to make such statements not false or misleading, but its allegations explaining why the statements are materially false and misleading also fall short.  As it must, Plaintiff has alleged reasons why the statements are materially false and misleading or omitted material facts to make such statements not false or misleading. See 15 U.S.C. § 78u-4(b)(1).  However, nearly all of the alleged reasons why the statements are materially false and misleading or omitted material facts are born of information from confidential sources. (See SAC ¶ 91(a)-(f), (h); ¶ 100(a)-(h); ¶ 114(a)-(c), (e)-(g); ¶ 119(a)-(d), (f); ¶ 128(a)-(g), (i)-(j); ¶ 133(a)-(c), (e)-(f); ¶ 142(a)-(b), (d)-(f); ¶ 150(a)-(c), (e)-(f); ¶ 155(a)-(d), (f); ¶ 161(a)-(c), (e)-(f).)  As detailed above, for most of the confidential sources, Plaintiff has not sufficiently pled facts to support the probability that the source would have personal knowledge of the information.  Other reasons why Plaintiff alleges the statements are materially false and misleading include "Triad's credit quality was not 'very

encouraging'," quoting from Tonnesen's statement in the October 26, 2006, press release. (Id. ¶ 91(g).) Plaintiff cites to paragraphs 54 through 56 for support, but those paragraphs merely argue that Triad's risk-to-capital ratios and statutory contingency reserve underestimated its risk, even though Plaintiff does not allege those reported figures were actually false. (See ¶¶ 54-56.) This explanation provides no support for Plaintiff's allegation as to why Tonnesen's statement would have been false and misleading, even if the Court had found such a statement materially factual, which it did not. The other reasons Plaintiff gives to explain why statements are materially false and misleading or omitted material facts are similarly infirm.

In sum, Plaintiff has not sufficiently pled false statements or omissions of material fact and has not sufficiently pled the reasons why the alleged statements were materially false and misleading.

C.

The final element of Plaintiff's securities fraud claim that Defendants challenge is loss causation. Unlike the PSLRA's heightened pleading standard for alleging materially false and misleading statements and scienter, the PSLRA does not "impose[] a more stringent pleading requirement" for loss causation. Teachers' Ret. Sys. of La., 477 F.3d at 185 (noting, though, that

the PSLRA "does explicitly state that a plaintiff must prove loss causation in that the defendants' material misrepresentations or omissions caused the drop in the stock's value"). Nevertheless, a plaintiff must allege "with sufficient specificity to enable the court to evaluate whether the necessary causal link exists" that the defendant's misrepresentations and omissions proximately caused the plaintiff's economic loss. Id. at 185-86. A plaintiff is not required to allege that the fraud was the sole cause of a security's decline, but he must show that the alleged fraud was "one substantial cause of the investment's decline in value." Katyle, 637 F.3d at 472. The challenge for a plaintiff comes "'when the plaintiff's loss coincides with a marketwide phenomenon causing comparable losses to other investors[.]'" Id. at 471 (quoting Lentell v. Merrill Lynch & Co., 396 F.3d 161, 174 (2d Cir. 2005)). Similarly, the claim will fail if the plaintiff "has not adequately pled facts which, if proven, would show that its loss was caused by the alleged misstatements [or omissions] as opposed to intervening events." Id. In addition, while a plaintiff may frame its loss causation argument around corrective disclosures, in this case, Plaintiff has alleged that a previously concealed risk materialized,[18] causing its loss.

---

[18] There are periodic references in the Complaint that suggest Plaintiff may have been alleging loss causation based on corrective disclosures; however, the bulk of allegations sound in materialization of risk.

Teachers' Ret. Sys. of La., 477 F.3d at 187 n.3; SAC § VI.  The Court finds

that Plaintiff has sufficiently pled loss causation.

Plaintiff alleges that "Defendants' fraudulent scheme artificially inflated

Triad's stock price by failing to disclose" a number of things. (SAC ¶ 188.)

Alleging artificially inflated stock price "will not itself constitute or

proximately cause the relevant economic loss." Dura Pharm, Inc., 544 U.S.

at 342-43 (explaining why allegation of inflated purchase price is

insufficient).  However, unlike the plaintiff in Dura Pharmaceuticals, Inc.,

Plaintiff does much more than merely allege that it "paid artificially inflated

prices for [Triad] securities and . . . suffered damage[s] thereby." Id. at 340

(first alteration added).

Plaintiff alleges that after Triad made its revelation after the market

closed on August 27, 2007, that it had drawn down the entire $80 million

credit facility, Triad's stock fell 24% on August 28 and fell again on August

29, a combined price drop of 35.2% in two days from $25.00 on August 27

to $16.20 on August 29.[19] (SAC ¶¶ 136, 138.)  Plaintiff also alleges that

after Triad's announcement on October 24, 2007, of a net loss of $31.8

---

[19] However, allegedly, Triad's stock rebounded on September 4, 2007, to
$17.65, the trading day following Triad's "reassurances" to the market on
August 31, 2007. (SAC ¶ 141.)

million for the third quarter, the stock fell by 30.94% "on unusually high trading volume."[20] (Id. ¶ 145.)  Plaintiff alleges that as a result of Triad's revelatory 2007 annual report filed after the market closed on April 1, 2008,[21] and subsequent analyst commentary, Triad's stock fell 59% from $5.25 on April 1 to $2.15 on April 4. (Id. ¶ 166.)  After press releases in May and June 2008 reporting a first quarter net loss of $150 million, denial of its efforts to appeal suspension as an approved insurer of Freddie Mac, failure of negotiations for a capital infusion, and run-off, Triad's shares were allegedly trading at $1.22 on "extremely heavy trading volume" by June 19, 2008, down 40.5% from $2.05 on June 18. (Id. ¶¶ 168-170.)

In an effort to distinguish Triad's stock price declines during the class period from other market factors, Plaintiff alleges that it applied "well-accepted methodologies" and found that "the timing and magnitude of Triad's stock price declines negate any inference that the losses [it] suffered . . . were caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the Defendants' fraudulent

---

[20] Plaintiff alleges that while Triad's stock rebounded after this loss, it was a result of the false and misleading statements Defendants made the day before or the day of the increase in stock value. (See id. ¶¶ 149, 154, 160.)
[21] April 1, 2008, is the end of the class period.

conduct." (Id. ¶ 199.)  Allegedly, Triad's stock price on the relevant dates "reacted with a high statistical significance to [Triad's] revelations." (Id.) Plaintiff then provides comparisons by way of narration and charts of the stock price changes on the relevant dates for Triad, the Russell 2000 Index, and the Equally-Weighted Index of Returns of MGIC Investment Cop, Radian Group, and PMI Group. (See id. ¶¶ 200-205.)  Although Plaintiff does not detail the "well-accepted methodologies" or explain how their application "negate[s] any inference" that Plaintiff's losses were caused by something other than Defendants' fraud, for the pleading stage, Plaintiff has sufficiently alleged with particularity loss causation to enable the Court to determine that a necessary causal link could exist.

### D.

In conclusion, Plaintiff has not sufficiently pled scienter or materially false statements or omissions to support a claim under section 10(b) of the Securities Exchange Act.  Because Plaintiff has not sufficiently pled a violation of section 10(b), Plaintiff's claim of a violation of section 20(a) of the Securities Exchange Act also fails.  See, e.g., Katyle, 637 F.3d at 478 n.11 (affirming dismissal of section 20(a) claim because of plaintiff's failure to allege a predicate violation of section 10(b)).

IV.

For the reasons stated herein, the Court affirms the Magistrate Judge's Order (Doc. #87) striking Exhibits 8-11 to the Declaration of Robyn F. Tarnofsky, and Plaintiff's Motion to Strike (Doc. #73) is **GRANTED** and Exhibits 8-11 are ordered struck.  The Court rejects the Magistrate Judge's Recommendation (Doc. #87), and Defendants' Mark K. Tonnesen's and Kenneth W. Jones' Motion to Dismiss (Doc. #63) is **GRANTED** and the instant action is **DISMISSED WITH PREJUDICE**.

This the 30th day of March, 2015.


/s/ N. Carlton Tilley, Jr.
Senior United States District Judge